IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 12-0367 |
| DOROTHY JUNE BROWN, | : | |
| JOAN WOODS CHALKER, | : | |
| MICHAEL A. SLADE, JR., | : | |
| COURTENEY L. KNIGHT | : | |

**SURRICK, J.**                                                  **JULY  9 , 2013**

## MEMORANDUM

Presently before the Court is Defendant Joan Woods Chalker's Motion to Dismiss Wire Fraud Counts 15 through 37 (ECF No. 74) and Defendant Dorothy June Brown's Motion to Dismiss Counts 1 through 37 of the Superseding Indictment or in the Alternative, Motion to Strike the Conflict of Interest Allegations and/or Motion for a Bill of Particulars (ECF No. 75). For the following reasons, Defendants' Motions will be denied.

## I.    BACKGROUND[1]

On January 22, 2013, a federal grand jury returned a sixty-seven count Superseding Indictment against Dorothy June Brown, Joan Woods Chalker, Michael A. Slade, Jr., Courteney L. Knight, and Anthony Smoot.  (Superseding Indictment ("Indictment"), ECF No. 47.)[2]  These

---

[1] For the purposes of addressing Defendants' arguments in support of dismissing the Indictment, we must accept as true the factual allegations set forth in the Indictment.  *See United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011).

[2] On March 15, 2013, Anthony Smoot entered a guilty plea to conspiracy to obstruct justice, in violation of 18 U.S.C. § 371 (Count 53), and obstruction of justice, in violation of 18 U.S.C. § 1519 and § 2 (Count 58).  (Min. Entry, ECF No. 55.)  His sentencing is scheduled for December 3, 2013.  (ECF No. 103.)

charges arise out of an alleged scheme perpetrated by Brown to defraud three separate charter schools out of over $6.7 million.

The Indictment charges Brown with fifty-two counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1-52), one count of conspiring to obstruct justice, in violation of 18 U.S.C. § 371 (Count 53), ten counts of obstruction of justice, in violation of 18 U.S.C. § 1519 (Counts 54-59, 63, 65) and § 1512(c)(2) (Counts 61-62), and one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3) (Count 67).

Chalker is charged with twenty-five counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 15-37; Counts 51-52); one count of conspiring to obstruct justice, in violation of 18 U.S.C. § 371 (Count 53); and seven counts of obstruction of justice, in violation of 18 U.S.C. § 1519 (Counts 55-57, 65-66) and § 1512(c)(2) (Counts 61-62).

On March 18, 2013, Brown and Chalker each filed Motions to Dismiss. (Chalker's Mot., ECF No. 74; Brown's Mot., ECF No. 75.)[3] On April 22, 2013, the Government filed a response to Brown's Motion (Gov't's Resp. to Brown, ECF No. 88), and a response to Chalker's Motion (Gov't's Resp. to Chalker, ECF No. 89). On May 8, 2013, Chalker and Brown each filed a reply to the Government's Response. (Chalker's Reply, ECF No. 99; Brown's Reply, ECF No. 100.) We heard argument on these Motions on June 20, 2013. (Min. Entry, ECF No. 107.)

### A.      Agora Charter School

Counts 1 through 14 of the Indictment relate to Brown's scheme to defraud the Agora Charter School, a public cyber charter school established by Brown in Philadelphia,

---

[3] On March 18 and 19, 2013, Knight, Slade, and Brown filed motions to adopt certain motions of their co-Defendants. (ECF Nos. 67, 71, 78.) On July 3, 2013 we granted Defendants' motions, and permitted them to adopt the arguments in the various motions so long as they had standing to assert those arguments. (ECF No. 120.) Accordingly, any additional arguments raised by Chalker in her Motion to Dismiss are adopted by her co-Defendants. In addition, Brown's Motion to Dismiss has been adopted by Defendants Slade and Knight.

Pennsylvania.  (Counts 1-14.)[4]  Brown submitted her first application for Agora's charter to the Pennsylvania Department of Education ("PDE") on October 1, 2004.  (Counts 1-14 ¶ 8.)  Eventually, PDE granted a charter to the Agora Board of Trustees on June 29, 2005.  (*Id.* at ¶ 12.)  In November 2005, after PDE granted Agora's charter, Brown and "Person No. 1" formed the Cynwyd Group, LLC ("Cynwyd"), a private, educational management company.  (*Id.* at ¶¶ 2, 7, 18.)  In May 2008, Brown became the sole owner of Cynwyd.  (*Id.* at ¶ 2.)

As part of the application process, Agora was required to submit bylaws to PDE which would govern the operation of the school.  (*Id.* at ¶ 14.)  Agora's bylaws included a provision that provided that "[a]n affirmative vote of a majority of the Board of Trustees of the charter school . . . shall be used to take action on . . . [e]ntering into contracts of any kind where the amount involved exceeds $200."  (*Id.* at ¶ 16.)

The Government alleges that after the Agora charter was approved in June 2005, Brown and Person No. 1 falsely represented that the Agora Board of Trustees had entered into a management contract with Cynwyd (the "Agora-Cynwyd Contract").  (*Id.* at ¶ 19.)  The Agora-Cynwyd contract entitled Cynwyd to receive 7% of the "Qualified Gross Revenues" of Agora.

---

[4] In 1997, Pennsylvania enacted the Charter School Law enabling private individuals to establish and maintain charter schools that operate independently from the existing school district structure.  (Counts 1-14 ¶ 4.)  The schools must be organized as public, not-for-profit corporations.  (*Id.* at ¶ 5.)  Charter schools are funded with public school funds from the students' districts of residence.  (*Id.* at ¶ 6.)  Under 24 P.S. §§ 17-1716-A(a) and 17-1749-A(a)(1) of the Charter School Law, the charter school's Board of Trustees is vested with the authority to decide matters related to the operation of the charter school.  (*Id.* at ¶ 7.)

