IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 12-0367 |
| DOROTHY JUNE BROWN | : | |

**SURRICK, J.**                                                                         **JULY 31, 2014**

## MEMORANDUM

Presently before the Court are Defendant Dorothy June Brown's Motion for Entry of Judgment of Acquittal in Counts 13, 14, and 67 of the Superseding Indictment (ECF No. 238), and Defendant's Supplemental Motion for Entry of Judgment of Acquittal on Counts 1-37, 45-58, 61-63, and 65 of the Superseding Indictment (ECF No. 299). For the following reasons, Defendant's Motions will be denied.

## I.       BACKGROUND

### A.       The Indictment

On January 22, 2013, a federal grand jury returned a sixty-seven count Superseding Indictment against Dorothy June Brown, Joan Woods Chalker, Michael A. Slade, Jr., Courteney L. Knight, and Anthony Smoot. (Superseding Indictment ("Indictment"), ECF No. 47.)[1] The charges arise out of an alleged scheme perpetrated by Brown to defraud three separate charter

---

[1] On March 15, 2013, Anthony Smoot entered a guilty plea to conspiracy to obstruct justice, in violation of 18 U.S.C. § 371 (Count 53), and obstruction of justice, in violation of 18 U.S.C. § 1519 and § 2 (Count 58). (Min. Entry, ECF No. 55.) His sentencing is scheduled for November 15, 2014. (ECF Nos. 103, 326.) On October 21, 2013, Joan Woods Chalker entered a guilty plea to two counts of obstruction of justice, in violation of 18 U.S.C. § 1519 and § 2 (Counts 55 and 57), and one count of obstruction of justice in violation of 18 U.S.C. § 1512(c) and § 2. (Min. Entry, ECF No. 169.) Her sentencing is scheduled for November 4, 2014. (ECF No. 324.)

schools out of over $6.7 million. The three charter schools at issue in this case are: the Agora Cyber Charter School ("Agora"), a public cyber charter school established by Defendant in June 2005; Laboratory School of Communication and Languages ("Lab"), a charter school founded by Defendant in 1998 in Philadelphia; and Planet Abacus, a charter school founded by Defendant in July 2007 in Philadelphia.[2]

The Indictment charges Brown with fifty-two counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1-52), one count of conspiring to obstruct justice, in violation of 18 U.S.C. § 371 (Count 53), ten counts of obstruction of justice, in violation of 18 U.S.C. § 1519 (Counts 54-59, 63, 65) and § 1512(c)(2) (Counts 61-62), and one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3) (Count 67).

## B. The Trial and Verdict

Jury selection began on October 21, 2013 and lasted two days. (Min. Entries, ECF Nos. 180, 181.) Trial commenced on November 6, 2013. (Min Entry, ECF No. 205.) Defendant was tried with co-Defendants, Michael Slade and Courtney Knight. On December 2, 2013, the Government rested. Defendant moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure on Counts 13, 14, and 67. (Min. Entry, ECF No. 239.) The request for a judgment of acquittal was taken under advisement. (*Id.*; *see also* Dec. 2, 2013 Trial Tr., ECF No. 276.) On December 5, 2013, the Court heard oral argument on Defendant's request for a judgment of acquittal on Counts 13, 14, and 67. (Min. Entry, ECF No. 245; Dec. 5, 2013 Trial Tr., ECF No. 279.) The jury began its deliberations on December 12, 2013. (Min Entry, ECF No. 255.) On December 19, 2013, the jury returned a partial verdict. The jury found Defendants

---

[2] Lab, Abacus, and two other schools founded by Defendant—Ad Prima Charter School ("Ad Prima") and Main Line Academy ("Main Line")—are brick and mortar charter schools. Agora is a cyber-charter school.

Slade and Knight not guilty of the counts charged against them. (Min. Entry, ECF No. 265; *see also* ECF Nos. 267-270.) The jury resumed deliberations with respect to the charges against Defendant on January 6, 2014. (Min. Entry, ECF No. 290.) On January 9, 2014, after communicating to the Court that it was unable to reach a verdict on many of the remaining counts, the jury returned a partial verdict with respect to Defendant. (Min. Entry, ECF No. 293.) The jury found Defendant not guilty on Counts 38-41, 59 and 67. (*Id.*; Verdict, ECF No. 294.) The jury was deadlocked on Counts 1-37, 46-58, 61-63 and 65. (Verdict.)

On January 10, 2014, counsel for Defendant filed a letter with the Court renewing Defendant's motion for an acquittal with regard to Counts 13, 14, and 67. (ECF No. 292.)

Re-trial is scheduled to commence on September 8, 2014.[3]

### C. Procedural History

On December 2, 2013, Defendant filed a Motion for Entry of Acquittal on Counts 13, 14, and 67 of the Superseding Indictment. (Def.'s Mot., ECF No. 238.) On January 23, 2014, Defendant filed a Supplemental Motion for Entry of Judgment of Acquittal on Counts 1-37, 46-58, 61-62, and 65 of the Superseding Indictment. (Def.'s Supp. Mot., ECF No. 299.) On February 19, 2014, the Government filed a Response in opposition to the Motion and Supplemental Motion. (Gov't Resp., ECF No. 307.) On March 4, 2014, Defendant filed a Reply. (Def.'s Reply, ECF No. 316.)

## II. LEGAL STANDARD

Defendant moves for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. Rule 29(c) allows the Court to enter a judgment of acquittal in cases like

---

[3] On February 24, 2014, an Order was entered granting Defendant's Unopposed Motion to Continue the Case beyond the Time Limits Established by the Speedy Trial Act. (ECF No. 311.) Defense counsel requested that the retrial be continued in light of conflicts with other matters. The Government did not oppose this request.

this where the jury has failed to return a verdict. Fed. R. Crim. P. 29(c)(2). The standard for granting a motion for acquittal based upon insufficient evidence is high. *United States v. Smith*, 294 F.3d 473, 476-77 (3d Cir. 2002). A defendant "challenging the sufficiency of the evidence pursuant to Rule 29 bears a heavy burden." *United States v. John-Baptiste*, 747 F.3d 186, 201 (3d Cir. 2014) (internal quotation marks omitted). Relief under Rule 29 is "confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984) (citing *Burks v. United States*, 437 U.S. 1, 17 (1978)); *see also United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010) ("[A]n insufficiency of the evidence claim places a heavy burden on the [defendant] because we will only find the evidence insufficient when the prosecution's failure is clear.").

In considering whether a judgment of acquittal is appropriate, the district court must view the evidence in the light most favorable to the Government and deny the request for a judgment acquittal when "any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006) (quotation marks omitted). District courts must be careful not to "usurp the role of the jury by weighing credibility and assigning weight to the evidence." *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010) (citations omitted). A claim that the evidence was insufficient places a heavy burden on the defendant. *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990).

## III. DISCUSSION

Defendant moves for a judgment of acquittal on all of the counts on which the jury was deadlocked. Specifically, Defendant seeks an acquittal on Counts 1-37 and 46-50, charging wire fraud; Count 53, charging conspiracy to obstruct justice; Counts 54-55, 57-58, and 63, charging obstruction of justice under 18 U.S.C. § 1519; and Counts 61-62, charging obstruction of justice

under 18 U.S.C. § 1512.[4] We will as we must review the evidence and testimony presented at trial and the inferences to be drawn therefrom in the light most favorable to the Government in separately assessing each category of counts.[5]

### A.    Wire Fraud Counts

Counts 1-37 and 46-50 charge Defendant with wire fraud, in violation of 18 U.S.C. § 1343. That statute states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. Thus, to prove that Defendant is guilty of wire fraud, the Government must establish the following elements: (1) Defendant's "knowing and willful participation in a scheme or artifice to defraud"; (2) Defendant's specific intent to defraud; and (3) Defendant's use of interstate wire communications in furtherance of the scheme to defraud. *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012); *see also* Third Circuit Model Jury Instruction § 6.18.1343.

To prove a scheme to defraud, the Government must show that Defendant made a material misrepresentation or omission. *See Neder v. United States*, 527 U.S. 1, 25 (1999) ("[W]e hold that materiality of falsehood is an element of the federal . . . wire fraud . . .

---

[4] Defendant also sought a judgment of acquittal on Counts 51-52, 56, and 65. The Government has requested voluntary dismissal of those counts. (*See* ECF No. 317.) The parties dispute whether those counts should be dismissed with or without prejudice. We will address the request to dismiss these counts in a separate Order.

[5] We note that the submissions by Counsel for Defendant and Counsel for the Government have very thoroughly and competently set forth the respective factual and legal positions.

statute[].”); *see also* Third Circuit Model Jury Instruction 6.18.1341-1. "A misrepresentation or omission is material when it has a 'natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed."' *United States v. Riley*, 621 F.3d 312, 332 (3d Cir. 2010) (quoting *United States v. Wells*, 519 U.S. 482, 489 (1997)). In addition, the fraud must expose the victim to an actual or potential loss of money or property. *United States v. Wright*, 665 F.3d 560, 573 (3d Cir. 2012); *United States v. Bryant*, 655 F.3d 232, 248 (3d Cir 2011).

### 1.  *Counts 1-12 – Agora Charter School*

#### i.  <u>Factual Background</u>

Counts 1 through 12 of the Indictment relate to Defendant's alleged scheme to defraud Agora.  Defendant first submitted her application for an Agora charter to the Pennsylvania Department of Education ("PaDOE") in October 2004.  (Nov. 6, 2013 Trial Tr. 111-16, ECF No. 218.)[6]  The application indicated that Agora intended to hire an external management company. (Gov't Ex. 101.)  The PaDOE did not approve the original application, but stated that it would re-evaluate after receiving documentation about the intended management company.  (Nov. 6 Trial Tr. 116-19; Gov't Ex. 192.)  In May 2005, Defendant submitted a revised application which did not contain any language about Agora intending to hire an external management company.  (Gov't Ex. 103; Nov. 6 Trial Tr. 121-22.)  The approved charter application contained proposed by-laws.  (*See* Agora By-Laws, Gov't Ex. 102.)  Pursuant to the by-laws, a majority of the board members present at a board meeting "shall decide any questions."  (*Id*. at Art. IV.)