In June 2002, the Charter School Law was amended to allow individuals to establish "cyber" charter schools.  (*Id.* at ¶ 5.)  A cyber charter school uses technology, including the Internet, in order to provide a significant portion of its curriculum, and to deliver a significant portion of instruction to its students.  (*Id.* at ¶ 1.)

(*Id.* at ¶ 19.)[5]  In reality, the Board never held a vote to approve the Agora-Cynwyd Contract. (Counts 1-14 ¶ 19.)

In order to perpetuate the fraud, Brown and others created a variety of fraudulent documents to make it appear as if the Agora Board had voted to enter into the Agora-Cynwyd Contract.  (*Id.* at ¶ 20.)  One of those fraudulent documents included a signed management contract entered into between Agora and Cynwyd dated May 10, 2006, signed on behalf of Cynwyd by Brown and Person No. 1.  (*Id.*)  The Government alleges that Anthony Smoot forged the signature of Smoot's cousin, Person No. 6, in order to make it appear that Person No. 6 had signed the Agora-Cynwyd Contract on behalf of Agora's Board.  (*Id.*)[6]  In addition, Brown caused the forgery of Smoot's sister, Person No. 7, in order to make it appear as though Person No. 7 had signed the Agora-Cynwyd Contract on behalf of the Agora Board of Trustees. (Counts 1-14 ¶ 20.)  Brown purportedly directed others to fabricate Board minutes and Board resolutions to create the impression that the Board had discussed and voted upon entering into the Agora-Cynwyd Contract, when in fact it had not.  (*Id.*)

Agora's bylaws also contained conflict-of-interest provisions, which provided that:

No Trustee shall as a private person engage in any business transaction with the charter school of which he or she is a Trustee, be employed in any capacity by the charter school of which he or she is a Trustee, or receive from such charter school any pay for services rendered to the charter school.

(*Id.* at ¶ 15.)

---

[5] The Agora-Cynwyd Contract provided that Cynwyd would act as Agora's manager, and would supervise, direct, and control the day-to-day business activities, management, and operation of Agora.  (Counts 1-14 ¶ 26.)  In addition, Cynwyd would provide accounting services, staffing, teacher training, and maintenance of Agora's books and records.  (*Id.*)

[6] Smoot was the business manager for other charter schools founded by Brown.  (Counts 15-37 ¶ 8.)

In order to circumvent the conflict-of-interest provisions, Brown ordered the creation of false Board meeting minutes, which represented that in July 2005, Brown had stepped down from her leadership position with Agora.  (*Id.* at ¶ 23.)  Brown also ordered the fabrication of Board minutes, which made it appear as though Agora's affairs were being managed and conducted by an independent Board of Trustees.  (*Id.* at ¶¶ 23-24.)  As part of this scheme, Brown asked Person No. 5, an employee of another charter school founded and controlled by Brown, to serve as the President of the Agora Board of Trustees.  (*Id.* at ¶ 24(a).)  In reality, Person No. 5 was not a member of the Board, let alone the President.  Brown also created false Board minutes indicating that Person Nos. 8, 9, 10, and 11 were members of the Agora Board when in fact these individuals were not Board members.  Brown asked Person No. 13 to serve as Agora's Chief Executive Officer, but in reality Person No. 13 served in name only, having no actual responsibilities and receiving no compensation.  (*Id.* at ¶ 24(d).)

On May 11, 2006, Brown, on behalf of Cynwyd, entered into another management contract with K12 Pennsylvania, LLC ("K12") ( the "Cynwyd-K12 Contract").  (*Id.* at ¶ 27.) According to this Contact, K12 was to "perform all business aspects and day-to-day management" of Agora.  (*Id.*)  Cynwyd agreed that K12 would receive 15% of Agora's "Qualified Gross Revenues."  (*Id.*)  The Government claims that after execution of the Cynwyd-K12 Contract, Brown and Cynwyd provided little to no services to Agora, but continued to collect millions of dollars in management fees, depriving Agora and its students of the use of these funds for educational purposes.  (*Id.* at ¶ 29.)  Between December 2007 and February 2008, the Government alleges that Brown submitted invoices to K12 causing Agora to pay approximately $2,637,073 to Cynwyd in fraudulent management fee payments.  (*Id.* at ¶ 30.)

Eventually, in the Spring of 2009, PDE conducted an audit of Agora as a result of complaints from parents of Agora students.  (*Id.* at ¶ 31.)  PDE advised Agora that it would no longer fund Agora.  On June 22, 2009, the PDE issued a notice of revocation of Agora's charter, alleging that Agora's payments to Brown and Cynwyd created conflict-of-interest issues, and that there was no clear and credible evidence that Cynwyd rendered any services to Agora.  (*Id.*)  As a result of the notice of revocation, and to prevent PDE and K12 from stopping payments to Cynwyd, Brown and Cynwyd filed a federal lawsuit in this District (hereinafter the "Cynwyd Litigation").  (*Id.*)  The Government alleges that as a part of that suit, Brown and Cynwyd falsely claimed that the Agora Board of Trustees had considered and voted on the Agora-Cynwyd Contract at a special Board meeting on May 6, 2006, when in fact no such vote had occurred. (*Id.*)  The Government claims that on October 20, 2009, based on Brown's false representations regarding the Agora-Cynwyd Contract, the parties agreed to a settlement, with K12 and PDE agreeing to pay Cynwyd $3,000,000 for management fees arising out of the Cynwyd-Agora Contract.  (*Id.* at ¶ 32.)  After the settlement, Brown and Cynwyd ceased contact with Agora. (*Id.* at ¶ 33.)  All told, the Government alleges that from December 2007 through October 2009, Cynwyd received approximately $5,637,073 in fraudulent management fees.  (*Id.* at ¶ 18.)