---

[6] Agora was not Defendant's first charter school.  In 1998, Defendant opened Lab.  At Lab, Defendant and her staff developed a curriculum known as the "Charter Signatures."  Based on Lab's success, due in large part to the Charter Signatures, Defendant opened Ad Prima in 2004 and Planet Abacus in 2007.  Defendant implemented the same methodology and Charter Signatures at these schools.  In her Motion, Defendant described in depth the success that her brick and mortar charter schools achieved in terms of student performance.

Certain matters, including "[e]ntering into contracts of any kind where the amount involved exceeds $200," required a majority vote of all of the members of the Agora Board of Trustees ("Agora Board"). (*Id*. at Art. VII.) The Agora charter was approved for a period of five years, contingent on strict adherence to the terms of the submitted application, and could only be amended by submitting a written request to the PaDOE. (Nov. 6 Trial Tr. 128-133; Gov't Ex. 105.)

Despite the representations to the PaDOE, after the charter was approved, Defendant caused Agora to contract with an external management company. Defendant, together with a colleague, formed a company named Cynwyd Group ("Cynwyd"), which contracted with Agora to manage and operate Agora. Defendant received 72% of Cynwyd's income up until 2008, after which, Defendant became Cynwyd's sole owner. (Nov. 26, 2013 Trial Tr. 86-89, ECF No. 275; Gov't Exs. 108, 1621-1623.) The Agora-Cynwyd Contract is dated May 10, 2006. (Agora-Cynwyd Contract, Gov't Ex. 185.) Under the terms of the contract, Agora hired and employed Cynwyd to manage and operate the administration and educational facilities of Agora. (*Id*. at 2.) In exchange for these services, Cynwyd was to be paid 7% of Agora's qualified gross revenues. (*Id*. at 6.) The Government alleges that between December 2007 and October 2009, Cynwyd received approximately $5,637,073 in payments as a result of the Agora-Cynwyd Contract.

According to the Government, Defendant falsely represented that the Agora Board voted on and approved the Agora-Cynwyd Contract. The Government further alleges that "[n]o one ever saw a signed copy of the fraudulent Agora-Cynwyd contract . . . until November 2008" when the PaDOE requested a copy of it during their audit of Agora. (*See* Gov't Resp. 5; Gov't Ex. 185.) The government contends that the contract was never presented to the Agora Board, let alone approved by the Agora Board. The Agora-Cynwyd Contract contained the forged

signature of James Marshall, the Agora Board president, allegedly on behalf of Agora, and the

signature of Defendant on behalf of Cynwyd. (Agora-Cynwyd Contract 8; Nov. 20, 2013 Trial

Tr. 148-49, ECF No. 236.)[7] Marshall never signed the Agora-Cynwyd Contract, nor did he give

anyone permission to sign it on his behalf. (Nov. 20 Trial Tr. 91-93.) Marshall's signature was

attested to by Myra Corbin, Board Secretary, whose signature was also forged. (Nov. 18, 2013

Trial Tr. 96-97, ECF No. 234.) Corbin testified that she served on the Agora Board for less than

a year, but never signed the Agora-Cynwyd Contract, or gave anyone permission to sign it on her

behalf. (*Id*. at 96-98.) Corbin never even saw the contract until the Government showed it to her

during an interview. (*Id*. at 97.)

The Agora-Cynwyd Contract was allegedly approved by the Agora Board on May 6,

2006. (Gov't Ex. 153.) The May 6, 2006 meeting minutes reflect that the "Special Board

Meeting" took place on a Saturday at 1:00 p.m., lasted approximately 28 minutes, and was

attended by eight alleged Agora Board members. (*Id*.; Nov. 7, 2013 Trial Tr. 181-83, ECF No.

219.) The names of the eight Board members listed in attendance at the May 6 meeting are

Gladys Lassiter, Courteney Knight, Damien Poitevein, Joan Chalker, Tom Kim, Vivienne

Crawford, Lynn Bull, Lisa Carbungcal. (Gov't Ex. 153.) Of these individuals, three did not

testify at trial: Defendant Knight, Gladys Lassiter, who died in 2006, and Vivienne Crawford.

The remaining five individuals testified that they did not attend an Agora Board meeting on May

6, 2006, or any other Agora board meeting. (Nov. 7 Trial Tr. 133, 139 (Bull); *id*. at 92

(Poitevein); *id*. at 62-63, 69 (Kim); Nov. 12, 2013 Trial Tr. 131, 139-140, 185, ECF No. 231

---

[7] Anthony Smoot testified that he forged Marshall's signature at the direction of, and in the presence of, Defendant. (Nov. 20 Trial Tr. 149.) Marshall is Smoot's cousin. (*Id*.) Smoot recalled that he forged Marshall's signature at a time when Marshall was serving as the Agora Board President. (*Id*.) Marshall testified that he was not asked to serve on the Agora Board until late 2006, and was asked to serve as President some time in 2007. (Nov. 13, 2013 Trial Tr. 86-88, ECF No. 232.)

(Carbungcal); Nov. 19, 2013 Trial Tr. 181-85 (Chalker), ECF No. 235.)[8] All five individuals

also testified that they never voted to approve the Agora-Cyber Contract. (Nov. 7 Trial Tr. 139

(Bull)); *id*. at 92 (Poitevein); *id*. at 70-71 (Kim); Nov. 12 Trial Tr. 131, 140 (Carbungcal); Nov.

19 Trial Tr. 184-85 (Chalker).) In fact, three of the individuals were unaware of, or had never

even heard of, the Cynwyd Group. (Nov. 7 Trial Tr. 139 (Bull); *id*. at 92 (Poitevein); *id*. at 71-

72 (Kim).)

The PaDOE conducted an audit of Agora from March through July 2009. (Nov. 7 Trial

Tr. 159.) The audit was initiated in response to complaints by Agora parents, including a parent

by the name of Gladys Stefany. (Nov. 6 Trial Tr. 141-45; Gov't Exs. 177, 187, 188.) Keith

Miller, the auditor, first visited the Agora offices on March 11, 2009. (Nov. 6 Trial Tr. 141-45.)

Upon receiving a copy of the Agora Board meeting minutes, Miller noticed that the minutes from

the May 2006 and November 2005 meetings were missing. He requested copies. (*Id*. at 167-71;

180-81.) The May 6, 2006 meeting minutes were faxed to the Agora offices that afternoon, and

given to Miller approximately two hours after he requested them. (*Id*. at 180-81.) The

Government alleges that these Board meeting minutes were drafted the same day that they were

requested by Miller. The Government produced evidence showing that the only version of the

May 6th meeting minutes found on the hard drives recovered from the Agora and Cynwyd

administrative offices shows that the document was created on March 11, 2009, the same day

---

[8] Lisa Bull, who testified that she never attended an Agora Board meeting, was listed on the roll call of five board meeting minute sheets. (Gov't Exs. 146-148, 150, 153.) Damien Poitevein, who testified that he never attended an Agora Board meeting, was listed on the roll call of 21 board meeting minute sheets. (Gov't Exs. 146-55, 158, 161.) Thomas Kim, who testified that he never served on the Agora Board or attended a single meeting, was listed on the roll call of 13 board meeting minute sheets. (Gov't Exs. 142-49, 151-53, 155.) Lisa Carbungcal, who testified that she did not recall attending any Agora Board meetings, was listed on the roll call of 21 board meeting minute sheets. (Gov't Exs. 142-149, 151-163.) Joan Chalker, who testified that she never attended an Agora Board meeting, was listed on the roll call of 22 board meeting minutes. (Gov't Exs. 142-49, 151-63, 165.)

that they were requested by, and produced to, the auditors. (Nov. 20, 2013 Trial Tr. 151-58, ECF No. 236.) The version of the meeting minutes recovered from the hard drive is identical to the version of the minutes produced to the auditors. (Nov. 20 Trial Tr. 221-22; *see also* Gov't Exs. 153, 624.)

Defendant also created the passage of four Agora Board resolutions, one of which purported to approve the Agora-Cynwyd Contract. Years after Lisa Carbungcal left her employment with Defendant's schools in 2007, she returned to visit Defendant, and at Defendant's request, she signed four documents, each of which were titled "Resolution of the Agora Cyber Charter School." (Nov. 12 Trial Tr. 145-148; Gov't Exs. 438, 439, 441, 445.) The resolutions signed by Carbungcal were all dated some time in 2006, although Carbungcal did not sign them until after she resigned in 2007. (Nov. 12 Trial Tr. 145-47; Gov't Exs. 438, 439, 441, 445.)[9] One of the resolutions signed by Carbungcal alleges that the Agora Board, by unanimous vote, entered into a contract with Cynwyd for the management of Agora. (Gov't Ex. 439.) The resolution bears a date of May 6, 2006. (*Id*.) In addition to the Board resolutions, Defendant also asked Carbungcal to type Board meeting minutes. (*Id*. at 141-42.) Defendant told Carbungcal what to write, including that Carbungcal was present at the meeting when in fact she was not present. (*Id*.)