### B.     Planet Abacus Charter School

Counts 15 through 37 of the Indictment charge Chalker and her co-Defendant Brown with wire fraud in connection with a scheme to defraud Planet Abacus and the School District of Philadelphia.  (Counts 15-37 ¶ 25.)  As part of that scheme, Brown and Chalker, allegedly caused "Planet Abacus to make approximately $705,561.62 in fraudulent payments" to Brown, and a private educational management company operated by Brown.  (*Id*. at ¶ 26.)

Planet Abacus was a charter school founded by Defendant Brown on July 1, 2007 in Philadelphia. (*Id.* at ¶¶ 19, 22.)[7] At Brown's request, Chalker served as the Chief Executive Officer of Planet Abacus. (Counts 15-37 ¶ 22.) The Planet Abacus bylaws provided that the Board of Directors "shall have full power to conduct, manage and direct the business and affairs of [Planet Abacus] and all powers of [Planet Abacus] are hereby granted to and vested in the Board of Directors." (*Id.* at ¶ 23.)[8] The bylaws further provided that "no Director shall maintain substantial personal or business interests which conflict or which may be seen as conflicting with those of [Planet Abacus]." (Counts 15-37 at ¶ 24.)[9] The Planet Abacus charter also required that the school maintain certain records on site at the Planet Abacus facility for inspection by the School District. (Counts 15-37 ¶ 30.) These records included Planet Abacus Board meeting minutes. (*Id.*)

In June 2007, Brown established AcademicQuest, LLC ("AcademicQuest"), an educational management organization. (*Id.* at ¶ 26.) Brown was the sole owner of AcademicQuest. (*Id.*) After approval of the Planet Abacus charter, the Government alleges that Brown falsely represented that the Planet Abacus Board of Directors had entered into a

---

[7] The application for the Planet Abacus charter was submitted in June 2005 by Brown to the School District of Philadelphia ( the "School District"). (Counts 15-37 ¶ 16.) At that time, the School District was governed by a five-member School Reform Commission ("SRC"), which approved applications for the creation of charter schools in Philadelphia. (*Id.*)

[8] The Government uses the terms Board of Directors and Board of Trustees interchangeably when referring to Planet Abacus's governing body. For the sake of consistency, we will use the term Board of Directors.

[9] In addition to these conflict-of-interest provisions, Philadelphia's Charter School Law was amended in July 2008 to prohibit a charter school administrator from receiving "compensation from another charter school or from a company that provides management or other services to another charter school." (Counts 15-37 ¶ 12.) "Administrator" is defined as "the chief executive officer of a charter school and all other employees of a charter school who by virtue of their positions exercise management or operation oversight responsibilities." (*Id.*)

management contract with AcademicQuest when in fact the Board had never voted on the contract. (*Id.* at ¶ 27.) The management contract entitled AcademicQuest to 15% of the "Qualified Gross Revenues" of Planet Abacus and an additional 2% of "Qualified Gross Revenues" if a percentage of the students' test scores increased by a certain amount. (*Id.*) The Government alleges that rather than diverting significant resources or funds from her private company, AcademicQuest, Brown directed employees of the other schools she controlled to provide services to Planet Abacus. (*Id.* at ¶ 36.)

Brown and others created two fraudulent management contracts between AcademicQuest and Planet Abacus, both dated March 5, 2007. (*Id.* at ¶ 28.) The first management contract was executed by Brown, on behalf of AcademicQuest, and Person No. 17, an individual purportedly serving as the President of the Planet Abacus Board as of the date of the Contract. (*Id.*) Brown's personal secretary, Person No. 12, was a witness to the execution of the Contract. (*Id.*) Brown and Person No. 17 executed a second management contract with Smoot signing as a witness. (*Id.*) Person No. 17 was not a member of the Planet Abacus Board, let alone its President, when he executed the management contracts. (*Id.*)

In addition, Brown caused the creation of falsified Board meeting minutes to make it seem as though the Planet Abacus Board had approved a management contract between Planet Abacus and AcademicQuest at a March 5, 2007 Board meeting. (*Id.* at ¶ 31.) The fabricated Board minutes listed Persons Nos. 7, 13, 17, 18, 19, and 20 as present at the March 5, 2007 meeting, and the meeting minutes indicate that these individuals all voted to approve the contract. (*Id.*) In reality, there was no Board managing the affairs of Planet Abacus at the time the AcademicQuest contracts were executed, the Board meeting never took place, and the Contracts were never voted on. (*Id.* at ¶¶ 29, 31.)

The Government alleges that the conflict-of-interest provisions of Planet Abacus's charter and bylaws prohibited Board members from receiving "management fee" payments while serving on the Board. (*Id.* at ¶ 29.) The charter also forbade Board members from conducting business with their immediate family. (*Id.*) In order to bypass these prohibitions, Brown made it appear as though she was not a Board member. (*Id.*) The Government alleges that in reality, there was no Board managing the affairs of Planet Abacus in February 2007, nor when the AcademicQuest management contracts were executed. (*Id.*) Rather, Brown managed and directed the affairs of Planet Abacus during that time. (*Id.*) In fact, Brown and Chalker caused the creation of false Board meeting minutes and false Board resolutions to make it appear as though an independent Planet Abacus Board had held meetings and conducted business without Brown's involvement. (*Id.* at ¶ 30.)

The Planet Abacus charter also provided that prior to entering into a management contract, the Planet Abacus Board was required to submit the proposed contract to the School District for review and comment. (*Id.* at ¶ 37.) In July 2009, during an audit of Planet Abacus's first year of operation, Brown was informed that the AcademicQuest contract potentially violated the Planet Abacus charter because the Board had failed to submit it to the School District. (*Id.* at ¶ 38.)[10] In order to conceal this potential violation, Brown, Chalker, and others created falsified contracts, falsified Board meeting minutes and resolutions, and other documents to make it appear as though the AcademicQuest management contract was actually a consulting contract, and thus would need no School District approval. (Counts 15-37 ¶ 38.)