In addition to the Agora-Cynwyd Contract, Cynwyd, through Defendant, entered into a contract with K12 Pennsylvania LLC ("K12"). Pursuant to the May 10, 2006 contract between Cynwyd and K12 (the "Cynwyd-K12 Contract"), K12 agreed to perform "all business aspects

---

[9] Carbungcal testified that Brown asked her to sign the resolutions because office staff had lost other versions. (Nov. 12 Trial Tr. 151.) Carbungcal felt uncomfortable signing them, deliberated for a couple of hours, but ultimately signed them because she was "worried about losing her friendship" with Defendant. (*Id*. at 151-52, 171.)

and day-to-day management" of Agora, in exchange for 15% of Agora's qualified gross revenues.  (Gov't Ex. 114.)[10]  Kevin Corcoran, was employed by K12 as the Director of Finance and Operations for Agora.  (Nov. 14 Trial Tr. 4, ECF No. 233.)  Evidence at trial revealed a tension between Defendant and K12 about how best to run and manage Agora.

Between December 2007 and January 2009, Defendant submitted invoices totaling $2,662,073 on behalf of Cynwyd to Agora for payment.  (Nov. 14 Trial Tr. 25-33; Gov't Exs. 110, 111, 117, 128, 1701.)[11]  These invoices comprise Counts 1, 3-7, and 9-11.  (Indictment 11-12.)  Counts 2, 9, and 12 relate to internet e-mail communications drafted by Defendant that relate to work performed by, or amounts owed to, Cynwyd.  (*Id.*)

ii.  Analysis

In support of her request for a judgment of acquittal on Counts 1 through 12, Defendant argues that the Government failed to introduce sufficient evidence:  (1) that Defendant made a material misrepresentation in any of the wire fraud schemes; and (2) that Defendant had the requisite intent to defraud.  (Def.'s Supp. Mot. 9.)  Specifically, Defendant contends that the Government did not introduce sufficient evidence to prove that Defendant "did not have a good faith belief that the Agora Board of Trustees had approved the contract; that, in fact, the Agora

---

[10] Defendant presented evidence that in the years K12 was involved in managing Agora, enrollment increased and student performance declined.  (Def.'s Supp. Mot. 5.)  Defendant contends that Cynwyd put pressure on K12 to better manage the school.  The Government argues that once K12 was hired to manage Agora, Defendant and Cynwyd provided little or no services to Agora, while at the same time collecting millions of dollars under the Agora-Cynwyd Contract.

[11] Corcoran from K12 was responsible for making payments from Agora's bank account after receiving invoices from Defendant.  (Nov. 14 Trial Tr. 4, 24-25; Gov't Exs. 110, 111, 117, 128.)  Corcoran testified that in the summer of 2007, he requested a copy of an Agora-Cynwyd Contract from Defendant.  (Nov. 14 Trial Tr. 22-23.)  Defendant provided him with an unsigned copy of the contract.  (*Id.* at 22-24; Gov't Ex. 191.)

board had not approved the contract and that Defendant did not intend to deliver the services Agora reasonably anticipated as the benefit of its bargain with Cynwyd." (*Id.*)

Defendant's first argument—that the Government failed to introduce sufficient evidence showing that Defendant made a material misrepresentation—must be rejected. The Government made clear that the primary misrepresentation that Defendant made in furtherance of the scheme to defraud in Counts 1 through 12 was that the Agora Board entered into the management contract with Cynwyd. The evidence introduced at trial showed that the Agora-Cynwyd Contract contained two forged signatures—one executing the agreement on behalf of Agora (James Marshall), and one attesting to Marshall's signature (Myra Corbin). The evidence also showed that Smoot, who was the business manager for Defendant's schools, forged Marshall's signature at the request of, and in the presence of, Defendant. The evidence also showed that, of the eight Agora Board members listed as attending the May 6, 2006 meeting, one was a defendant who did not testify, one was deceased, and five testified that they did not attend the May 6 Board meeting or any other Agora meeting, nor did they approve the Agora-Cynwyd Contract. In addition, Lisa Carbungcal testified that Defendant requested her signature on a phony board resolution that purported to memorialize the Agora Board's vote to enter into the contract with Cynwyd. Based on all of the evidence introduced by the Government, we are satisfied that a rational juror could find that the evidence demonstrated a material misrepresentation made by Defendant in furtherance of a scheme to defraud.

Defendant contends that this evidence does not conclusively demonstrate that the Agora-Cynwyd contract was not approved by the Board because the Agora by-laws only required the vote of one Board member to approve Cynwyd's engagement. Defendant points to the fact that the by-laws are silent with respect to the number of board members that must be present at any

board meeting and to the by-law provision that only requires a majority of Board members present at any meeting to "decide any questions." Defendant ignores the by-law provision requiring a majority vote of all Agora Board members for the approval of entering into contracts where the amount involved exceeds $200. A rational juror could certainly find that the Agora-Cynwyd Contract falls into that category. In addition, Defendant invites us to draw the inference that because three of the eight Agora Board members listed on the May 6 meeting minutes did not testify at the trial, any one of them could easily have approved the Agora-Cynwyd Contract, and thus, the Government failed to prove that the contract was not approved. When viewing the evidence in a light most favorable to the Government—including evidence that five Board members testified that they had never attended any Agora Board meeting or approved the Agora-Cynwyd Contract, that the meeting minutes were created on a computer at Agora's administrative office the same day they were produced to auditors in 2009, that the contract itself contained forged signatures, and that Lisa Carbungcal was asked to sign a fabricated resolution purporting to memorialize the Board's approval of the contract many years after the alleged May 6 meeting took place—the inference proposed by Defendant is untenable.

Defendant also argues that because other Agora Board members who were not listed as attending the May 6 Board meeting were aware of the existence of the Agora-Cynwyd Contract, and aware that Defendant received fees pursuant to the contract, there could not have been a material misrepresentation about the validity of the Agora-Cynwyd Contract.[12] This argument is

---

[12] For example, Defendant points to the fact that Howard Lebofsky, former Agora Board President, testified that he was given a copy of an Agora-Cynwyd Contract prior to joining the Board. (December 2, 2012 Trial Tr. 22-23, ECF No. 276.) However, Mr. Lebofsky also testified that he did not join the Agora Board until sometime in 2008, years after the contract had allegedly been approved. (*Id*. at 13.) By that time, Defendant had already submitted multiple Cynwyd invoices to Agora, and had been paid on those invoices. The fact that Mr. Lebofsky

similarly unavailing. It is of no consequence that Board members that served after the Agora-Cynwyd Contract was allegedly approved, or who were in no way associated with the alleged approval of the contract, were aware of a contract's existence and that Defendant was compensated in accordance with the terms of the contract. A rational juror could find, based on the evidence presented at trial, that Defendant had fraudulently represented to those Board Members that the contract had been blessed by the Board.

Defendant's second argument centers on the intent requirement of the wire fraud statute. Specifically, Defendant contends that she provided valuable services to Agora, that her valuable services support an inference that she acted in good faith, and that a finding of good faith precludes an inference that she acted with the required intent to defraud. As we instructed the jury, a finding that Defendant acted in good faith is a complete defense to the charges. (December 12, 2013 Trial Tr. 66, ECF No. 283.) This is because "good faith on the part of the defendant would be inconsistent with their acting with intent or acting intentionally." (*Id*. at 66-67.) We further instructed the jury that:

> A person acts in good faith when he or she has an honest held belief, opinion or understanding that a fact existed, a statement was true, or that the acts were not unlawful, even though the belief or the opinion or the understanding turns out to be inaccurate or incorrect. Thus, for example . . . if Dr. Brown made an honest mistake or had an honest misunderstanding about the Board's approval of the contract, then she did not act with intent or intentionally.

> You should understand that a defendant did not act in good faith, however, if even though he or she honestly held a certain opinion or belief or understanding, he or she also made false statements, false representations or promises to others.

(*Id*. at 67.)

---

was aware of the purported Agora-Cynwyd contract during his tenure on the Agora Board in 2008 and 2009, does not serve to validate an alleged fraud that occurred in 2006.

Defendant misconstrues the good faith defense and its application to the evidence presented by the Government. The Government does not take issue with Defendant's qualifications or performance as an educator. However, the fact that Defendant may have provided valuable services to Agora does not mean that she honestly believed that the Agora Board had approved the Agora-Cynwyd Contract. Nor does it negate the evidence, viewed in a light most favorable to the Government, that she caused the contract to be forged, requested that an employee execute a board resolution purporting to memorialize the Agora Board's approval of the contract many years after it was allegedly approved, and submitted invoices pursuant to the contract knowing that contract was not in fact valid. One who honestly believes that what they are doing is beneficial does not act in good faith when in order to reach their goal they lie, make false statements, or cause false statements to be made. This is certainly true when the one creating the lies and false statements is ultimately the financial beneficiary of those lies and false statements. Based on all of the evidence introduced by the Government, we are satisfied that a rational juror could find proof of Defendant's guilt beyond a reasonable doubt with respect to Counts 1 through 12.

2. *Counts 13 & 14 – Settlement Agreement with Cynwyd*

i. <u>Factual Background</u>

Counts 13 and 14 of the Indictment also relate to Defendant's alleged scheme to defraud the School District of Philadelphia and Agora. Specifically, they charge that as a result of the fraudulent Agora-Cynwyd Contract, Defendant received $3 million dollars for settling civil lawsuits with K12 and the Department of Education.