One of these falsified documents was a consulting contract between Planet Abacus and AcademicQuest dated March 5, 2007. (*Id.* at ¶ 39.) Person No. 17 signed the contract as the

---

[10] The audit was performed pursuant to the requirements of the Charter School Law and the Planet Abacus charter. (Counts 15-37 ¶ 38.)

Planet Abacus President, Brown signed on behalf of AcademicQuest, and Chalker forged the signature of a witness to the contract, Person No. 23. (*Id.*) Person No. 19 forged the signature of her aunt, Person No. 22, as a witness to Brown's execution of the contract. (*Id.*) Neither Person No. 22 nor 23 had given permission for their names to be signed by others, and in fact Person No. 22 was deceased as of the date of the contract. (*Id.*) Brown, Knight, and others also fabricated at least two additional versions of backdated "consulting contracts" between Planet Abacus and AcademicQuest. (*Id.* at ¶ 40.) In August 2009, Brown falsified Board meeting minutes to make it appear as though the Planet Abacus Board had held a special meeting on March 16, 2007 for the purpose of approving a "consulting contract" with AcademicQuest. (*Id.* at ¶ 43.) In reality, the consulting contracts were never approved by the Planet Abacus Board. (*Id.*)

On August 28, 2009, Smoot provided the March 16, 2007 falsified Board meeting minutes to the auditor. (*Id.* at ¶ 45.) The auditor requested that Planet Abacus obtain a legal opinion as to whether the AcademicQuest Contract constituted a management contract. (*Id.*) Rather than provide this information to the auditor, Smoot, Brown, and Chalker, hired a different auditing firm to complete the Planet Abacus audit. (*Id.*) In February 2010, Brown, Chalker, and Smoot provided fabricated Board meeting minutes, resolutions, and other falsified records, including AcademicQuest invoices to the second auditor. (*Id.* at ¶ 46.)

The Government alleges that from December 2007 to April 2011, Brown, Chalker, and others used the fabricated consulting and management contracts, to cause Planet Abacus to make approximately $705,561.62 in fraudulent payments to AcademicQuest and Brown. (*Id.* at ¶ 26.)

## II. MOTIONS TO DISMISS

### A. Legal Standard

Defendants move to dismiss Counts 1-37 of the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3).[11]  Under Rule 12(b)(3), an indictment may be dismissed on motion of a defendant for failure to state an offense.  Rule 7(c)(1) requires an indictment to "be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  An indictment is sufficient so long as it:

> (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution. Moreover, no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.

*United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (internal citations and quotation marks omitted.)  Indeed, the Third Circuit has observed that an indictment charging a statutory crime is deemed sufficient so long as it "substantially follows the language of the criminal statute, provided that its generality does not prejudice a defendant in preparing his defense nor endanger his constitutional guarantee against double jeopardy."  *United States v. Eufrasio*, 935 F.2d 553, 575 (3d Cir. 1991).

An indictment fails to state the elements of the offense if the facts alleged "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation."  *Bergrin*, 650 F.

---

[11] Brown seeks to dismiss Counts 1-37, while Chalker requests dismissal of Counts 15-37.

3d at 264-65. A motion to dismiss is not the "permissible vehicle for addressing the sufficiency of the government's evidence." *Id.* at 268.

Here, Defendants seek to dismiss Counts 1-37, which charge wire fraud, in violation of 18 U.S.C. § 1343. [12] In order to prove wire fraud under 18 U.S.C. § 1343, the Government must establish that:

> (1) defendant devised a scheme to defraud or to obtain money, or property . . . by materially false or fraudulent pretenses, representations or promises (or willfully participated in such a scheme with knowledge of its fraudulent nature); (2) defendant acted with the intent to defraud; and (3) in advancing, furthering, or carrying out the scheme, defendant transmitted any writing, signal or sound by means of a wire, radio or television communication in interstate commerce, or caused the transmission of any writing, signal or sound of some kind by means of a wire, radio or television communication in interstate commerce.

Third Circuit Model Criminal Jury Instructions § 6.18.1343; *see also United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012). [13] The fraud must expose the victim to an actual or potential loss of money or property. *United States v. Wright*, 665 F.3d 560, 573 (3d Cir. 2012) ("Traditional mail fraud under § 1341 involves defrauding a private party of money or property. . . ."); *United States v. Bryant*, 655 F.3d 232, 248 (3d Cir. 2011); *United States v. Riley*, 621 F.3d

---

[12] The federal wire fraud statute, 18 U.S.C. § 1343, is practically identical to the federal mail fraud statute, 18 U.S.C. § 1341, and cases interpreting one statute apply equally to the other. *United States v. Yusuf*, 536 F.3d 178, 188 n.14 (3d Cir. 2008) (citing *United States v. Morelli*, 169 F.3d 798, 806 n.9 (3d Cir. 1999)).

[13] Section 1343 provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343

312, 328 n.22 (3d Cir. 2010). Counts 1-37 also charge Brown and Chalker under 18 U.S.C. § 2, with aiding and abetting.[14]

### B.  Conflict-of-Interest Theory of Wire Fraud

Defendants Brown and Chalker assert that the Government failed to properly allege wire fraud, as the allegations fail to set forth a "scheme or artifice to defraud," as that term is construed under 18 U.S.C. § 1343. Specifically, Defendants argue that the scheme alleged by the Government is premised on Brown's and Chalker's attempts to conceal violations of the conflict-of-interest provisions provided in Agora's and Planet Abacus's charters and bylaws. (Brown's Mot. 11-19; Chalker's Mot. 6-8.) Defendants contend that this so called, "conflict-of-interest theory" of fraud cannot support an indictment for wire fraud.