As a result of its audit, on June 22, 2009, the PaDOE issued a notice of revocation to Agora, resulting in Agora losing its funding. (Nov. 12 Trial Tr. 121-22; Gov't Ex. 132.) The

grounds for revocation included, among other things, that Agora violated its charter by retaining outside management companies, Cynwyd and K12, without providing copies of the agreements to the PaDOE for their review and comment. (Gov't Ex. 132.) The Notice of Revocation advised that the board meeting minutes provided to the auditors were incomplete and inaccurate. (*Id.*)

In response to PaDOE's audit and Notice of Revocation, Agora and Cynwyd filed civil lawsuits in federal court against the PaDOE alleging that they were owed fees under the Agora-Cynwyd Contract. (Gov't Exs. 138, 139.); *see also Agora Cyber Charter School v. Pa. Dept. of Educ.*, No. 09-2917 (E.D. Pa., filed June 25, 2009), at ECF No. 1; *The Cynwyd Group. LLC v. K12 Pa., LLC*, No. 09-2963 (E.D. Pa., filed June 29, 2009), at ECF No. 1. In Agora's lawsuit against the PaDOE, Agora alleged multiple claims against the PaDOE, including violations of the charter school law, Title IX, due process, and Agora's civil rights, as a result of the PaDOE's actions in conducting the audit, revoking Agora's charter, and withholding funds from Agora. Agora's complaint specifically alleged that on May 6, 2006, the Agora Board "formally and unanimously approved entering into a management agreement for Agora." (Gov't Ex. 138.) A copy of the Agora-Cynwyd Contract was attached to the complaint. In Cynwyd's lawsuit against K12, Cynwyd alleged a breach of contract claim against K12, seeking recovery of funds it believed it was entitled to for services provided to Agora.

The lawsuits were settled in October 2009. (Nov. 12 Trial Tr. 33; Gov't Ex. 141.) Under the terms of the settlement agreement, K12 and the PaDOE agreed to pay Cynwyd $3,000,000, and Cynwyd agreed to terminate its contracts with Agora and K12. (Nov. 12 Trial Tr. 37, 39-40; Gov't Ex. 141.) Gerald Zahorchak, the former Secretary of Education for the Commonwealth of Pennsylvania, was involved in the civil lawsuits and the settlement of those actions. (Nov. 12

Trial Tr. 18-30.)  Zahorchak testified that in entering into the settlement agreement, the PaDOE relied on the Agora-Cynwyd Contract, and the representation that the contract had been unanimously approved by the Agora Board.  (*Id*. at 37-38.)

ii.   Analysis

Defendant seeks a judgment of acquittal on Counts 13 and 14, arguing that the Government failed to introduce sufficient evidence of a scheme to defraud.  (Def.'s Mot. 3.) Specifically, Defendant claims that there was insufficient evidence to show that the settlement payments made by K12 and the PaDOE were based upon the Agora-Cynwyd Contract.  Rather, Defendant contends that the PaDOE relied only on the terms of the settlement agreement itself, as evidenced by the language contained in the agreement, and therefore could not have relied on representations outside of the agreement, such as the representation that the Agora-Cynwyd Contract was unanimously approved by the Agora Board.  (*Id*. at 9.)

Defendant's argument that the settlement payments were not based on the Agora-Cynwyd Contract is unpersuasive.  The payments were based upon the same scheme to defraud that is set forth in Counts 1 through 12, and the same false representation that the Agora Board approved the contract.  The scheme to defraud Agora and the PaDOE is supported by sufficient evidence, as discussed above in Section III.A.1.  Both lawsuits are based on the Agora-Cynwyd Contract and the approval of the contract by the Agora Board.  The Agora-Cynwyd Contract is in fact the only basis upon which Defendant received the settlement payouts.  In addition, the PaDOE relied on the representation that the Agora-Cynwyd Contract was a valid binding contract in deciding to settle the lawsuits in the first place.  The fact that the settlement agreement states that no party relied on any other statement, representation, or warranty, as inducement or settlement for entering in the agreement does not control.  Based upon all of the

17

evidence surrounding the Agora-Cynwyd Contract, a rational juror could find beyond a reasonable doubt that Defendant's receipt of the settlement payments were in furtherance of a scheme to defraud Agora and PaDOE. Defendant's request for a judgment of acquittal on Counts 13 and 14 will be denied.

### 3. *Counts 15-37 – Planet Abacus Charter School*

#### i. <u>Factual Background</u>

Counts 15 through 37 of the Indictment relate to Defendant's alleged scheme to defraud the School District of Philadelphia and Planet Abacus, a charter school founded by Defendant in July 2007 in Philadelphia. Specifically, the Indictment alleges that Defendant: (1) falsely represented to others that the Planet Abacus Board of Trustees ("Planet Abacus Board") had entered into a management and consulting contract with AcademicQuest, LLC ("AcademicQuest"), an educational management company founded by Defendant in June 2007; (2) participated in creating fraudulent documents to make it falsely appear as if the payments made to AcademicQuest from Planet Abacus were pursuant to board-approved contracts; and (3) collected approximately $705,561.00 pursuant to the fraudulent contracts. (Indictment 18-27.)

On July 1, 2007, the School District of Philadelphia granted a charter to Planet Abacus. (Gov't Ex. 233.) The charter contained a requirement that "prior to the execution of any agreement for the management or operation of" Planet Abacus, the school "shall submit a true, correct, and complete copy of the proposed Management Agreement to the School District for its review and comment." (*Id*. at 7.) During the relevant time period, the school district never received a contract between AcademicQuest and Planet Abacus. (Nov. 18 Trial Tr. 35-41.)

Defendant was the sole owner of AcademicQuest and allegedly caused Planet Abacus to enter into a management contract with AcademicQuest. (Nov. 12 Trial Tr. 205-07.) Under the

terms of the contract, AcademicQuest was responsible for managing and operating Planet Abacus in return for 15% of Planet Abacus's gross revenues. (Gov't Exs. 304, 307.) During the course of the investigation, multiple versions of the contract between Planet Abacus and AcademicQuest were recovered by federal authorities. (Nov. 26 Trial Tr. 223-25.) Different versions had different titles, such as Management Contract, or Consulting Contract, were signed by different individuals, and contained different dates.

Defendant gave Anthony Smoot a copy of a Planet Abacus-AcademicQuest contract that purported to be a management agreement dated March 5, 2007. (*Id*. at 101; Gov't Ex. 304.) Pursuant to this agreement, Defendant as sole owner of AcademicQuest received over $600,000 in fees from Planet Abacus. (Nov. 20 Trial Tr. 101-103; Gov't Ex. 1703.) The invoices submitted by Defendant and the checks issued all contained notations that the fees were for management services. (Nov. 20 Trial Tr. 101-03; Gov't Exs. 304, 305, 1703.)

An audit of Planet Abacus was conducted during the summer of 2009. The auditor, Lawrence Maulo, expressed concerns about the management fees being paid to AcademicQuest from Planet Abacus, and he requested to see a contract supporting the payments. (Nov. 13, 2013 Trial Tr. 149-152, 163-64, ECF No. 232.) Smoot gave him a copy of the management agreement that contained the signatures of Smoot, Defendant, and Earl Shorter. (*Id*. at 167-68; Nov. 20 Trial Tr. 101; Gov't Ex. 304.)[13] Smoot also gave Maulo the invoices submitted by AcadmicQuest to Planet Abacus. (Nov. 20 Trial Tr. 102-03; Nov. 13 Trial Tr. 168-69.) Maulo asked whether the management agreement had ever been submitted to the Philadelphia School District. He did not receive an answer. (Nov. 13 Trial Tr. 163-38.) Reacting to Maulo's inquiries, Defendant provided to Smoot, who in turn, provided to Maulo, a copy of a "Consulting

---

[13] Earl Shorter died in April 2013. (Gov't Ex. 1416.)

Agreement" between Planet Abacus and AcademicQuest. (Nov. 20 Trial Tr. 111; Nov. 13 Trial Tr. 167-68; Gov't Ex. 307.) This agreement was titled "Consulting Agreement Revised" and was dated March 5, 2007. (Gov't Ex. 307.) The agreement contained the signatures of Earl Shorter, Fannie Lee Coleman, Elizabeth Kennedy, and Defendant. (*Id*.) The signature of Coleman was forged by Doris Evans, at Defendant's request. (Nov. 14 Trial Tr. 119-22.) The signature of Kennedy was forged by Joan Chalker. (*Id*.)

During the 2009 audit, Maulo was also provided meeting minutes for two Planet Abacus Board meetings that purportedly occurred on March 5, 2007 and March 16, 2007. (Nov. 20 Trial Tr. 110; Nov. 13 Trial Tr. 166, 171-76.) The March 5, 2007 meeting minutes reflect that the Planet Abacus Board unanimously approved that Planet Abacus contract with AcademicQuest to provide management services to Planet Abacus. (Gov't Ex. 309.) The March 5 meeting minutes reflect that the following Planet Abacus Board members were in attendance: Kathleen Suloff, Joan Chalker, Myra Corbin, Rubye McLaughlin, Earl Shorter, and Doris Evans. (*Id*.) Of these Board members, four testified at trial: Suloff, Chalker, Corbin, and Evans. All four testified that they did not attend a Planet Abacus Board meeting on March 5, 2007, and that they did not vote to approve a contract between Planet Abacus and AcademicQuest. (Nov. 19 Trial Tr. 129-31 (Suloff)[14]; *id.* at 187; Nov. 20 Trial Tr. 78-79 (Chalker); Nov. 14 Trial Tr. 128-31 (Evans); Nov. 18 Trial Tr. 92-102 (Corbin).) The meeting minutes themselves were drafted by Chalker, at the request of Defendant. (Nov. 19 Trial Tr. 187-99; Nov. 20 Trial Tr. 44-47.) Defendant requested Chalker to type the minutes, and told her what information to put in them. (Nov. 20 Trial Tr. 16, 79-80.)

---

[14] Suloff also testified that her signature on a document purporting to approve an Abacus budget was forged. (Nov. 19 Trial Tr. 132.)