Defendants rely on the Supreme Court's decision in *United States v. Skilling*, 130 S. Ct. 2896 (2010), which addressed the limitations of honest services wire fraud under 18 U.S.C. § 1346. Under 18 U.S.C. § 1346, the term "scheme or artifice to defraud" includes "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The Court in *Skilling* limited honest services fraud to only those schemes that deprive another of honest services through "bribes and kickbacks." 130 S. Ct. at 2931. The Court specifically rejected the Government's argument that honest services fraud should include "undisclosed self-dealing by a public official . . . [such as] the taking of official action by the [official] that

---

[14] Section 2 provides that:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2.

further[s] his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 2932.

Defendant's reliance on *Skilling* is misplaced. The Supreme Court's holding in *Skilling* is strictly limited to honest services fraud under 18 U.S.C. § 1346. As the Third Circuit in *Wright* observed, "*Skilling* did not disturb the law of traditional fraud." *Wright*, 665 F.3d at 573; *see also United States v. Del Toro*, 489 F. App'x 537, 539-40 (3d Cir. 2012) (holding that *Skilling* was inapposite where the defendant was not charged with honest services wire fraud); *United States v. Conti*, No. 08-05, 2010 WL 4613798, at *5 (W.D. Pa. Nov. 5, 2010) ("*Skilling* does not apply to the charges of traditional fraud pursuant to the mail and wire fraud statutes."); *Stinn v. United States*, 856 F. Supp. 2d 531, 537 (E.D.N.Y. 2012) ("The *Skilling* Court said nothing about the sufficiency of the government's evidence to establish traditional money or property fraud. The Court merely held that, if the government charges, and the jury is instructed on, an honest services theory of fraud under § 1346, the government must prove that a defendant received bribes or kickbacks as a part of the deceptive scheme."); *United States v. Fenzl*, 731 F. Supp. 2d 796, 800 (N.D. Ill. 2010) (concluding that *Skilling* does not insert "additional elements or limitations to the traditional mail or wire fraud statutes"); *United States v. Washington*, No. 11-4647, 2011 WL 10068686, at *1 (N.D. Ill. Oct. 3, 2011) ("*Skilling* limited the behavior proscribed by § 1346, not § 1343, the traditional wire fraud statute.").

Here, the Government does not allege an honest services theory of wire fraud under § 1346. Rather, the Government's theory is based on traditional wire fraud under § 1343. The Government does not allege that Brown deprived the charter schools or students of her "honest services," or that she failed to disclose a conflict of interest. Brown is charged with fabricating management contracts in order to misappropriate substantial amounts of money for her own

private educational management organizations and for herself.  *See Riley*, 621 F.3d at 327

(noting that "the risk of exposure to . . . a loss of money or property is sufficient to distinguish

[mail fraud] from honest services fraud").

Moreover, the Government is not precluded from including allegations regarding

Brown's attempts to circumvent the schools' prohibitions on self-dealing.  Such allegations are

relevant to the Government's overall theory of the case, as it provides context for why Brown

and her co-Defendants conducted the scheme in the manner that they did.  *See United States v.*

*Pitt*, 482 F. App'x 787, 802 n.2 (4th Cir. 2012) (Traxler J., concurring in part, dissenting in part)

("*Skilling* does not preclude the prosecution under § 1341 of a conflict-burdened defendant who

commits pecuniary fraud, nor does it somehow render evidence of an undisclosed conflict

irrelevant or inadmissible in a § 1341 pecuniary fraud case."); *United States v. Hatfield*, 724 F.

Supp. 2d 321, 330 (E.D.N.Y. 2010) (concluding that despite *Skilling's* limitation on honest

services fraud, evidence of the defendant's self-dealing was relevant to the allegations of mail

and wire fraud).  We are satisfied that the Indictment properly alleges wire fraud pursuant to §

1343 and does not run afoul of the limitations set forth in *Skilling*.[15]

---

[15] Brown also argues that the Government's alleged theory of fraud violates Brown's due
process rights by rendering § 1343 unconstitutionally vague.  (Brown's Mot. 19-20.)  She
specifically contends that the Government is attempting to police conflict-of-interest violations
under the auspice of traditional fraud, and that this affords prosecutors virtually complete
discretion to pursue defendants who have engaged in self-dealing.  (*Id.*)  In the alternative, she
requests the Court to strike the conflict-of-interest allegations because they do not stand as a
valid independent theory of criminal liability and could lead to juror confusion and prejudice.
(*Id.* at 18.)
      These requests are denied.  We have already determined that the Government is not
charging Brown for a violation of the school's conflict-of-interest provisions. The Indictment is
based on Brown's fabrication of contracts, Board meeting minutes, and various other documents
for the purpose of misappropriating the school's funds.  Her efforts to circumvent the conflict-of-
interest provisions are relevant to the Government's overall theory of the case.  The allegations
in the Indictment that reference these conflict-of-interest provisions, and Brown's efforts to

## C.     Specific Intent to Defraud

Brown further argues that Counts 1-37 must be dismissed because the Indictment does not sufficiently allege that Brown acted with the specific intent to defraud Agora or Planet Abacus.  (Brown's Mot. 22.)  Brown contends that "where the alleged victim of the fraud knows the truth, there can be no intent to deceive."  (*Id.* at 22 (citing *United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002); *Norton v. United States*, 92 F.2d 753, 754-55 (9th Cir. 1937); *Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, 257 F. Supp. 2d 819, 830-31 (M.D. La. 2002)).)[16]  Brown suggests that Agora and Planet Abacus, two of the alleged victims, would have known (a) whether or not the management contracts at issue had been approved by the schools' Board of Trustees, and (b) whether or not Brown was a Director or Trustee of either school at the time the contracts were executed.  Essentially, Brown maintains that she could not possibly have deceived the schools' Board of Trustees and thus she could not have had the requisite intent to deceive.  (*Id.* at 23.)