The March 16, 2007 meeting minutes are titled "Planet Abacus Special Board Policy Review Meeting," and reflect that the Planet Abacus Board unanimously voted to approve a consulting agreement between Planet Abacus and AcademicQuest. (Gov't Ex. 312.) The minutes also reflect that Defendant was present at the meeting, and she informed the Board that the management contract that they had approved on March 5th was presented to them by mistake. (*Id*.) The minutes also state that Earl Shorter was present at the meeting, and he informed the Board that Defendant had sent him a letter explaining that the management contract should have been a consulting contract. (*Id*.) The letter to Shorter is dated March 9, 2007. In actuality, the letter was drafted by Doris Evans some time in 2009 at Defendant's request. (Nov. 14 Trial Tr. 127; Gov't Ex. 310.) Defendant provided Evans with the information for the letter and the date of the letter. (Nov. 14 Trial Tr. 127.) Also at Defendant's request, in 2009, Evans drafted the March 16 Board meeting minutes, and a Board of Trustees Resolution dated March 14, 2007. (*Id*. at 127-29; Gov't Exs. 311, 312.) The Resolution addressed the change of character of the Planet Abacus-AcademicQuest Contract from a management agreement to a consulting agreement. (Gov't Ex. 311.)

The March 16 Board meeting minutes state that the following Planet Abacus Board members were in attendance: Myra Corbin, Earl Shorter, Ernestine Rouse, and Alma Diggs. (Gov't Ex. 312.) Of these Board members, Corbin and Diggs testified at trial. Both testified that they did not attend a Planet Abacus Board meeting on March 16, 2007, and did not vote to approve a contract between Planet Abacus and AcademicQuest at that meeting. (Nov. 20 Trial Tr. 81-85 (Diggs); Nov. 18 Trial Tr. 92-102 (Corbin).) Diggs had never even heard of AcademicQuest, and was unaware of any contracts between Planet Abacus and AcademicQuest. (Nov. 20 Trial Tr. 81-85.)

Defendant's efforts to make it appear as though the management agreement was in fact a consulting agreement are further revealed by evidence that she requested invoices and bills to be altered to remove reference to the management agreement.  Specifically, Defendant requested that Smoot change any references to "management" on the AcademicQuest invoices to "consulting."  (*Id*. at 113-14.)  Smoot made these changes.  (*Id*.; Gov't Ex. 511.)  Defendant also requested the attorney who drafted the management contract to alter his bills to reflect that the management contract was prepared on behalf of another school.  (Nov. 12 Trial Tr. 83-87.)  The attorney complied, and altered two-year-old bills to reflect the changes requested by Defendant. (*Id*. at 86-87.)

After receiving the consulting contract, board meeting minutes, resolution, and letter from Defendant to Shorter, the auditor continued to have concerns about the contractual relationship between Planet Abacus and AcademicQuest, and requested that Defendant and Smoot seek a legal opinion.  (Nov. 13 Trial Tr. 173-79.)  He never received the legal opinion, and he later withdrew from the audit without having completed it.  (*Id*. at 174, 206-17.)

All of the Counts comprising Counts 15 through 37, with the exception of two Counts, relate to wire transfers to AcademicQuest from Planet Abacus.  (Indictment 30-33.)  The total amount paid to AcademicQuest pursuant to the Planet Abacus-AcademicQuest Contract was $705,561.62.  (Gov't Ex. 1703.)  Counts 34 and 35 relate to email communications from Defendant regarding the consulting services provided by AcademicQuest.  (Indictment 32-33.)

ii.    Analysis

Defendant argues that the Government failed to present sufficient evidence:  (1) of a material misrepresentation made by Defendant in furtherance of the scheme to defraud; (2) that

Defendant had the requisite intent to defraud; and (3) that Defendant lacked good faith in believing that the Planet Abacus Board approved the Planet Abacus-AcademicQuest agreements.

The Government contends that the primary misrepresentation made by Defendant was that the Planet Abacus Board approved the contractual relationship with AcademicQuest. Based upon the evidence introduced during the trial, this is certainly a reasonable inference to draw. The meeting minutes from the March 5, 2007 Planet Abacus Board meeting state that the six members in attendance unanimously voted to contract with AcademicQuest. However, four of the Planet Abacus Board members listed on the meeting minutes testified that they did not attend a meeting on March 5, 2007, and that they never voted to approve a contract between Planet Abacus and AcademicQuest. Defendant requested Chalker to draft the minutes and told her what information to put in them. The meeting minutes from the March 16, 2007 Planet Abacus Board meeting state that the four members in attendance unanimously voted to approve of a revised contract between Planet Abacus and AcademicQuest, after being advised that the contract they previously approved was incorrect and mistakenly submitted to them. However, two of the Planet Abacus Board members listed on the March 16 meeting minutes testified that they did not attend this meeting and never approved of any contract between Planet Abacus and AcademicQuest. Defendant requested that Evans draft the March 16 meeting minutes and told her what information to put in them. Defendant suggests that because the Government did not call the other Board members, some of whom have since passed away, it failed to offer sufficient evidence showing a material misrepresentation. Defendant merely offers an alternative inference that can be drawn from the absence of testimony. However, viewing the evidence in a light most favorable to the Government, the more reasonable inference is that the meetings never took place and the Board never actually voted to approve the contracts.

Defendant also argues, as she did with respect to Counts 1 through 12, that the Government failed to show that she intended to deceive the Board about the existence of the contract between Planet Abacus and AcademicQuest or the amounts paid to her under the contract. Defendant points to evidence that Planet Abacus budgets were presented to the board and contained line items for fees paid to AcademicQuest. This inference assumes that the Planet Abacus Board members reviewing the budget were aware of the circumstances under which the contract was entered. There is no evidence of this. Rather, the evidence shows that at least one version of the Planet Abacus-AcademicQuest contract contained forged signatures, and that Board meeting minutes purporting to approve of the contracts were drafted, at Defendant's direction, years after the meetings took place. In addition, when determining whether the intent element is present, the jury may consider whether the defendant "acted with a desire or purpose to bring about some gain or benefit to herself." Third Circuit Model Jury Instructions 6.18.1314-4. Defendant was the sole owner of AcademicQuest and was the only person who benefited from the Planet Abacus-AcademicQuest contract. She received $705,561 pursuant to that contract.

Finally, Defendant's good faith argument fails when one considers the evidence viewed in a light most favorable to the Government. The evidence showed that Defendant directed others to draft board meeting minutes evidencing the board's approval of the contracts, when in fact, many board members who were listed on the minutes, testified that they were not at the meeting and never approved of any contracts with AcademicQuest. Defendant also contends that the evidence merely shows that Defendant acted in good faith by changing documents in order to conform to past events that actually took place. Defendant invites us to conclude that because Earl Shorter and Ernestine Rouse did not testify at the trial, the Government failed to show that

the Board did not approve the Planet Abacus-AcademicQuest contract. This inference also fails when viewed in light of all of the other evidence in the record. Defendant's request for a judgment of acquittal on Counts 15 through 37 will be denied.

4. *Counts 46-50 – Laboratory Charter School*

i. Factual Background

Counts 46 through 50 of the Indictment relate to Defendant's alleged scheme to defraud the School District of Philadelphia and Lab. Specifically, the Indictment alleges that Defendant paid Barbara Browne, an employee she hired to do work for Cynwyd, to be paid with money from Lab, which was funded by the Philadelphia School District. (Indictment 14, 34-35.)

Ms. Browne was hired by Defendant in July 2008 to be an administrative assistant for Cynwyd. (Nov. 26, Trial Tr. 34-35.) She worked for Defendant for approximately 16 to 18 months. (*Id*. at 35.) Ms. Browne reported to Defendant, and spent approximately 95% of time doing work for Cynwyd. (*Id*. at 38.) Ms. Browne would submit invoices to Defendant and Anthony Smoot indicating the amount of time she spent doing work for Cynwyd. (*Id*. at 38; Gov't Ex. 500-136.) Her invoices were on Cynwyd Group letterhead. (Nov. 26 Trial Tr. 39; Gov't Ex. 500-136.) After submitting an invoice, she would receive a check issued by Lab. (Nov. 26 Trial Tr. 41; Gov't Exs. 1040-1044.) The checks were signed by Defendant and Smoot. (Nov. 26 Trial Tr. 41.) Ms. Browne testified that she was not working for Lab at this time. (*Id*.) At some point in 2009, Defendant instructed Ms. Browne to prepare her invoices for Lab instead of for Cynwyd. (*Id*. at 44.) From July 2009 through September 2009, the invoices were prepared on Lab letterhead. (Gov't Ex. 730.) Despite invoicing a different entity, Ms. Browne's work did not change. (Nov. 26 Trial Tr. 46.) She continued to work on Cynwyd-Agora-related matters. (*Id*.)

Counts 46 through 50 represent wire transfers made to Ms. Browne from the Lab bank accounts. The invoices comprising these Counts total $11,250.

        ii.   <u>Analysis</u>

Defendant contends that the Government's evidence fails to show that the payments to Ms. Browne were motivated by an intent to defraud. (Def.'s Supp. Mot. 19.) Defendant contends, that at most, the evidence shows that Ms. Browne performed the services for which she was paid, and that she performed services for one entity but was paid by another entity. (*Id*. at 20.) Defendant also argues that the Government failed to show that she did not act in good faith in ensuring that Ms. Browne was compensated for her services. (*Id*.)

As we instructed the jury at trial, "in considering whether the defendant acted with an intent to defraud, you may consider, among other things, whether she acted with a desire or purpose to bring about some gain or benefit to herself." (Dec. 12, 2013 Trial Tr. 42, ECF No. 283.) Viewing evidence in the light most favorable to the Government, we are satisfied that a rational juror would find that Defendant had an intent to defraud Lab and the School District of Philadelphia by causing Lab to pay Ms. Browne for the work she performed for Cynwyd, Defendant's private education management company. Ms. Browne was hired by Defendant to provide administrative assistance to Cynwyd. She performed approximately 95% of her work for Cynwyd. She submitted her work to Defendant, and understood at all times that Cynwyd was her employer, and that Defendant was her boss. Yet, despite working for, and submitting invoices to, Cynwyd, Ms. Browne received payments issued by Lab. Defendant received the benefit of Ms. Browne's work without having to pay for it. Defendant was the only person who benefited from this scheme.