As a general matter, we begin with the standard set forth by the Third Circuit for the intent to defraud.  The Third Circuit has established that an intent to defraud is shown if the defendant acted "knowingly and with the intention or purpose to deceive or to cheat."  *United States v. Andrews*, 811 F. Supp. 2d 1158, 1171 (E.D. Pa. 2011) (citing 3d Cir. Mod. Crim. Jury Inst. 6.18.1341-4).  The Third Circuit's Model Jury Instruction on this issue further instructs that a jury can "consider whether [the defendant] acted with a desire or purpose to bring about some gain or benefit to herself or someone else or with a desire or purpose to cause some loss to

evade these provisions do not render § 1343 unconstitutionally vague, and need not be stricken from the Indictment.

[16] Brown fails to cite any controlling Third Circuit caselaw on the issue of specific intent to defraud.

someone." 3d Cir. Mod. Crim. Jury Inst. 6.18.1341-4. Specific intent may be inferred from circumstantial evidence. *Riley*, 621 F.3d at 333. "The specific intent element may be found from a material misstatement of fact made with reckless disregard for the truth." *United States v. Hannigan*, 27 F.3d 890, 892 n.1 (3d Cir. 1994) (citing *United States v. Boyer*, 694 F.2d 58, 59-60 (3d Cir. 1982)). Intent may also be shown "by offering evidence of instances when the particular defendant took actions preventing the discovery of [her] misdeeds . . . ." *United States v. Pinto*, 548 F. Supp. 236, 245 (E.D. Pa. 1982).

The Indictment is replete with specific instances of Brown and her co-Defendants fabricating Board meeting minutes and Board resolutions in an effort to conceal the fact that Brown falsified the management contracts. (Count 1-14, ¶¶ 19-26; Count 15-37, ¶¶ 27-34, 36-46.) If these facts are proven, they are sufficient for a jury to infer that Brown and her co-Defendants acted with the requisite intent to defraud. Moreover, the jury would be free to consider that Brown fabricated the documents with the intention of procuring profits for herself through her various educational management organizations.

In addition, the facts alleged in the Indictment do not support Brown's assertion that Agora or Planet Abacus were not susceptible to Brown's alleged falsehoods. In the case of Agora, the Indictment alleges that Brown and Person No. 1 falsely represented that Agora and Cynwyd had entered into a management contract. (Counts 1-14 ¶ 19.) Brown dated the fraudulent management contract May 10, 2006. (*Id.* at ¶ 20.) Brown falsified Board meeting minutes to make it appear as though the Board had approved the Agora-Cynwyd Contract on May 6, 2006. (*Id.* at ¶ 31.) In reality, the Board had never approved the Contract. (*Id.*) It is conceivable, then, that the Board members who actually served during the time the fraudulent

payments were made to Cynwyd in 2007, 2008, and 2009 would have been unaware that Brown fabricated the Contract and the Board minute meetings approving the Contract.

The same rationale applies to the fraudulent Planet Abacus contracts. Brown allegedly fabricated management contracts between Planet Abacus and AcademicQuest each dated March 5, 2007. (Counts 15-37 ¶ 28.) She also falsified Board minute meetings to make it appear as though the Planet Abacus Board approved a contract on March 5, 2007. (*Id.* at ¶ 31.) In reality, there was no Planet Abacus Board at the time the contracts were executed. (*Id.* at ¶ 29.) Payments were made under these contracts from December 2007 until April 2011, therefore, it is possible that the members of the Board serving at the time the payments were made were unaware of the fraudulent nature of the March 5, 2007 contracts. The Indictment alleges a specific intent to deceive sufficient to withstand Brown's Motion to Dismiss.

### D. Deprivation of Money or Property Interest

Under § 1343, the alleged fraud must expose the victim to actual or potential loss of money or property. *Wright*, 665 F.3d at 573. Brown argues that Counts 1-14 must be dismissed because the Government failed to specifically identify a victim with the requisite property interest in the proceeds of the fraudulent scheme. (Brown's Mot. 23.) Similarly, Chalker challenges Counts 15-37 claiming that that the Indictment fails to allege that Planet Abacus or the School District sustained any economic harm. (Chalker's Mot. 11.)

In paragraph 18 of Counts 1-14, the Government alleges that "[b]etween in or about December 2007 and in or about October 2009, Cynwyd received approximately $5,637,073 in fraudulent payments from the Agora funds, and as a result of the fraudulent payments Brown deprived Agora and its students of the use of those funds for educational purposes." (Counts 1-14 ¶ 18.) Brown argues that this allegation fails to specify how Brown deprived the students of

educational services, and what services they were deprived. (Brown's Mot. 26.) Brown seemingly suggests that the Indictment must specify how the money would have otherwise been spent by Agora had it not been diverted to Cynwyd.