Defendant contends that because Ms. Browne assisted Chalker with preparing the PIMs report, which is a report issued to the state concerning all of the schools, including Lab, she also performed work for Lab. While it is true that Ms. Browne assisted Chalker, the CEO of Planet Abacus, to prepare the PIMS report, the report related to all of Defendant's schools, not just Lab. Moreover, it is not disputed that most of Ms. Browne's work was done for Cynwyd.

Defendant's good faith argument is also unavailing. There is no dispute that Ms. Browne performed the services for which she was paid. Ms. Browne is not alleged to be the victim of the fraud. The victims were Lab and the Philadelphia School District. While Defendant may have had good intentions in ensuring that Ms. Browne was paid for her services, good faith cannot serve as a defense for a scheme where Ms. Brown was paid by a different entity, a government-funded entity, when she provided the work for Defendant's private company. Defendant's request for a judgment of acquittal on Counts 46 through 50 will be denied.

**B.      Obstruction of Justice Counts Under 18 U.S.C. § 1519**

Counts 54, 55, 57, 58, and 63 all charge obstruction of justice under 18 U.S.C. § 1519. That statute states:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519. The jury was instructed that the Government must prove the following elements:

> (1) that the defendant knowingly altered, falsified, destroyed, mutilated, concealed, or attempted to conceal a record, document, or tangible object;
>
> (2) that the defendant did so with the intent to impede, obstruct, and influence the investigation and proper administration of a matter; and

(3) that the matter was within the jurisdiction of an agency of the United States, including the Federal Bureau of Investigation, and the Department of Education, Office of Inspector General.

(Dec. 12 Trial Tr. 56-57.); *see also United States v. Moyer*, 674 F.3d 192, 207, 209-10 (3d Cir. 2012). The defendant does not need to have knowledge of a pending federal investigation or proceeding. *Moyer*, 674 F.3d at 208-09 ("The government therefore need not prove that [the defendant] actually knew that the 'matter' at issue was within the jurisdiction of the federal government when he falsified documents.").

### 1. Count 54 – May 6, 2006 Agora Board Meeting Minutes

Count 54 charges Defendant with obstruction of justice for knowingly altering and falsifying the May 6, 2006 Agora Board meeting minutes. The factual support for this charge is previously set forth in Section II.A.1. above.

Defendant contends that the Government offered no evidence showing that she falsified the May 6 Board meeting minutes. Defendant points to the testimony of the computer forensic expert, Esteban Roche, who testified that according to metadata analysis of the computers housed at the administrative offices for the schools, the May 6 meeting minutes were created by an individual named "Kathy." Defendant contends that the only "Kathy" that served as a witness during the trial was Kathy Suloff, who testified that she did not recall whether she typed the May 6 meeting minutes, and that Defendant never explicitly requested her to falsify board meeting minutes. The Government responds that all of the evidence viewed in its entirety shows that Defendant caused or directed or aided and abetted in the creation of the May 6th meeting minutes on March 11, 2009, and only after the auditor specifically requested them. In addition, five of the eight individuals listed on the May 6 Board meeting minutes testified that they were never at the May 6th meeting, never attended any Agora Board meetings, and never approved of

28

the Agora-Cynwyd Contract. Viewing the evidence in the light most favorable to the Government, we agree with the Government.

Defendant provided all of Agora's Board meeting minutes to the auditor on May 11, 2009, when he was at the school conducting the audit. The auditor noticed that the May 2006 minutes were missing and requested that he be provided with a copy of the minutes. Approximately two hours after the minutes were requested, they were faxed to the location where the audit was taking place. The computer forensic expert testified that the only version of the meeting minutes recovered from the computers and hard drives at the schools' administrative office was created on March 11, 2009, the same day that the minutes were requested by the auditor.

Even though the metadata did not reveal Defendant as the creator of the meeting minutes, the evidence shows that Defendant asked at least two of her employees—Chalker and Evans—to draft meeting minutes for the schools. Evans and Chalker both testified that they complied, and that Brown told them what information to include in the meeting minutes. Suloff also testified that she retyped or reformatted Agora Board meeting minutes. When Suloff did this, she saw that her name was listed on many of the meeting minutes, even though she never attended an Agora Board meeting. After expressing concerns to Defendant about her name appearing on meeting minutes, Suloff was advised by Defendant that mistakes had been made in the former minutes, and that changes were being made "for the good of the schools." (Nov. 19 Trial Tr. 117, 120.) Although Suloff may not have been specifically told to falsify the minutes, Defendant told her to retype them and provided false information to put in them. When drawing all inferences in the Government's favor, a rational juror could find Defendant had knowingly falsified or caused the falsification of the May 6 Board meeting minutes with the intent to

impede or influence one of the matters that was under investigation by the auditors. Defendant's request for a judgment of acquittal on Count 54 will be denied.

## 2. Count 55 – March 5, 2007 Planet Abacus Board Resolution

Count 55 charges Defendant with obstruction of justice for knowingly altering and falsifying the March 5, 2007 Planet Abacus Board resolution entitled "Resolution Approving Contracting with AcademicQuest for Consulting Services," with the intent to impede a matter within the jurisdiction of federal agencies, namely the FBI and the Department of Education, Office of Inspector General ("DOE-OIG").

The evidence at trial shows that the March 5, 2007 Resolution was drafted by Chalker in 2009, at Defendant's request. (Nov. 19 Trial Tr. 205-09; Gov Ex. 651.) Two electronic copies of the resolution were recovered from a computer and a flash drive located in the administrative offices of the schools. (Nov. 25, 2013 Trial Tr. 162-66, ECF No. 274.) Metadata shows that the documents were created on July 28, 2009, and that the author was Chalker.

Defendant argues that a judgment of acquittal is appropriate on Count 55 because the evidence is consistent with a showing of Defendant's good faith, and inconsistent with her intent to obstruct justice. Specifically, Defendant contends that Chalker typed the Resolution after a meeting with Defendant where Defendant advised Chalker that she had made a mistake drafting the original contract as a management contract as opposed to a consulting contract. (*See* Nov. 19 Trial Tr. 205, 209.) According to Defendant, this evidence shows that Defendant and Chalker were, in good faith, correcting a mistake that was brought to their attention during Maulo's audit, not that they were obstructing justice. We reject Defendant's argument.

The evidence at trial demonstrates that Defendant first undertook changing the management agreement to a consulting agreement in 2009, only after learning that the auditor

had concerns that the agreement was never submitted to the Philadelphia School District for their review and comment, with full knowledge that the charter forbade the hiring of an outside "management" company. The evidence also shows that, in 2009, two years after the management agreement took effect, instead of admitting to the "mistake," Defendant instead drafted a new "revised" consulting contract containing forged signatures, caused invoices and bills to be altered to reflect consulting rather than management fees, requested her staff to fabricate board meeting minutes, and dictated a letter to Earl Shorter explaining the discrepancy. Viewing the evidence in a light most favorable to the Government, the reasonable inference that can be drawn is that Defendant was attempting to cover her tracks, and not that she was trying to, in good faith, correct a mistake. Defendant's request for a judgment of acquittal on Count 55 will be denied.

3. *Count 57 – June 25, 2007 Lab Benefits Policy*

Count 57 charges Defendant with obstruction of justice for knowingly falsifying a June 25, 2007 Laboratory Benefits Policy with the intent to impede or influence a matter within the federal jurisdiction of the FBI and Department of Education. Specifically, Defendant and Chalker altered the policy in 2009 by inserting a retroactivity clause that allowed them each to be paid for unused sick time and leave time that had accumulated before the policy was created.

Lab's leave and benefits policy forbid employees from accumulating sick and vacation days going back more than 18 months. (Nov. 13 Trial Tr. 203-05; Gov't Exs. 321, 322.) On December 21, 2009, approximately six months after Defendant stopped working for Lab, Defendant told Chalker and Smoot that she and Chalker were entitled to money for their unused vacation and sick days dating back to 1998. In April 2009, Smoot issued a check to Defendant in the amount of $144,939.10 and a check to Chalker in the amount of $69,156.24, representing

payouts for their unused time. (Gov't Exs. 1045, 1046.) During his audit in the summer of 2009, Maulo raised concerns about the benefits payouts, explaining to Defendant that the June 25, 2007 policy did not permit employees to be paid out on unused sick and vacation days going back to 1998 because the policy was not retroactive. (Nov. 13 Trial Tr. 194-97, 201-02.) In response to Maulo's concerns, Defendant told Chalker to revise the June 2007 Lab Benefit Policy to insert a retroactivity clause. This was done on December 21, 2009. (Nov. 19 Trial Tr. 214-16; Nov. 20 Trial Tr. 64; Gov't Ex. 516, 665.)

Defendant argues that a judgment of acquittal is appropriate on Count 57 because the Government failed to present sufficient evidence showing that Defendant "was not acting in good faith to record actual past events" when she told Chalker to revise the policy. (Def.'s Supp. Mot. 31.) Defendant points to the testimony of Chalker, who testified that after talking to Maulo and Defendant, "the upshot was that I was asked to do a revision of the existing vacation and sick time [policy] to reflect the suggestions that Mr. Maulo had made." (Nov. 19 Trial Tr. 213-14.) Defendant suggests that Chalker's testimony demonstrates that Defendant and Chalker were simply doing what the auditor told them to do to reflect the Board's approval of the changed policy. The problem with this is that Chalker's testimony is ambiguous and is not supported by any evidence that the Lab Board in fact approved the changes to the benefits policy. Moreover, Maulo did not testify specifically that he recommended that the policy be changed, rather only that he had concerns about the payout and the policy as it was drafted. A rational juror viewing this evidence could conclude that Defendant and Chalker unilaterally changed the 2007 Lab Benefit Policy without Lab Board approval, and with the intent to obstruct the investigation that had prompted the audit. Viewing the evidence in a light most favorable to the Government, we will deny Defendant's request for a judgment of acquittal on Count 57.