Such specificity is not required. *See Kemp*, 500 F.3d at 280 ("No greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.")(internal quotation marks omitted). Paragraph 18 of Counts 1-14 explicitly states that Agora, and its students, the alleged victims, were deprived of the use of the Agora funds, when Brown fraudulently paid Cynwyd under a fake management contract. It is sufficient that the Government alleges that Agora, and its students, had an interest in the funds used for the Agora-Cynwyd Contract, and that they were deprived of those funds. The Indictment provides sufficient factual orientation to permit Brown to prepare her defense.[17]

Brown also argues that Counts 13 and 14 must be dismissed because they were based on wire transfers of funds authorized by PDE and K12 as part of the October 2009 settlement of the Cynwyd Litigation. (Brown's Mot. 27.) Brown argues that Counts 13 and 14 must be dismissed because: (1) PDE and K12 waived any property interest when they agreed to settle the Cynwyd Litigation; and (2) neither K12 or PDE have returned the consideration they received in the settlement agreement. (*Id.*)

The Government was not a party to the Cynwyd Litigation or the settlement. Clearly, the settlement agreement cannot immunize Brown from federal criminal prosecution. Brown further argues that any examination into the possible misrepresentations made as a part of the settlement

---

[17] In addition, Brown argues that PDE and K12 lacked the requisite property interests in the proceeds of the fraud. (Brown's Mot. 23-26.) We need not address these arguments having already determined that the Government alleged that Agora and its students had a property interest in the proceeds of the fraud.

agreement would require a "time-consuming and messy trial within a trial" and that to avoid this morass we ought to dismiss these counts.  (Brown's Mot. 32.)  We decline to dismiss these counts on the basis that their inclusion creates time-consuming issues for defense counsel.  The Government has sufficiently pled that Counts 13 and 14 are part of the scheme or artifice to defraud perpetrated by Brown, and as such, there is no basis for dismissal.

Chalker argues that Counts 15-37 must be dismissed because the Government failed to allege that Planet Abacus or the School District sustained any loss of money or property.  (Chalker's Mot. 11.)  Specifically, Chalker claims that there were no allegations that AcademicQuest failed to provide services or that Planet Abacus paid more for those services than it otherwise would have.  (*Id.*)  Chalker's argument is without merit.  It is firmly established that we need not determine that Planet Abacus actually suffered a loss, merely that they were exposed to a loss of money or property.  *Riley*, 621 F.3d at 327 ("[T]he Government need not prove actual loss to the locality to satisfy the elements of the mail fraud statute."); *see also* 3d Cir. Mod. Crim. Jury Inst. 6.18.1341-1 ("[I]t is not necessary that the government prove that . . . [the] intended victim actually suffered any loss.").

The Government alleges that AcademicQuest was not entitled to any of the school's funds as the payments were made under a fraudulent management contract.  Moreover, the Government alleges that AcademicQuest was not in fact managing the affairs of Planet Abacus.  (Counts 15-37 ¶ 36.)  Rather, Brown directed employees from other schools that she controlled to provide services to Planet Abacus.  (*Id.*)  Accordingly, it is clear that the Indictment sufficiently alleges that Planet Abacus had the requisite property interest in the funds that were diverted to AcademicQuest.

### E. Material Deception

Finally, Chalker argues that Counts 15-37 must be dismissed because the Government failed to allege the element of a "material deception." (Chalker's Mot. 10.) She claims the Government failed to charge that these misrepresentations were material to the School District's or Planet Abacus's decision to pay out any money. (*Id.* at 10.)

In *Neder v. United States*, 527 U.S. 1, 25 (1999), the Supreme Court established that materiality of a falsehood is an element of wire fraud. A misrepresentation "is material if it 'has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Id.* at 16 (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). The decisionmaker need not actually be influenced by the statement. *United States v. Fumo*, No. 06-319, 2009 WL 1688482, at *6 (E.D. Pa. June 17, 2009). Rather, the relevant inquiry is whether "the falsehood was of a type that one would normally predict would influence the given decisionmaking body." *Id.* (quoting *United States v. McBane*, 433 F.3d 344, 351 (3d Cir. 2005)). Even though materiality has been recognized as an element of the federal wire fraud statute, "failure of an indictment to allege materiality as an explicit element is not fatal to the indictment." *United States v. Wecht*, No. 06-0026, 2007 WL 3125096, at *5 (W.D. Pa. Oct. 24, 2007) (citing *United States v. White*, No. 04-370, 2004 WL 2612017, at *12 (E.D. Pa. Oct. 29, 2004)); *United States v. Stewart*, 151 F. Supp. 2d 572, 584 (E.D. Pa. 2001) ("[T]he superseding indictment identifies misrepresentations that can only be characterized as material even though the word 'material' is not used."). The Court must examine whether the indictment alleges facts that would warrant the "inference of materiality." *Wecht*, 2007 WL 3125096, at *5 (quoting *United States v. Solomon*, 273 F.3d 1108, at *2 (5th Cir. 2001) ("In a mail fraud indictment that

does not specifically allege materiality, allegations of specific facts may be sufficient to warrant the inference of materiality.")).

Chalker argues that the Government failed to allege that the fabricated Board meeting minutes and Board resolutions were material to the School District's decision to fund Planet Abacus or Planet Abacus's decision to pay AcademicQuest.  However, it is clear from the Indictment that these misrepresentations are material.  The false Board meeting minutes were available to the School District for inspection, and these fabricated documents prevented the School District from discovering that Planet Abacus and AcademicQuest had not entered into a Board-approved contract.  The fraudulent management contract is the basis for the fraudulent payments.  It is reasonable to infer that its very existence was material to Planet Abacus's decision to pay AcademicQuest.

Chalker also argues that none of the misrepresentations were directed at Planet Abacus or the School District, the ultimate victims of the fraud.  (Chalker's Mot. 10.)  The Third Circuit Court of Appeals has yet to address the issue of whether material misrepresentations must be directed to the victim of the alleged scheme to defraud.  *See Bryant*, 655 F.3d at 249-50 (declining to decide the issue of whether the misrepresentations must be directed to the victim of the fraudulent scheme).  However, another district court within the Third Circuit has confronted the issue and concluded that the alleged falsehoods need not be made directly to the ultimate victim of the scheme to defraud.  *United States v. Fumo*, 628 F. Supp. 2d 573, 589 (E.D. Pa. 2007) ("[T]here is no requirement that the government specifically allege that such false statements were made directly to the ultimate victim.") (internal quotation marks omitted); *see also Fumo*, 2009 WL 1688482, at *47 (upholding jury instruction which charged that "a misrepresentation made to a third party may be sufficient if made to further the fraud. . . .")