4.    *Count 58 – AcademicQuest Consulting Invoices*

Count 58 charges Defendant with obstruction of justice for knowingly altering and falsifying AcademicQuest invoices for dates ranging from September 30, 2007 to February 28, 2009 to reflect consulting fees instead of management fees.  Much of the factual support for this count is previously set forth in Section III.A.3.a above.  As discussed in this section, during his audit of Planet Abacus in 2009, Maulo expressed concerns that the Planet Abacus-AcademicQuest management agreement had not been submitted to the Philadelphia School District prior to becoming effective.  Planet Abacus' failure to submit the management agreement to the School District would have been a violation of the school's charter.  In response, Defendant caused a new Planet Abacus-AcademicQuest consulting agreement to be executed, which contained two forged signatures.  She also requested staff members to draft board meeting minutes to reflect the Planet Abacus Board's adoption of the management agreement and subsequent adoption of the consulting agreement.  The meeting minutes were drafted approximately two years after the meetings allegedly took place.  The minutes described that the management agreement was submitted to them by mistake and that the agreement was always intended to be one for consulting services.  In addition, Defendant requested Evans to draft a letter to Shorter dated some time in 2007 that explained the mistake made in characterizing the contract.  In response to Maulo's concerns, Defendant also requested that Smoot alter a set of AcademicQuest invoices by changing a notation contained on the invoices from "management fees" to "consulting fees."

Defendant argues that a judgment of acquittal on this count is appropriate because there was no evidence introduced at trial demonstrating that the invoices were changed with the intent to obstruct justice.  Instead, Defendant contends that the invoices were revised "as part of a good

faith effort to conform to the revised Planet Abacus-AcademicQuest consulting agreement," in response to an auditor inquiry. (Def.'s Supp. Mot. 32.) We disagree. The evidence, when viewed a light most favorable to the Government, shows that in response to Maulo's inquiries, Defendant arranged for the creation of false and fabricated documents to justify her receiving over $600,000 under the Planet Abacus-AcademicQuest management contract. A rational juror could conclude that Defendant intended to obstruct justice by causing the alteration of the AcademicQuest invoices. Defendant's argument that the evidence does not show an intent to obstruct justice because she was merely responding to an auditor's inquiry is without merit. Defendant's knowledge of a pending federal investigation or proceeding is not required for her to have obstructed justice in violation of 18 U.S.C. § 1519. *Moyer*, 674 F.3d at 208-09. Defendant's request for a judgment of acquittal on Count 58 will be denied.

### 5.    *Count 63 – Lease Agreement between Cynwyd and AcademicQuest*

Count 63 charges Defendant with obstruction of justice for knowingly fabricating a lease agreement dated November 28, 2007 between Cynwyd and AcademicQuest (the "Cynwyd-AcademicQuest Lease") with the intent to impede or influence a matter within the jurisdiction of the federal agencies.

Evidence presented at trial showed that on or about April 5, 2010, Defendant presented Arnita Medley, her secretary at the time, with a document purporting to be a lease between AcademicQuest and Cynwyd. Under the terms of the document, AcademicQuest would pay Cynwyd $25,000 a month to use the property to operate a publically funded charter school. (Gov't Ex. 508; Nov. 18 Trial Tr. 140-43.) Defendant asked Medley to sign the Lease using a fictitious name. (Nov. 18 Trial Tr. 142.) Medley did not feel like she had a choice, but signed the document using the name Arnita Bluntz, without having first reviewed the document. (*Id.* at

140, 142-143.)  The Lease was also signed by Defendant on behalf of the lessee, Cynwyd.

(Gov't Ex. 508.)

Defendant argues that a judgment of acquittal on this count is appropriate because there is

no evidence that she intended to obstruct, impede, or influence an investigation.  Specifically,

Defendant contends that because she was the owner of both AcademicQuest and Cynwyd, her

authorization to Medley to sign the document was proper.  We reject this argument.  Defendant

directing a subordinate to sign a false name to a document does not "legitimize the agreement" as

Defendant suggests.  Instead, it is evidence that could convince a rational juror that Defendant

knowingly caused the falsification of a Lease with the intent to impede an investigation which

was in fact ongoing at the time.  Defendant's request for a judgment of acquittal is denied.

### C. Obstruction of Justice Counts under 18 U.S.C. § 1512 -- Counts 61 and 62 – Emergency Loan Agreements

Defendant also seeks a judgment of acquittal on Counts 61 and 62, which charge

obstruction of justice under 18 U.S.C. § 1512(c)(2).  In these counts, Defendant is charged with

corruptly obstructing, influencing, and impeding an official proceeding by fabricating four

backdated "Emergency Loan Agreements."   The Government contends that the Loan

Agreements were created as evidence that the school's board of directors approved the transfer

of funds between the schools.

Section 1512(c)(2) penalizes anyone who corruptly "obstructs, influences, or impedes

any official proceeding, or attempts to do so."  18 U.S.C. § 1512(c)(2).  To be found guilty of

obstruction of justice under this statute, the jury must be convinced that the following elements

were proved beyond a reasonable doubt:

> (1) that the defendant knowingly and intentionally instructed, influenced, or
> impeded any official proceeding or attempted to do so;

(2) that the defendant did so corruptly.

(Dec. 12 Trial Tr. 60.)  In other words, Defendant must have acted with the intent to prevent the

Government from obtaining materials to which it was entitled as part of its investigation into

Defendant's schools.  Section 1512 requires that the obstruction be in relation to an official

proceeding, which is defined to include a proceeding before the grand jury.  *See* 18 U.S.C. §

1515(a)(1)(A).

   *1.    Factual Background*

   On April 1, 2010, in response to grand jury subpoenas, counsel for Defendant produced

to the U.S. Attorney's Office financial information for Defendant's schools, which showed that

money had been transferred between the schools.  (Nov. 26 Trial Tr. 207; Gov't Exs. 733-736,

738.)  Defendant's counsel also produced to the U.S. Attorney's Office four Emergency Loan

Agreements.  (Gov't Exs. 718-721.)

   Each of the Emergency Loan Agreements purports to document the borrowing of funds

by one school from another school.[15]  Loan 1 and Loan 2 are dated July 1, 2007 and resolve that

Planet Abacus may borrow funds from Main Line and Lab.  (Gov't Exs. 718, 719.)  However,

metadata analysis reveals that these Loans were drafted on March 25, 2010, almost three years

after they were dated, and a week before they were produced to the Government in response to

the grand jury subpoenas.  (Gov't Exs. 1714.)  Loan 3 and Loan 4 are dated in 2003 and 2004

and resolve that Ad Prima may borrow funds from Main Line and Lab.  (Gov't Exs. 720, 721.)

Despite the representation that they were created in 2003 and 2004, metadata analysis reveals

---

[15] The first Emergency Loan Agreement, dated July 1, 2007, permits Abacus to borrow
$50,000 from Main Line ("Loan 1").  (Gov't Ex. 718.)  The second Emergency Loan Agreement,
dated July 1, 2007, permits Abacus to borrow $75,000 from Lab ("Loan 2").  (Gov't Ex. 719.)
The third Emergency Loan Agreement, dated November 20, 2003, permits Ad Prima to borrow
$15,000 from Main Line ("Loan 3").  (Gov't Ex. 720.)  The fourth Emergency Loan Agreement,
dated July 2004, permits Ad Prima to borrow $300,000 from Lab ("Loan 4").  (Gov't Ex. 721.)

that these Loans were actually drafted on March 31, 2010. (Gov't Ex. 1714.) One of these loans contains the forged signature of Doris Evans. (Gov't Ex. 720; Nov. 14 Trial Tr. 152.) Chalker testified that Defendant directed her to type the Emergency Loan Agreements in March 2010 so that they could be sent to the U.S. Attorney's Office. (Nov. 19 Trial Tr. 221-24.)

### 2. *Analysis*

Defendant argues that a judgment of acquittal is warranted on Counts 61 and 62 because the Government did not introduce any evidence showing that the school's boards did not approve of each of the emergency loan agreements. In support of this, Defendant relies on the testimony of the school's auditors, who took no issue with the loans. Specifically, Defendant points to the testimony of Maulo, who testified that the emergency loans were not an "audit issue" because "the loan that was on one set of books as a loan payable and was on the other set of books as a loan receivable." (Nov. 13 Trial Tr. 236.) Defendant also argues that there was no evidence that Defendant acted corruptly and with the intent to obstruct justice.

We are not persuaded by Defendant's argument. Defendant does not dispute the evidence introduced by the Government, but instead offers an alternative inference that can be drawn from that evidence. The fact that Maulo did not view the Loan Agreements as an audit issue during his 2009 audit does not mean that the school's boards approved the Loans. The evidence at trial showed that within weeks of responding to a federal grand jury subpoena, Defendant directed Chalker to draft the Loan Agreements. These agreements purported to serve as the basis for transferring funds between Defendant's schools. Based on all of this evidence, viewed in a light most favorable to the Government, any rational juror could find beyond a reasonable doubt that Defendant obstructed, influenced, and impeded the grand jury proceeding

by causing the fabrication of the four Emergency Loan Agreements.  Defendant's request for a judgment of acquittal on Counts 61 and 62 will be denied.

### D. Conspiracy to Obstruct Justice – Count 53

Finally, Defendant seeks a judgment of acquittal on Count 53, which charges conspiracy to obstruct justice, in violation of 18 U.S.C. § 371.  Specifically, Count 53 alleges that from at least August 2008 through April 2012, Defendant conspired with others to obstruct justice by altering and falsifying records within the investigative jurisdiction of the FBI and Department of Education in response to grand jury subpoenas issued to her companies and the schools she founded.