Moreover, other federal appellate courts that have decided the issue have determined that the individual deceived by the fraud need not be the same person who is the victim of the scheme. *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998) ("We see no reason to read into the statute an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud."); *United States v. Blumeyer*, 114 F.3d 758, 767-68 (8th Cir. 1997) (holding that misrepresentations made to a third party were made in furtherance of a scheme to defraud an insurance company and its policyholders); *United States v. Pepper*, 51 F.3d 469, 473 (5th Cir. 1995) ("There is no statutory requirement that direct misrepresentations must be made to the victims of the scheme."); *United States v. Consentino*, 869 F.2d 301, 307 (7th Cir. 1989) (concluding that misrepresentations made to a third party were part of the defendants' scheme to defraud the victims); *cf. United States v. Olatunji*, 872 F.2d 1161, 1168 (3d Cir. 1989) (noting that an indictment may properly allege mail fraud where the misrepresentations were made to two different Government agencies even though the scheme deprived property from only one).  The great weight of authority dictates that the Government need not allege that the false misrepresentations were directed to the victims of the scheme to defraud.

In this instance, the Government has alleged that Defendants made false representations concerning the Planet Abacus-AcademicQuest consulting contracts to two separate auditing companies.  (Counts 15-37 ¶¶ 45-46.)  Even though some of these misrepresentations were directed at the auditing companies, the allegations also indicate that the fabricated meeting minutes were available on-site at the Planet Abacus facility for inspection by the School District.  (*Id.* at ¶ 30.)  The fabricated contracts and falsified Board meeting minutes and resolutions worked in concert to conceal Brown's attempts to circumvent the prohibitions on self-dealing

provided by the school's charter and the Charter school law, and thus are material misrepresentations made in furtherance of the scheme to defraud.

## III.     MOTION FOR A BILL OF PARTICULARS

### A.     Legal Standard

A bill of particulars is designed to "inform the defendant of the nature of the charges brought against [her] to adequately prepare [her] defense, to avoid surprise during the trial and to protect [her] against a second prosecution for an inadequately described offense." *United States v. Addonizio*, 451 F.2d 49, 63-64 (3d Cir. 1971). A bill of particulars should be ordered "when the indictment itself is too vague and indefinite for such purposes." *Id.* at 64. The Court is given considerable discretion when deciding these motions and must "strike a prudent balance between the defendant's legitimate interest in securing information concerning the government's case and numerous countervailing considerations . . . [including] the unfairness that can result from forcing the government to commit itself to a specific version of the facts before it is in a position to do so." *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989). Access to pretrial discovery minimizes the need for a bill of particulars. *See United States v. Urban*, 404 F.3d 754, 772 (3d Cir. 2005).[18]

### B.     Discussion

Brown requests a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f) to address the following: (1) the legal theory that supports the Government's allegations in Counts 1-37 (Brown's Mot. 18); (2) the identity of the victims and their property interest with respect to Counts 1-14 (*id.* at 27); and (3) information regarding the false information that PDE and K12 relied upon when settling the Cynwyd Litigation (*id.* at 36).

---

[18] The parties agree that the discovery provided to Defendants by the Government has been voluminous.

First, Brown contends that if the Government maintains that its theory of fraud in Counts 1-37 is not based on a of conflict-of-interest violation then the Government must submit a bill of particulars detailing the legal theory underlying these allegations. We have addressed Brown's arguments with respect to her conflict-of-interest theory of fraud. *See Supra* Section II.A. The Indictment clearly indicates that Counts 1-37 are based on a theory of traditional wire fraud under 18 U.S.C. § 1343, and as such, the Indictment fully apprises Brown of the charges against her and allows her to prepare her defense.

Brown further argues that a bill of particulars is necessary to identify the victims and their property interest with respect to Counts 1-14. In paragraph 17 of Counts 1-14, the Government identifies Agora Cyber Charter School and its numerous sources of public funding as the victims of the alleged scheme to defraud. In any event, the Indictment need not specifically name the victims. *See United States v. Delle Donna*, 552 F. Supp. 2d 475, 498-99 (D.N.J. 2008) (denying motion for bill of particulars stating it was unnecessary that an indictment identify victims by their given names); *see also United States v. Ingram*, 62 F. App'x 32, 33 (3d Cir. 2003) (noting that "[t]he identity of the victim or co-perpetrators [was] not an essential element" in allegations of wire fraud); *United States v. Mizyed*, 927 F.2d 979, 981 (7th Cir. 1991) (holding that an indictment sufficiently alleged mail fraud despite not specifically identifying the victims by name).

Finally, Brown asserts that the Government should furnish details about how the false representations made to K12 and PDE induced the Cynwyd settlement. (Brown's Mot. 36.) The Indictment explicitly states that "[b]ased on the false representation by Brown and Cynwyd that the Agora [Board of Trustees] had previously voted to enter into a ten-year contract with Cynwyd at a special Board meeting on May 6, 2006, K12 and PDE agreed to pay Cynwyd

$3,000,000 . . . ." (Counts 1-14 ¶ 32.) As previously explained, the Government need not allege that the decisionmaker was actually influenced by the allegedly fraudulent misrepresentations. *See supra* Section II.E. Rather, it is sufficient if "the falsehood was of a type that one would normally predict would influence the given decisionmaking body." *Fumo*, 2009 WL 1688482, at *6 (quoting *McBane*, 433 F.3d at 351). Certainly, representations regarding the validity of the management contract, which were the basis of the Cynwyd Litigation, could influence PDE and K12's decision to settle. The Indictment sufficiently alleges these facts, obviating the need for a bill of particulars.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motions will be denied.

An appropriate Order follows.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**