To prove that Defendant is guilty of conspiracy, the Government must show the following elements:  (1) that two or more persons agreed to commit an offense against the United States, here, obstruction of justice; (2) that Defendant was a party to or member of that agreement; (3) that Defendant joined the agreement or conspiracy knowing of its objectives to commit an offense against the United States and intending to join together with a least one other alleged conspirator to achieve those objectives; that is, that Defendant and at least one other alleged conspirator shared a unity of purpose and intent to achieve a common goal or objective to commit an offense against the United States; and (4) that at some point during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further objectives of the agreement.  Third Circuit Model Jury Instruction 6.18371A; *see also United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012); (Dec. 12 Trial Tr. 46-47).  Defendant must have "specifically intend[ed] to further the substantive offense."  *United States v. Carbo*, 572 F.3d 112, 116 n.2 (3d Cir. 2009).

The elements of conspiracy "can be proven entirely by circumstantial evidence." *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005). Although circumstantial or indirect evidence alone may be sufficient for proving a conspiracy, the Third Circuit has cautioned that:

> We must, however, give close scrutiny to the sufficiency of the government's evidence in a conspiracy case, for the reasons that slight evidence of a defendant's connection with a conspiracy is insufficient to support a guilty verdict, and guilt must remain personal and individual. Conspiracy cannot be proven by piling inference upon inference where those inferences do not logically support the ultimate finding of guilt.
>
> In conducting the sufficiency inquiry, we do not view the government's evidence in isolation, but rather, in conjunction and as a whole. The court must determine whether all the pieces of evidence, taken together, make a strong enough case to let a jury find the defendant guilty beyond a reasonable doubt. To sustain a conspiracy conviction, the contention that the evidence also permits a less sinister conclusion is immaterial. The evidence need not be inconsistent with every conclusion save that of guilt.

*Id*. (internal quotation marks and citations omitted).

### 1. Factual Background

In May 2008, the FBI and DOE-OIG began investigating the Philadelphia Academy Charter School ("PACS"), and its founder, Brien Gardiner. (Nov. 12 Trial Tr. 190-91.) PACS was a public charter school in Northeast Philadelphia. (*Id*. at 191.) During this investigation, the investigators discovered that Gardiner, who also founded Cynwyd with Defendant, had close ties to Defendant. (*Id*. at 191-92.) The investigation expanded to look at Gardiner's associates, including Defendant. (*Id*. at 191.) As part of the investigation, between May 2008 and October 2008, grand jury subpoenas were issued to entities known to be affiliated with Gardiner and Defendant, including Agora, Planet Abacus, Lab, Ad Prima, Main Line, Cynwyd, and AcademicQuest. (Gov't Exs. 701-713.) The subpoenas requested all financial records, including financial statements, ledgers, balance sheets, bank statements, credit card statements, receipts, invoices, and cancelled checks from 2003 to the present from each of the entities. (*Id*.; Nov. 12

Trial Tr. 194.)  The subpoena to Agora requested "any and all documents . . . relating to . . . the Cynwyd Group . . . [and] June Brown" including contracts and loan agreements.  (Nov. 12 Trial Tr. 196-97.)

Based on the information obtained during the 2008 investigation, the FBI and DOE-OIG launched another criminal investigation in March 2010 that was focused specifically on Defendant, Cynwyd, AcademicQuest, and Defendant's schools, including Lab, Ad Prima, Agora, Main Line, and Abacus.  (*Id*. at 208.)  During this investigation, grand jury subpoenas were issued to AcademicQuest and Cynwyd, in 2012.  (Gov't Exs. 714-717.)  The focus of the 2010 investigation was to determine whether Defendant used Cynwyd and AcademicQuest to defraud Agora, Planet Abacus, Ad Prima, and Main Line.  (Nov. 13 Trial Tr. 56.)

The evidence that was obtained during the 2008 and 2010 investigations has been previously described in this Memorandum.  Generally, the evidence, when viewed in a light more favorable to the Government, shows that during the investigation, Defendant directed employees to alter and falsify documents, including contracts, board meeting minutes, board resolutions, and financial records, that related to the relationship and exchange of money between and among the schools she founded and her private companies, Cynwyd and AcademicQuest.  *See Supra* at Sections III.A.1-4, III.B., III.C.

2.    *Analysis*

Defendant argues that a judgment of acquittal is warranted because there is insufficient evidence showing that Defendant formed an agreement with others with the intent to obstruct justice.  In support of this argument, Defendant relies on evidence that Defendant had meetings with her employees where board meeting minutes were discussed.  Defendant claims that none of the testimony reveals that she specifically requested her employees to fabricate the board

meeting minutes.  She points to the testimony of Chalker, who stated that at one meeting, Defendant advised the CEOs of the schools that the minutes were not up to par in that they contained poor grammar and spelling and were incomplete, but that Defendant did not direct that any CEO falsify minutes.  (Def.'s Supp. Mot. 26 (citing Nov. 20 Trial Tr. 38-39 and Nov. 19 Trial Tr. 198-99).)  Defendant also points to the testimony of Doris Evans, who stated that after a meeting with Defendant and Latonya Knox, the Director of Business at Lab, Defendant advised Evans that the board meeting minutes needed to be "redone" according to the format Knox had described at the meeting.  (*Id*. at 27 n.6 (citing Nov. 14 Trial Tr. 135-36).)[16]

Defendant contends that this evidence does not show that she suggested, encouraged, or invited anyone to falsify or alter the documents with the intent to obstruct justice, but instead shows that she "wanted the CEOs of the schools she found to take responsibility for ensuring the schools' minutes appeared professional and accurately reflected what had transpired at the board meetings."  (Def.'s Supp. Mot. 27.)  Defendant's reliance on the selective testimony of Chalker and Evans is misplaced.  Based upon all of the evidence in the record, we must reject Defendant's argument.

The evidence shows that Defendant requested Smoot to forge a signature on the Agora-Cynwyd Contract and that another signature on the contract was forged.  The evidence also shows that the May 6, 2006 Agora Board meeting minutes purporting to approve of this contract were actually drafted in 2009, the same day they were requested by and produced to the PaDOE during an audit.   Five individuals listed as attending the May 6 meeting testified that they were not at that meeting or any other Agora meeting and never approved of the Agora-Cynwyd Contract.  With respect to Abacus, the evidence shows that Defendant requested Evan's and

_____

[16] Evans also testified that at that meeting, Knox never proposed that prior minutes should be changed or reformatted.  (Nov. 14 Trial Tr. 135.)

Chalker to draft board meeting minutes, and provided the information for those minutes. Defendant also requested Smoot to change notations on AcademicQuest invoices from "management" to "consulting." More than half of the individuals that attended the March 5 and March 16, 2007 Abacus Board meetings where the agreement to contract with AcademicQuest was allegedly approved, testified that they never attended those meetings and never approved of the contract with AcademicQuest. In 2010, Brown requested Chalker to draft backdated "Emergency Loan Agreements" to justify the transfer of money between the schools. Defendant, through her private companies, received millions of dollars pursuant to the contracts that were forged, were executed in violation of the schools' charters, and were not approved by the schools' board of directors. Defendant was the only person who benefited from the falsification of the documents at issue. In addition, circumstantial evidence shows that all of these documents were produced to auditors in 2009, after having already received federal grand jury subpoenas requesting financial information, loans, and contracts.

Chalker's and Evans' testimony should not be viewed in isolation, but rather, together with all of the other evidence and testimony presented by the Government in support of the conspiracy charge. *See United States v. Gypsum Co.*, 600 F.2d 414, 417 (3d Cir. 1979) ("The character and effect of a conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (quotation omitted). Moreover, the Government is not required to prove "the existence of a formal or written agreement, or an express oral agreement spelling out the details of the understanding." Third Circuit Model Jury Instruction 6.16.371C; (Dec. 12 Trial Tr. 48 (charging jury on requirements of conspiracy).) Therefore, the jury may conclude that Defendant joined others in an agreement to obstruct justice even if she did not expressly direct Evans and Chalker to fabricate meeting minutes.

Defendant also argues that several of the documents alleged to be a part of the conspiracy resulted from the actions of others, and not Defendant. Specifically, Defendant states that it was Chalker and Evans's idea to forge the two attesting signatures on the Abacus-AcademicQuest consulting agreement. However, this claim is not consistent with Evans' testimony. Evans stated that Defendant handed her the signature page of the agreement, and told her that it needed two signatures and needed to be taken care of right away. (Nov. 14 Trial Tr. 120-21.) In addition, Smoot testified that he forged James Marshall's signature on the Agora-Cynwyd Contract at the request of, and in the presence of, Defendant. When Kathy Suloff was asked to re-type Agora Board meeting minutes and noticed her name was listed as attending even though she never attended a board meeting, she expressed concern to Defendant and was told by Defendant that it was "for the good of the schools." (Nov. 19 Trial Tr. 117, 120.) Defendant's claim that she had no part in the falsification of documents is contradicted by the evidence showing that, in many instances, she in fact, directed that the documents be altered, changed, or fabricated.

The Government proposes that the record, viewed in its entirety, reveals that it was in Defendant's "interest to disguise the true state of financial affairs and impede a federal investigation into the circumstances under which she obtained millions of dollars from Agora and Abacus, which were charter schools funded with public money." (Gov't Resp. 41.) Based upon the entire record viewed in a light most favorable to the Government, we conclude that the Government's inference is a reasonable one, and that there is sufficient evidence for a rational juror to find that Defendant conspired with others to form an agreement to obstruct justice.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Entry of Judgment of Acquittal in Counts 13, 14, and 67 of the Superseding Indictment, and Defendant's Supplemental Motion for Entry of Judgment of Acquittal on Counts 1-37, 45-58, 61-63, and 65 of the Superseding Indictment must be denied.

An appropriate Order follows.

BY THE COURT:

_____

R. BARCLAY SURRICK, J.