**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DOROTHY JUNE BROWN, et al. | Case No. 2:12-cr-00367-RBS |

## **ORDER**

AND NOW, this _____ day of _____, 2015, upon consideration of Defendant Dorothy June Brown's Motion for a Competency Hearing Pursuant to 18 U.S.C. § 4241(c), the government's response thereto, and the evidence presented during a hearing held January 28 through January 30, 2015, it is hereby ORDERED as follows:

1.      Defendant Dorothy June Brown presently suffers from a mental disease or defect which prevents her from rationally and reasonably assisting her counsel in her defense and, therefore, is not competent to stand trial in this matter.

2.      Defendant Dorothy June Brown will not attain the capacity to permit the proceedings to go forward in the foreseeable future.

3.      Defendant Dorothy June Brown does not pose a substantial risk of bodily injury to another person or serious damage to property of another.

4. Therefore, the requirements of 18 U.S.C. § 4241(d) and § 4246(a) are satisfied.

No additional commitment period is required under the circumstances of this case.

BY THE COURT:

_____
R. Barclay Surrick
U.S. District Court Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DOROTHY JUNE BROWN, et al. | Case No. 2:12-cr-00367-RBS |

**DEFENDANT DOROTHY JUNE BROWN'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW REGARDING COMPETENCY TO STAND TRIAL**

Defendant Dorothy June Brown, through her undersigned counsel, hereby submits the following proposed findings of fact and conclusions of law regarding her competency to stand trial.

## I. PROPOSED FINDINGS OF FACT

**Background**

1. On September 2, 2014, Defendant Dorothy June Brown, through her counsel, moved this Court to hold a hearing to determine her competency to stand trial. (Doc No. 334 – Filed Under Seal.) Jury selection for the re-trial in this matter was set to begin on September 8, 2014.

2. In support of the motion, Dr. Brown submitted a neuropsychological report from her treating clinical neuropsychologist, Dr. Barbara Malamut, and an expert report from a forensic psychiatrist, Dr. Stephen Mechanick, regarding Dr. Brown's competency to stand trial.

3. The government did not oppose Dr. Brown's motion for a competency hearing, but requested the Court to appoint an expert of the government's choosing to evaluate Dr. Brown's competency to stand trial. (Doc. No. 339 – Filed Under Seal.)

4.      Two experts were appointed by the Court to evaluate Dr. Brown's competency to stand trial:  Dr. Pogos Voskanian, a forensic psychiatrist, and Dr. Jeffrey Summerton, a forensic psychologist.  (Doc. Nos. 342, 344.)  Each of the court-appointed experts submitted a report setting forth their opinions, which were provided to counsel for the government and Dr. Brown. (Doc. Nos. 353, 354 – Filed Under Seal.)

5.      Based on Dr. Brown's motion, the submissions from Dr. Malamut and Dr. Mechanick, the government's response, and the reports of the court-appointed experts, the Court granted the motion for a competency hearing and scheduled a three-day hearing for January 28 through January 30, 2015.  (Doc. Nos. 342, 344, 368.)

6.      Prior to the hearing, on the government's unopposed motion, Dr. Brown was committed to the custody of the Attorney General for a thirty-day custodial examination at FMC Carswell in Fort Worth, Texas pursuant to 18 U.S.C. § 4247(b).  (Doc. No. 352.)  Dr. Daniel Kim and Dr. Christine Anthony, forensic psychologists at FMC Carswell, submitted a joint report regarding Dr. Brown's competency to stand trial.  (Doc. No. 363 – Filed Under Seal.)

7.      During the hearing, the Court received evidence and heard testimony from the two court-appointed experts, Dr. Voskanian and Dr. Summerton; Dr. Anthony from FMC Carswell; and Dr. Brown's proffered witnesses, Dr. Malamut and Dr. Mechanick.

8.      Based on the record presented during the competency hearing, the Court makes the following findings of fact by a preponderance of the evidence.

9.      Dr. Brown suffers from mild neurocognitive disorder, as diagnosed by Dr. Malamut.  *See* Defense Exhibit 2A at 8.

10.     Mild neurocognitive disorder is a serious condition, which reflects brain dysfunction or brain damage.  *See* 1/30/2015 Tr. at 12:12-19.

**Dr. Mechanick's Examination and Opinion**

11.     Dr. Mechanick examined Dr. Brown for more than four hours on August 29, 2014.  *See* Defense Exhibit 9 at 1.  Before and during the examination, Dr. Mechanick conferred with Dr. Brown's lawyers regarding their difficulties communicating with Dr. Brown.  *Id.* at 1, 10; 1/28/2015 Tr. at 11:24-12:6.

12.     Dr. Mechanick has evaluated individuals with cognitive disorders.  1/29/2015 Tr. at 67:20-22, 82:21-83:23.

13.     Dr. Mechanick's discussion with Dr. Brown's counsel was an important part of his evaluation to determine whether she was able to understand, retain, and use information she was provided regarding her case.  *See* 1/28/2015 Tr. at 12:7-12:11.

14.     The American Academy of Psychiatry and the Law ("AAPL") provides Guidelines for the evaluation of an individual's competency to stand trial.  *See* Defense Exhibit 30.

15.     These Guidelines are a reliable authority on the recommended procedures for performing a forensic evaluation of an individual's competency to stand trial.  *See* 1/28/2015 Tr. at 57:23-58:11 (Dr. Voskanian testifying that AAPL Guidelines are a reliable authority).

16.     These Guidelines recommend that a forensic psychiatrist speak with a defendant's counsel as part of evaluating a defendant's competency to stand trial.  *See* Defense Exhibit 30 at S32 ("A defendant's attorney will often have information that is not otherwise available, such as what has happened during previous attorney-client contacts and the reasons that the attorney believes the defendant may be incompetent to stand trial.  Information about the quality of the attorney-client relationship may be especially valuable . . . ."); *id.* at S38 ("Court-appointed psychiatrists may want to speak with both the prosecution and defense attorneys."); *id.* at S39

("A brief interview with the defense attorney may provide valuable information about the attorney's specific concerns about the defendant's competence and examples of the defendant's limitations related to trial proceedings."); *id.* at S46 ("In many evaluations of adjudicative competence, the psychiatrist should contact the defendant's attorney to assess the defendant's ability to assist counsel. Potentially useful information provided by defense counsel may include the defendant's behavior with the attorney, the defendant's ability to follow instructions provided by the attorney, . . . and other effects of psychiatric symptoms on the defendant's interaction with counsel. . . . The psychiatrist should also assess the defendant's capacity to make legal decisions in collaboration with defense counsel and to participate in other activities that counsel may require.").

17.     Dr. Mechanick was the only expert who spoke with defense counsel about the specific allegations against Dr. Brown.

18.     In Dr. Mechanick's opinion, Dr. Brown has problems understanding the facts of her case, the strength of the government's case and the evidence the government will present, and how the case has proceeded. *See* Defense Exhibit 9 at 11-12; 1/28/2015 Tr. at 14:19-15:4, 38:13-39:3, 47:10-24.

19.     During her interview by Dr. Mechanick, Dr. Brown was not able to describe the government's allegations against her, provided inaccurate information regarding the allegations, and provided inaccurate information regarding the witnesses and her co-defendants at the first trial. *See* Defense Exhibit 9 at 7-10.

20.     The deficiencies observed by Dr. Mechanick demonstrate that Dr. Brown lacks the ability to assist counsel in preparing for and during trial. *See* 1/28/2015 Tr. at 17:3-15.

21.     Dr. Brown's deficiencies were demonstrated when she told Dr. Mechanick that "the government alleged that she did not have a signed contract with K12, 'which was a lie.'" Defense Exhibit 9 at 8. The government has not made that allegation; rather, in the superseding indictment and during the first trial, which this Court observed, the government alleged that Dr. Brown did not have a signed contract with Agora Cyber Charter School, an entirely different entity. *See* Defense Exhibit 20; 1/28/2015 Tr. at 16:15-17:2.

22.     In addition, Dr. Brown's deficiencies were demonstrated when she advised Dr. Mechanick that Anthony Smoot had been a co-defendant with Dr. Brown at the first trial, and Courteney Knight had testified against her at the first trial. *See* Defense Exhibit 9 at 8, 10.

23.     In reality, as this Court observed during the first trial, it was just the opposite – Courteney Knight was the co-defendant and Anthony Smoot was one of the government's key witnesses against Dr. Brown. *See* 1/28/2015 Tr. at 15:5-16:14.

24.     Dr. Brown's deficiencies were further demonstrated when she was unable to describe to Dr. Mechanick the allegations against her regarding wire fraud and conspiracy to obstruct justice. *See* Defense Exhibit 9 at 9.

25.     During Dr. Mechanick's interview, Dr. Brown's deficiencies were further demonstrated by her inability to remember a discussion with her lawyers a day earlier regarding the potential penalties she faces and a plea discussion, and her inability to describe to Dr. Mechanick the substance of that discussion even after having just been reminded by her lawyers of that discussion during the phone conversation involving Dr. Mechanick. *See* Defense Exhibit 9 at 9-10; 1/28/2015 Tr. at 13:12-14:15.

26.     In Dr. Mechanick's opinion, Dr. Brown is not able to adequately help her lawyers, notwithstanding that one trial has already occurred. *See* 1/28/2015 Tr. at 41:6-23.

27.     Even though there has already been one trial in this matter, Dr. Brown still needs to be able to follow, process, and understand the course of the second trial.  1/28/2015 Tr. at 25:7-23.

28.     The assessment of her competence to stand trial is based on her current level of competency.  *See* 1/28/2015 Tr. at 25:7-23.

29.     With a second opportunity to attack the same evidence, "an effective defendant might be able to recall additional information to assist her attorney or might be able to have a different slant on things that would be helpful."  *See* 1/28/2015 Tr. at 40:16-41:5.

30.     To the extent even only 10 percent of the case is different, "there is still 10 percent that is up for grabs and that is – that could be the significant difference in the outcome."  *See* 1/28/2015 Tr. at 40:16-41:5.

31.     Dr. Mechanick concluded, based on a "composite picture" – including his examination, his review of medical records, and his review of Dr. Malamut's report – that Dr. Brown has mild to moderate cognitive impairment, which likely represents an early stage of a dementing illness such as Alzheimer's disease.  *See* Defense Exhibit 9 at 11; 1/28/2015 Tr. at 45:21-46:20, 48:11-21.

32.     Dr. Mechanick opined, to a reasonable degree of medical certainty, that Dr. Brown lacks the ability to consult with her attorneys with a reasonable degree of rational understanding and, therefore, is not competent to stand trial.  *See* Defense Exhibit 9 at 12-13; 1/28/2015 Tr. at 7:6-13, 46:21-48:3.

33.     Dr. Mechanick concluded that Dr. Brown currently lacks the ability to testify on her own behalf.  *See* Defense Exhibit 9 at 13.

34.     Dr. Mechanick's observations and opinion regarding Dr. Brown's inability to testify on her own behalf are consistent with difficulties that Dr. Brown demonstrated during her testimony in a due process hearing in April 2014.  *See* Defense Exhibit 7; *see also* 1/28/2015 Tr. at 10:20-11:5.

35.     During that testimony, Dr. Brown was unable to respond to questions, confused the order of events, and confused the dates associated with events critical to the defense of her school, Main Line Academy, which was facing allegations of retaliation.  *See* Defense Exhibit 7 at 152-53, 179-80, 190-92, 207, 211-13.

36.     Just as she did when she met with Dr. Mechanick, Dr. Brown demonstrated confusion about her own educational history during that testimony.  *See* Defense Exhibit 7 at 118, 134, 150, 174-75, 176-77; Defense Exhibit 9 at 5 & n.4.

37.     Dr. Brown also was unable to name two of the schools she created.  Defense Exhibit 7 at 106-07.

**Dr. Voskanian's Examination and Opinion**

38.     Dr. Voskanian examined Dr. Brown for approximately five hours and forty-five minutes.  *See* Court Exhibit 1 at 1.  He concluded that she is competent to stand trial, but only if she is represented by counsel.  In his opinion, she could not represent herself.  *See id.* at 21; 1/28/2015 Tr. at 53:16-54:3, 130:16-20.

39.     On the issue of his expertise in the area of neuropsychological testing, Dr. Voskanian testified, "I would not say that I am an expert in neuropsychological testing.  I would not say that.  I would defer to someone else."  He also admitted that he is not qualified to interpret neuropsychological testing.  1/28/2015 Tr. at 66:4-10.

40. Dr. Voskanian testified that, based on the time he spent with Dr. Brown and his in-person interview, Dr. Brown did not exhibit any cognitive impairments. *See* 1/28/2015 Tr. at 74:5-75:14, 76:12-23, 104:15-105:4.

41. In Dr. Voskanian's view, Dr. Brown's inability to recall her age suggests "severe, severe cognitive decline," which is inconsistent with the rest of his evaluation. *See* 1/28/2015 Tr. at 111:7-112:8.

42. Dr. Voskanian acknowledged that Dr. Brown's inability to recall her age and the year at the time of the interview was consistent with other evaluators' examinations. *See* 1/28/2015 Tr. at 112:25-114:19.

43. In fact, he testified that "it was more significant in terms that she has been probably reminded of her age by multiple people." 1/28/2015 Tr. at 113:3-5.

44. To support his opinion that Dr. Brown does not have mild neurocognitive disorder, Dr. Voskanian testified that he did not observe Dr. Brown engage in any compensatory strategies. 1/28/2015 Tr. at 74:2-4.

45. Dr. Voskanian testified that Dr. Brown brought, what he described as a "cheat sheet," to her interview, *id.* at 123:23-125:22, which included biographical information about herself such as her birthdate, her wedding anniversary, and her educational and professional history, *see* Court Exhibit 3.

46. Dr. Voskanian accepted Dr. Brown's statement that no one asked her to testify during the first trial and made no effort to verify that information with Dr. Brown's lawyers. 1/28/2015 Tr. at 92:9-93:24.

47.     Dr. Voskanian's conclusion that Dr. Brown reasonably understood the charges was based on what she told him, and he made no independent effort to determine the accuracy of her statements:

Q: I take it you attempted to do that with Dr. Brown?

A: To check?

Q: Right.

A: No.  What she said was close, very close.

Q: Close but was it – did you check?  Did you just go back and check?

A: I don't think so because it was extremely close.

1/28/2015 Tr. at 90:7-92:8.

48.     Dr. Voskanian's opinion is based on his belief that a defendant's understanding of the actual allegations is irrelevant to assessing competency.  1/28/2015 Tr. at 96:5-19 ("It's a very complex case.  So I did not go through details exactly what happened in each school.  That is irrelevant to what I am doing.").

49.     In Dr. Voskanian's opinion, a general understanding as illustrated, in part, in the following excerpt from his report is sufficient:

> When I asked Dr. Brown to tell me about her charges, she replied, "I am not sure . . . I know they (charges) are stupid.  They said I made too much money . . . and there was a document that should have been signed.  But, it was signed."  When asked specifically for the meaning of the charge "Wire Fraud," she replied, "anything that travels through wire and is dishonest . . . mail can be wire fraud . . . they call it wire fraud because they sent my checks through the mail . . . because they said 'You weren't supposed to get the money.'"

Court Exhibit 1 at 13 (ellipses in original); *see also* 1/28/2015 Tr. at 95:7-97:7.

50.     Dr. Voskanian's opinion is based on his belief that Dr. Brown's references to K12 and problems with staff, *see* Court Exhibit 1 at 4, demonstrate that she has a "clear understanding of the events that led to her current charges," 1/28/2015 Tr. at 98:2-12.

- 9 -

51.    Dr. Voskanian's opinion is based, in part, on his belief that the following description of the obstruction of justice charges demonstrated an adequate understanding by Dr. Brown of the charges she faces to demonstrate her competency to stand trial:

> [I]nterfering with whatever they consider to be their legal process.  Standing in their way . . . if you knew someone is going to testify and you try to convince them not to, or to testify in a certain way, or convince them that something should be done in another way . . . .

Court Exhibit 1 at 13 (ellipses in original); *see also* 1/28/2015 Tr. at 97:13-15.

52.    Finally, for the witness tampering charge, Dr. Voskanian's opinion is based on his determination that the following description provided by Dr. Brown during her interview demonstrates an adequate understanding of the charge to establish her competency to stand trial: "Interfering or talking to a witness that you are not supposed to communicate with."  Court Exhibit 1 at 13; *see also* 1/28/2015 Tr. at 97:19-20.

53.    Dr. Voskanian did not know that Dr. Brown was acquitted of witness tampering and she did not inform him of that fact.  *See* 1/28/2015 Tr. at 97:21-98:23.

54.    Dr. Voskanian did not conduct further inquiry about the factual allegations against Dr. Brown for the obstruction of justice and witness tampering charges.

55.    Dr. Voskanian did not conduct further inquiry into the several other wire fraud theories alleged in the superseding indictment.

56.    Dr. Voskanian did not conduct further inquiry into the details of which contract was allegedly not signed, which is pertinent in this case because the superseding indictment addresses several contracts.  *See* Defense Exhibit 20.

57.    Dr. Brown's confusion about the contracts was demonstrated during the evaluations by other experts.  *See* Proposed Findings of Fact § 21, *supra* & ¶¶ 114, 116-119, *infra*.

58.     Dr. Voskanian also failed to clarify the role of K12, which is pertinent to this case because Dr. Brown incorrectly described the contract at issue as one with K12.  *See* Proposed Findings of Fact ¶ 21, *supra* Mechanick.

59.     In evaluating Dr. Brown's "descriptions" of the charges, Dr. Voskanian solely relied on "whatever was available to" him.  *See* 1/28/2015 Tr. at 99:17-23.

60.     Dr. Voskanian's opinion is based on his determination that it is sufficient that Dr. Brown knew some witnesses and knew some co-defendants were acquitted.  *See* 1/28/2015 Tr. at 120:22-122:10.

61.     Dr. Voskanian did not verify any names or details because he does not "think it is [his] function to address very narrow specific details."  *See* 1/28/2015 Tr. at 120:22-122:10.

62.     Dr. Voskanian, in rendering his opinion, failed to consider that Dr. Brown incorrectly identified witnesses and co-defendants during her interview with another evaluator.  *See* Proposed Findings of Fact ¶¶ 22-23, *supra*.

63.     Dr. Voskanian, while disputing the diagnosis of mild neurocognitive disorder, admitted that such a diagnosis would mean that Dr. Brown would experience functioning and memory issues, and that the memory issues would be more than just age-appropriate memory issues.  1/28/2015 Tr. at 105:6-14.

64.     Dr. Voskanian's opinion is based upon his determination that someone who attended a "multitude" of schools might not be able to describe his or her educational history.  1/28/2015 Tr. at 108:2-6.  Other witnesses contradicted that position.  *See, e.g.*, 1/28/2015 Tr. at 149:5-150:9, 151:12-18 (Dr. Summerton stating that Dr. Brown's inability to recall her educational background is significant); 1/29/2015 Tr. at 74:4-21 (Dr. Mechanick testifying that he "firmly believes" Dr. Brown's inability to recall her education, among other things,

demonstrates "repeated consistent problems with her memory in these areas, as well as other areas related to the case"); 1/30/2015 Tr. at 49:24-50:8 (Dr. Malamut testifying that "[e]verything was very confused in terms of her educational background").

**Dr. Summerton's Examination and Opinions**

65.     Dr. Summerton examined Dr. Brown on September 13, 2014 for three and one-half hours.  *See* Court Exhibit 2 at 1.

66.     Dr. Summerton administered several psychometric tests, which "are basically questionnaires that have been normed on basic psychological phenomena over groups of people. They are standardized systemized tests."  1/28/2015 Tr. at 136:2-10.

67.      Dr. Summerton also administered the MacArthur Competence Assessment Tool – Criminal Adjudication ("MacCAT").  The MacCAT is developed to address the components of competency described in *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam).  *See* Court Exhibit 2 at 7; 1/28/2015 Tr. at 139:17-140:2.

68.     The MacCAT consists of three measures – understanding, reasoning, and appreciation.  Understanding measures the capacity for factual understanding of the legal process and the adjudication process; reasoning measures the ability to distinguish more or less relevant factual information and the ability to reason about legal options; and appreciation measures the defendant's capacity to understand her own legal situation and circumstances.  *See* 1/28/2015 Tr. at 140:16-141:14.

69.     In his original report, Dr. Summerton concluded that Dr. Brown demonstrated mild impairment across all three measures.  *See* Court Exhibit 2 at 7.

70.     Dr. Summerton acknowledged that the sample fact pattern used in the MacCAT involved a much simpler case than the instant case.  *See* 1/28/2015 Tr. at 141:18-142:5.

71.     In his original report, Dr. Summerton concluded that Dr. Brown's performance on the Paulhus Deception Scales indicates that she was engaging in positive impression management.  *See* Court Exhibit 2 at 6.  This suggests that she was not malingering.

72.     In his original report, Dr. Summerton concluded that Dr. Brown's memory was variable and at times significantly impaired when she met with him, *see* Court Exhibit 2 at 3, which is consistent with the experiences of other evaluators, *see, e.g.*, 1/28/2015 Tr. at 26:9-14, 49:21-50:12, 74:4-21 (Dr. Mechanick testimony regarding Dr. Brown's memory impairments); Defense Exhibit 2A at 3, 5-6; Government Exhibit 1 at 2-3, 6.

73.     In his original report, Dr. Summerton concluded that Dr. Brown also provided a "vague and somewhat disjointed account of her (offense) conduct," again focusing on the role of K12 rather than the government's allegations of the various wire frauds.  *See* Court Exhibit 2 at 7.

74.     Dr. Summerton's conclusion is also consistent with the experiences of other evaluators.  *See* Proposed Findings of Fact ¶¶ 21, 57-58, *supra* & ¶¶ 114-119, *infra*.

75.     Based on this account, Dr. Summerton determined, in his original report, that "the extent to which [Dr. Brown] has a 'rational as well as a factual understanding of the proceedings against (her)' is unclear given her vague account."  *See* Court Exhibit 2 at 7-8.

76.     Dr. Summerton did not ask Dr. Brown about her alleged offense conduct and did not ask her about the charges.  *Compare* 1/28/2015 Tr. at 144:6-15, *with id.* at 144:16-146:8, 185:13-25.

77.     In his original report, Dr. Summerton inquired "why the issue of competency is being raised now but not during the first trial less than a year ago, Dr. Brown basically indicated that she had trouble the first time remembering things and recalling events but did not say

anything about the extent of her problems.  She said that her attorney then began to 'get impatient with me' when she could not remember what he had told her."  Court Exhibit 2 at 8.

78.     Dr. Summerton reiterated this during the competency hearing:

> [Dr. Brown] more spoke about her first trial in that she had trouble following things, remembering things and so forth, which is the whole issue here now.  And that I had asked her when I was talking to her, why is this a problem now and it was not during the first trial?  And she said, well, it was a problem for her in the first trial, but she was afraid to say anything about it and that you, Mr. Miller, started to become somewhat impatient with her about it because she did not seem to pay attention or follow.

1/28/2015 Tr. at 146:11-24.

79.     Based on his evaluation and test administration, Dr. Summerton concluded in his original report that "Dr. Brown's capacity to understand and participate in her own legal circumstances . . . have most dramatically been affected by her mental status – *primarily her memory, which appears to be quite variable and at times substantially impaired*."  Court Exhibit 2 at 9 (emphasis added).

80.     Dr. Summerton subsequently modified this during the competency hearing.  He attributed this modification to his consideration of the information and opinion offered by Dr. Anthony from FMC Carswell.  1/28/2015 Tr. at 148:13-21, 155:17-158:21.

81.     Dr. Summerton's decision to modify his opinion was based, in part, upon his belief that Dr. Anthony had more time to evaluate Dr. Brown, and he also thought it was a "good idea, that [Dr. Brown] structure her notebooks and her trust in you and communicate with the help of her husband."  1/28/2015 Tr. at 155:17-158:21, 159:22-160:1.

82.     Dr. Summerton did not identify any specific facts that Dr. Brown was able to recall to support his deference to the FMC Carswell report.  *See generally* 1/28/2015 Tr. at 148:13-21, 154:3-161:16.

83. Dr. Summerton could only "suppose" and "presume" that Dr. Brown's lawyers could refresh her recollection. 1/28/2015 Tr. at 186:19-20, 187:21-188:3.

84. Dr. Summerton also testified that the stress and anxiety from the charges, related to a so-called "fall from grace," contributed to the deterioration of Dr. Brown's mental condition and impaired her memory. *See* Court Exhibit 2 at 9; 1/28/2015 Tr. at 153:9-24.

85. Dr. Summerton believed that, at the time he examined Dr. Brown, she was suffering from dissociative amnesia, with symptoms of depersonalization or derealization. Court Exhibit 2 at 10.

86. Dr. Summerton believed that with the passage of time, and by the time Dr. Brown visited FMC Carswell, the condition he had observed during his evaluation of Dr. Brown remitted or lessened. *See* 1/28/2015 Tr. at 148:13-21, 159:12-160:1.

87. Dr. Summerton also believed that Dr. Brown's stress and anxiety could increase, with the same effect on her mental status, as the second trial approaches, at which time he would need to evaluate her again to confirm her competency to stand trial. *See* 1/28/2015 Tr. at 160:24-162:25, 164:20-22, 167:2-6.

88. Dr. Summerton did not believe that Dr. Brown's memory problems were age-related. *Compare* 1/28/2015 Tr. at 147:18-24, *with id.* at 128:10-16 (Dr. Voskanian opining memory issues are age-related).

89. Dr. Summerton did not disagree with Dr. Malamut's diagnosis of mild neurocognitive disorder. *See* 1/28/2015 Tr. at 138:11-17.

90. Dr. Summerton did not rule out malingering, *see* Court Exhibit 2 at 10, but he did agree that Dr. Malamut's testing results "did not suggest that there was malingering," *see* 1/28/2015 Tr. at 139:9-16.

91.     Dr. Summerton determined that Dr. Brown's dissociative amnesia impaired her competency to stand trial under two of the six factors identified in *Wilson v. United States*, 391 F.2d 460, 463 (D.C. Cir. 1968):  (1) the extent to which the amnesia affects the defendant's ability to consult with counsel, and (2) the extent to which the amnesia affects the defendant's ability to testify on her own behalf.  *See* Court Exhibit 2 at 10; *see also* 1/28/2015 Tr. at 168:18-169:14 (Dr. Summerton testimony reveals that he did not know what he had opined in his report regarding Dr. Brown's ability to testify).

92.     During Dr. Summerton's evaluation, Dr. Brown was vague about her educational history, as she was with other evaluators.  *See* Court Exhibit 2 at 2; 1/28/2015 Tr. at 151:1-152:15; Court Exhibit 1 at 6-7; Defense Exhibit 9 at 5 & n.4; Government Exhibit 1 at 2; 1/30/2015 Tr. at 49:24-50:8 (Dr. Malamut testifying that Dr. Brown was confused about her educational history and that Dr. Malamut had to obtain the information from Dr. Brown's husband).

93.     Dr. Summerton, like Dr. Voskanian, relied only on information Dr. Brown provided to him; he did not consult collateral information.  1/28/2015 Tr. at 154:19-22.

**FMC Carswell Examinations and Opinion**

94.     Dr. Anthony examined Dr. Brown on four separate occasions during the commitment period, for a total of approximately seven (7) hours.  1/29/2015 Tr. at 22:16-24:24.

95.     Dr. Kim met with Dr. Brown on one occasion for approximately one (1) hour. 1/29/2015 Tr. at 24:25-25:6.

96.     Dr. Anthony has been a forensic psychologist at FMC Carswell for less than five years.  1/29/2015 Tr. at 5:6-13.

97.     Dr. Anthony has examined fewer than 10 patients presenting with dementia symptoms, out of the hundreds of competency examinations she has conducted.  *See* 1/29/2015 Tr. at 5:18-20, 16:6-23, 22:7-10.

98.     Dr. Anthony is not a neuropsychologist.  1/29/2015 Tr. at 13:4-16.

99.     Dr. Anthony did not speak with Dr. Brown's lawyers or the government's lawyers regarding the allegations in this matter.  1/29/2015 Tr. at 10:22-11:2, 28:11-14.  She received only the superseding indictment; the reports from Dr. Malamut, Dr. Mechanick, Dr. Voskanian, and Dr. Summerton; and additional background materials provided to the other witnesses, including correspondence between Dr. Brown's counsel and Dr. Malamut and Dr. Mechanick, and Dr. Brown's medical records.  *Id.* at 9:1-10:21; *see also* Government Exhibit 1 at 1-2.

100.    Dr. Anthony administered one test to Dr. Brown over the course of the commitment period, the Personal Assessment Inventory (the "PAI").  *See* Government Exhibit 1 at 1, 8.

101.    The PAI does not test for competency to stand trial and does not assess cognitive abilities.  1/29/2015 Tr. at 16:24-17:13.

102.    Dr. Anthony did not administer any neuropsychological or cognitive tests to Dr. Brown and did not rely on Dr. Malamut's testing in her own analysis.  1/29/2015 Tr. at 13:17-19, 16:2-5, 22:13-15.

103.    But Dr. Anthony was aware that Dr. Malamut's testing suggested declines in multiple cognitive domains.  1/29/2015 Tr. at 15:20-22.

104.    Nonetheless, Dr. Anthony and Dr. Kim concluded that Dr. Brown "currently does not meet criteria for a mental disease or defect which would impair her factual and rational understanding of the legal proceedings before her or impair her ability to communicate with her

attorney with a reasonable degree of rational understanding." Government Exhibit 1 at 11. Therefore, they opined, Dr. Brown is "currently competent to proceed." *Id.*

105.    Dr. Anthony testified that the staff who observed Dr. Brown observed her social interactions and behavior. 1/29/2015 Tr. at 25:7-24.

106.    Dr. Anthony reported that Dr. Brown was unable to recall the names of her schools and her degrees. *See* Government Exhibit 1 at 2; 1/29/2015 Tr. at 44:2-6; *see also* Defense Exhibit 18 at Tab 4.

107.    Dr. Anthony reported that, when Dr. Brown arrived at FMC Carswell, Dr. Brown did not know the year and believed that she was in Washington when, in fact, she was in Texas. *See* Government Exhibit 1 at 5; 1/29/2015 Tr. at 38:18-25; Defense Exhibit 18 at Tab 1. Dr. Anthony downplayed the significance of these failures. *See* 1/29/2015 Tr. at 39:1-20.

108.    Dr. Anthony testified that Dr. Brown had trouble recalling dates and numbers. *See* Government Exhibit 1 at 6; 1/29/2015 Tr. at 41:7-13.

109.    Dr. Anthony also reported that Dr. Brown had to refer to a notebook to recall her own age, dates, numbers, and specific places. *See* Government Exhibit 1 at 6, 7-8; 1/29/2015 Tr. at 39:21-40:18.

110.    The superseding indictment contains numerous dates and numbers. *See* Defense Exhibit 20; 1/29/2015 Tr. at 41:4-5.

111.    Dr. Anthony's report states that one factor that supports her conclusion that Dr. Brown is competent to stand trial is the fact that Dr. Brown was able to find her way around the facility and to Dr. Anthony's office. *See* Government Exhibit 1 at 7, 10. Dr. Anthony testified, however, there are signs posted within FMC Carswell directing individuals to Dr. Anthony's department. 1/29/2015 Tr. at 12:8-10.

112.    Dr. Anthony's report states that one fact that supports her conclusion that Dr. Brown is competent to stand trial is the fact that in recorded conversations Dr. Brown referenced the fact the calls were being recorded.  *See* Government Exhibit 1 at 10.  Dr. Anthony testified, however, there are signs near the telephones at FMC Carswell advising individuals that phone calls will be recorded.  1/29/2015 Tr. at 12:21-13:3.

113.    Dr. Anthony's opinion is based on her belief that she, herself, could understand the allegations in the superseding indictment if they were explained to her.  *See* 1/29/2015 Tr. at 50:20-25.  There is no evidence that Dr. Anthony made any attempt to do so with Dr. Brown.

114.    Dr. Anthony now acknowledges that she did not adequately understand the allegations against Dr. Brown at the time she conducted her evaluation.  *See* 1/29/2015 Tr. at 35:2-36:8; *see also id.* at 27:22-28:10 (Dr. Anthony explaining she did not read indictment count-by-count or school-by-school).

115.    Dr. Anthony now acknowledges that she did not know the facts underlying the charge for witness tampering at the time she performed her evaluation and that it was "possible [she] was inaccurate."  1/29/2015 Tr. at 31:1-16.

116.    Dr. Anthony now acknowledges that Dr. Brown's description of wire fraud counts 1-14 did not match the allegations in the superseding indictment.  1/29/2015 Tr. at 33:25-35:1.

117.    Dr. Anthony acknowledged during testimony at the hearing that Dr. Brown's description of the charges against her, *see* Government Exhibit 1 at 9, did not match the description contained in the superseding indictment, *see* 1/29/2015 Tr. at 35:2-36:8.

118.    Dr. Anthony's notes reflect that during her evaluation process, Dr. Brown reportedly believed the prosecution was about one contract.  *See* Defense Exhibit 18 at Tab 5.

119. The superseding indictment clearly includes allegations about several contracts. *See* Defense Exhibit 20.

120. Dr. Brown made similar errors when explaining the charges to Dr. Mechanick. *See* Proposed Finding of Fact ¶ 21, *supra*.

121. Dr. Anthony acknowledges that during her evaluation, Dr. Brown did not know her potential sentence and, while there was a discussion of plea bargaining, Dr. Anthony does not know if Dr. Brown accurately described any actual plea discussion that might have occurred. *See* 1/29/2015 Tr. at 36:21-37:18; *see also* Defense Exhibit 18 at Tab 5.

122. Dr. Brown was not able to discuss or describe her case with Dr. Anthony. *Compare* Government Exhibit 1 at 10, 11.

123. Dr. Anthony suggested that Dr. Brown could provide more accurate information if she were allowed to speak at length rather than in response to simple, direct questions. *See* Government Exhibit 1 at 6.

124. Dr. Anthony's open-ended questions about the government's allegations, however, did not yield accurate information from Dr. Brown. *See* 1/29/2015 Tr. at 36:9-15.

125. Dr. Anthony also opined that Dr. Brown could review transcripts from the first trial to refresh her recollection. *See* Government Exhibit 1 at 11.

126. Dr. Anthony did not attempt to refresh Dr. Brown's recollection with the transcripts to know if this suggestion would actually refresh Dr. Brown's recollection. 1/29/2015 Tr. at 50:4-15.

127. Dr. Anthony also suggested that Dr. Brown could keep notes to enhance her recall and understanding of her case. *See* Government Exhibit 1 at 11.

128.    Dr. Anthony did not attempt to refresh Dr. Brown's recollection regarding the facts of her case.  1/29/2015 Tr. at 41:7-42:4.

129.    Dr. Anthony opined that Dr. Brown's memory difficulties do not impact her daily functioning.  Government Exhibit 1 at 10.  Dr. Anthony agreed that standing trial for criminal charges is not a daily function.  1/29/2015 Tr. at 47:16-18.

130.    Dr. Anthony believes that impairment of daily functioning is an essential criterion for diagnosing a mental disorder.  Government Exhibit 1 at 10-11; 1/29/2015 Tr. at 19:24-20:1.

131.    Dr. Anthony's belief is contradicted by the diagnosis criteria for mild neurocognitive disorder in the DSM-5 and Dr. Malamut's testimony.  *See* Defense Exhibit 3; Proposed Findings of Fact ¶¶ 170-172, *infra*.

132.    Dr. Malamut has expertise in neuropsychology that Dr. Anthony does not possess, and Dr. Malamut has significantly more experience with elderly patients experiencing dementia.  *Compare* Proposed Findings of Fact ¶ 136, *infra*, *and* Defense Exhibit 1, *with* 1/29/2015 Tr. at 13:4-16 (Dr. Anthony's education and lack of neuropsychology training), *and id.* at 16:6-23 (Dr. Anthony stating that she has evaluated for competency fewer than ten patients who exhibit early signs of dementia).

133.    Notwithstanding Dr. Anthony's conclusion, evidence was presented that demonstrated Dr. Brown's daily functions were impaired.  *See* Proposed Findings of Fact ¶¶ 182-183, *infra*.

**Dr. Malamut's Examination and Diagnosis**

134.    Dr. Malamut conducted neuropsychology testing during her meetings with Dr. Brown on three different days in August 2014 that lasted for approximately four and one-half hours.  See Defense Exhibit 2A; 1/30/2015 Tr. at 20:11-20.

135.    Dr. Malamut administered more than twenty (20) neuropsychological tests to Dr. Brown.  *See* Defense Exhibit 2A at 9-10.

136.    Dr. Malamut is an expert in neuropsychology, having administered neuropsychological testing to elderly patients since 1983.  She administers and interprets these test results on an almost daily basis.  1/30/2015 Tr. at 21:7-23:11; *see also* Defense Exhibit 1 (Curriculum Vitae of Dr. Malamut).

137.    Dr. Malamut reached her diagnosis after considering Dr. Brown's symptoms, her medical history, her interview, Dr. Malamut's observations, and Dr. Brown's performance on the neuropsychological testing.  1/30/2015 Tr. at 10:5-12.

138.    Dr. Brown's neuropsychological test results suggested and were consistent with dysfunction in the temporal and parietal lobes of the brain, which are responsible for the formation of new memories, attention, naming skills, and expressive language skills.  1/30/2015 Tr. at 13:22-14:11.

139.    Dr. Brown's diagnosis is consistent with early stages of a primary progressive dementia, such as Alzheimer's disease.  Defendant Exhibit 2A at 8; 1/30/2015 Tr. at 12:24-15:4.

140.    In Alzheimer's disease, the declarative memory system – the system that involves facts and details as opposed to routines and habits – is deteriorating.  1/30/2015 Tr. at 19:6-20:10.

141.    Alzheimer's disease cannot be confirmed until after death, but starts and clinically manifests in the temporal and parietal areas of the brain (i.e., the areas of Dr. Brown's brain dysfunction).  1/30/2015 Tr. at 14:12-17, 15:9-15.

142.     Dr. Malamut's diagnosis was supported by her testing, which included more than twenty (20) cognitive tests.  *See, e.g.*, 1/30/2015 Tr. at 39:14-42:11; *see also* Defense Exhibit 2A at 9-10.

143.     During one such test, Dr. Brown was asked to draw a standard clock showing the time 11:10.  This test is very sensitive to dementia and patients with dementia have particular trouble with drawing the hands of the clock.  1/30/2015 Tr. at 41:25-42:11

144.     Dr. Brown demonstrated a cognitive impairment in the manner in which she drew the hands of the clock.  *See* Defense Exhibit 6; 1/30/2015 Tr. at 41:25-42:11.  Dr. Brown's performance on this test demonstrates some level of brain damage, brain dysfunction, or other brain disorder.  1/30/2015 Tr. at 42:8-11.

145.     Dr. Brown's performance on the clock drawing test was not the result of stress or depression.  1/30/2015 Tr. at 42:22-43:12.

146.     Dr. Brown's educational background contained in Dr. Malamut's report was provided by Dr. Brown's husband.  *See* 1/30/2015 Tr. at 49:24-50:8.

**Mini-Mental Status Examinations**

147.     The Mini-Mental Status Examination ("MMSE") is a screening tool for cognitive impairment.  Four of the evaluators in this case administered this screening tool, using three variations.

148.     The MMSE is a reliable and valid screening test, with standardized administration and scoring.  1/30/2015 Tr. at 26:22-28:8.  If the test is not administered and scored appropriately, there is no way to know if the score obtained correlates to how the test should have been administered and scored.  *Id.* at 27:1-28:8.

149.    Dr. Voskanian believes it is necessary to administer a mini-mental status examination to have a complete file.  1/28/2015 Tr. at 88:5-17.

150.    Dr. Voskanian administered the Standardized MMSE, or SMMSE, which was created by Dr. William Molloy of Canada.  Dr. Voskanian administered a version of the SMMSE licensed for use only in British Columbia, Canada, and did not have the author's permission to download, print, and use the form that he administered to Dr. Brown.  *See* 1/28/2015 Tr. at 77:22-78:12; *see* Court Exhibit 1, Attachment.

151.    The SMMSE is not the gold standard for diagnosing mild cognitive impairment. 1/30/2015 Tr. at 71:19-22.

152.    The SMMSE uses the "WORLD" task, which asks the patient to spell WORLD forwards and backwards, rather than the serial sevens task, which asks the patient to continuously subtract seven from one hundred.  Research has confirmed that the WORLD task is easier than the serial sevens, 1/30/2015 Tr. at 29:6-10; *see also id.* at 69:12-16, which the other MMSE administrators used in this case.

153.    Nevertheless, Dr. Voskanian contends that the WORLD task and serial sevens task are equivalent.  *See* 1/28/2015 Tr. at 83:8-21.

154.    Dr. Brown received a score of 28/30 on Dr. Voskanian's administration, which did not suggest cognitive impairment.  Court Exhibit 1 at 19.

155.    Dr. Voskanian failed to properly score his administration of the SMMSE in several ways.  *See* 1/28/2015 Tr. at 87:2-17, 88:20-90:2.

156.    Further, the author of the SMMSE that Dr. Voskanian administered has recognized that "highly educated patients sometimes score higher than their level of function suggests."  1/30/2015 Tr. at 72:1-2.  Further,

We would expect a recently retired school teacher to score 30. Colleagues noticed however that she has trouble organizing her volunteer work and although she scores 27 out of 30 in the normal range of the SMMSE, she likely has some cognitive impairment.

*Id.* at 72:2-7; *see also* 1/28/2015 Tr. at 37:10-17 (Dr. Mechanick discussing expectations for

MMSE score for someone of Dr. Brown's education and intellect), 49:21-50:15 (Dr. Mechanick

discussing Dr. Brown's cognitive impairments beyond what is typical of someone with her

background).

157.    Dr. Malamut administered the most recent version of the mini-mental status

examination, the MMSE-2.  *See* Defense Exhibit 24.

158.    Dr. Malamut always administers the MMSE because it is well recognized and

gives a sense of a person's level of functioning.  1/30/2015 Tr. at 26:20-27:4.  The MMSE-2

does not permit the evaluator to use the "WORLD" task.  *Id.* at 28:13-29:5.  Dr. Brown received

a one out of a possible five on the serial sevens task in place of the WORLD task.  *Id.* at 30:1-5.

159.    Dr. Brown received a score of 20/30 on Dr. Malamut's administration, which

placed her in the range of mild cognitive impairment.  *See* Defense Exhibit 24.

160.    Dr. Malamut concluded that Dr. Brown's performance on the MMSE-2 was

consistent with Dr. Brown's results on the other tests Dr. Malamut administered.  1/30/2015 Tr.

at 30:12-15.

161.    Dr. Mechanick administered the MMSE.  Dr. Brown received a 17/30 on Dr.

Mechanick's administration, which placed her in the range of moderate cognitive impairment.

*See* Defense Exhibit 9 at 11; Defense Exhibit 25; 1/28/2015 Tr. at 10:8-15, 18:9-21.

162.    Dr. Summerton also administered the MMSE.  *See* Defense Exhibit 17.

163.     Dr. Summerton testified that the MMSE is "very widely used" and agreed that it was appropriate to administer the MMSE to Dr. Brown because he was assessing her competence and whether she had any impairments.  *See* 1/28/2015 Tr. at 175:9-22.

164.     Dr. Brown received a 24/30 on Dr. Summerton's administration of the MMSE, which placed her in the range of mild cognitive impairment.  *See* Defense Exhibit 17.

165.     Dr. Summerton incorrectly scored his administration of the MMSE, and should have awarded Dr. Brown a 23/30.  *See* 1/28/2015 Tr. at 177:17-178:6.

166.     Dr. Anthony was the only evaluator who did not find it necessary to administer the MMSE.  *See* 1/29/2015 Tr. at 17:14-16.

167.     Dr. Anthony did not "feel it [was] necessary" to administer the MMSE to Dr. Brown.  1/29/2015 Tr. at 17:22-18:1.  Instead, she determined Dr. Brown's competency based on interviews with Dr. Brown and did not "see a need to go backwards."  *Id.* at 18:22-24.

**Dr. Brown's Mental Condition and Its Impact on Her Ability to Assist Counsel**

168.     Mild neurocognitive disorder is a condition identified in the Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), which was published in 2013.  *See* Defense Exhibit 3; *see also* 1/30/2015 Tr. at 10:13-21.

169.     The DSM-5 provides for several levels of dementia, which are more specific in terms of early signs of dementia versus later stages of dementia.  1/30/2015 Tr. at 10:22-11:9.

170.     The diagnostic criteria for mild neurocognitive disorder require "[e]vidence of modest cognitive decline in one or more cognitive domains" based on (1) "[c]oncern of the individual, a knowledgeable informant, or the clinician that there has been a mild decline in cognitive function"; and (2) "[a] modest impairment in cognitive performance, preferably documented by standardized neuropsychological testing."  Defense Exhibit 3.

171.    The diagnostic criteria also require that "[t]he cognitive deficits *do not* interfere with capacity for independence in everyday activities (i.e., complex instrumental activities of daily living such as paying bills or managing medication are preserved, but greater effort, compensatory strategies, or accommodation *may* be required)."  Defense Exhibit 3 (emphases added).

172.    Dr. Malamut, through her interviews with Dr. Brown and Dr. Brown's husband, and based on her extensive neuropsychological testing, concluded that Dr. Brown exhibited each diagnostic criterion for mild neurocognitive disorder.  *See* Defense Exhibit 2A.

173.    The government did not contest the diagnosis itself; rather, the government attempted to minimize the impact of Dr. Brown's condition.  *See, e.g.*, 1/30/2015 Tr. at 56:6-61:22, 63:7-64:12.

174.    The government had the opportunity to present rebuttal testimony from a designee who received Dr. Malamut's underlying testing materials, but the government did not introduce any such testimony or evidence at the hearing.  *See* 1/30/2015 Tr. at 54:20-56:4.

175.    Dr. Voskanian and Dr. Anthony did not agree with Dr. Malamut's diagnosis.  Dr. Voskanian believed that Dr. Brown did not meet the criteria, *see* Court Exhibit 1, and Dr. Anthony concluded that absent impairment in daily functioning, there could be no mental disease or defect, *see* Government Exhibit 1.

176.    In rendering his opinion, Dr. Voskanian relied on the criteria for a different condition in the DSM-5.

177.    In his report, as he admitted during cross examination, he quoted the criteria for *major* neurocognitive disorder, not *mild* neurocognitive disorder.  *Compare* Court Exhibit 1, *with*

Defense Exhibit 4; *see also* 1/28/2015 Tr. at 71:19-72:23 (Dr. Voskanian acknowledging that the criteria he listed correspond to major, not mild, neurocognitive disorder).

178.     There are two significant differences between major and mild neurocognitive disorder.  First, major requires "significant" cognitive decline; mild requires only "modest" cognitive decline.  Second, major requires interference with independence in everyday activities; mild does not require any interference.  *Compare* Defense Exhibit 3, *with* Defense Exhibit 4.

179.     Dr. Malamut's testing revealed at least a modest, if not a significant, decline in cognitive abilities.  Dr. Malamut administered a test of premorbid functioning, which revealed Dr. Brown had average functioning "before any disease process."  1/30/2015 Tr. at 63:7-64:1.

180.     Dr. Brown's results on the other testing, including numerous rankings lower than the fifth percentile when compared to a peer group by age, gender, and education level, revealed decline from average to impaired.  1/30/2015 Tr. at 21:24-22:18, 64:2-12; *see also* Defense Exhibit 2A at 9-10 (Percentile column).

181.     Even though some of Dr. Brown's test results showed average or, in one case, superior ability, Dr. Brown exhibited significant impairment in several important cognitive domains.  1/30/2015 Tr. at 44:8-45:7, 58:7-11, 63:7-64:12.

182.     In addition, Dr. Malamut's interviews with Dr. Brown and Dr. Brown's husband revealed interference with everyday activities.  For instance, Dr. Brown often forgets to take her medication and occasionally experiences confusion when driving in familiar areas.  *See* 1/30/2015 at 15:16-19:5; *see also* Defense Exhibit 2A at 2; Defense Exhibit 7 at 135-41.

183.     The evidence during the hearing also revealed that Dr. Brown must utilize compensatory strategies, such as to remember her own age and other biographical information.  *See* 1/28/2015 Tr. at 123:23-125:22 (Dr. Voskanian testifying about Dr. Brown's use of a cheat

sheet); Court Exhibit 3 (cheat sheet); Government Exhibit 1 at 6 (noting Dr. Brown had to refer

to notebook to recall her own age); 1/29/2015 Tr. at 40:3-41:2; *see also* 1/29/2015 Tr. at 74:22-

75:15 (Dr. Mechanick identifying Dr. Brown's compensatory strategies, which Dr. Voskanian

and Dr. Anthony observed but failed to credit); 1/30/2015 Tr. at 42:20-21 (noting Dr. Brown

exhibited confusion regarding her age), 49:24-50:8 (confirming that Dr. Brown's husband

provided her educational background for report), 64:19-65:5 (noting that Dr. Brown required

assistance to arrange appointment with Dr. Malamut); Defense Exhibit 9 at 5 & n.4 (reporting

that Dr. Brown had to consult her husband regarding her own educational history).

184.    Dr. Anthony maintained that some interference with daily functioning is required

for a diagnosis, despite the plain language of the DSM-5 for mild neurocognitive disorder.

1/29/2015 Tr. at 20:9-21:16.

185.    The DSM-5 states that "cognitive deficits *do not* interfere with capacity for

independence in everyday activities" and says only that "greater effort, compensatory strategies,

or accommodation *may* be required."  *See* Defense Exhibit 3 (emphases added); *see also*

1/30/2015 at 15:16-19:5 (discussing evidence of interference with Dr. Brown's instrumental

activities of daily living and dementia patients' independence in early stages, particularly for

highly-educated patients).

186.    Further, instrumental activities of daily living are preserved.  *See* Defense Exhibit

3; *see also* Defense Exhibit 2A at 8.

187.    Dr. Summerton did not disagree with Dr. Malamut's diagnosis, but instead

reached a different diagnosis.  *See* 1/28/2015 Tr. at 138:11-17.

188.    Dr. Malamut conducted substantial neuropsychological testing, *see* Defense Exhibit 2A at 9-10, which is the "gold standard" for a standardized assessment of mild neurocognitive impairment, *see* 1/29/2015 Tr. at 66:23-67:19.

189.    Dr. Brown's executive functioning is significantly impaired.  1/30/2015 Tr. at 34:15-17.  The term "executive functioning" is "an umbrella term that involves many different types of higher level functioning," such as a person's ability to solve problems, to plan and carry out activities, to keep the goal in mind when carrying out activities, to regulate behavior, and to self-monitor.  1/30/2015 Tr. at 30:16-31:10.

190.    Impaired executive functioning also inhibits Dr. Brown's ability to organize her thoughts and provide information and her ability to cope with memory impairments.  *See* 1/29/2015 Tr. at 73:1-74:3.

191.    Dr. Brown's test results for executive functioning are consistent with early stages of Alzheimer's disease.  1/30/2015 Tr. at 44:3-7.

192.    During Dr. Malamut's neuropsychological testing, Dr. Brown was unable to retain information, was unable to have her recollection refreshed, could not think flexibly, and perseverated on erroneous responses despite persistent feedback that the response was not correct.  *See* 1/30/2015 Tr. at 33:10-34:14, 37:4-38:13, 46:9-49:2; *see also* 1/28/2015 Tr. at 26:18-29:6 (suggesting that attempting to refresh Dr. Brown's memory may be a "perilous endeavor").

193.    Dr. Brown's performance in this regard was not normal.  1/30/2015 Tr. at 38:14-17.

194.    Dr. Brown also demonstrated memory problems with overlearned facts, in addition to her inability to retain new information.  1/30/2015 Tr. at 45:8-47:6; *see also* Defense Exhibit 2A at 5, 6.

195.    Dr. Brown's memory of new verbal information ranged from borderline to impaired; the ability to remember new information is one of the known problems in Alzheimer's disease.  1/30/2015 Tr. at 46:9-47:6.

196.    In short, Dr. Brown has cognitive issues with old memories and new memories.

197.    Dr. Brown also had difficulty processing information, particularly about her case. 1/29/2015 Tr. at 80:23-81:16.

198.    The manifestations of Dr. Brown's disorder, particularly her impaired executive functioning, inhibit her ability to reasonably and rationally assist her counsel in preparing her defense.  *See, e.g.*, Defense Exhibit 9 at 11-12; 1/28/2015 Tr. at 33:2-34:18, 71:16-74:3.

199.    Dr. Brown is unable to recall and provide details regarding herself and dates and events related to the government's allegations.  Defense Exhibit 9 at 11.

200.    It is unlikely that anxiety, stress, or depression is playing a significant role in Dr. Brown's cognitive problems.  *See* Defense Exhibit 9 at 11; 1/30/2015 Tr. at 42:22-43:12.

201.    Dr. Brown is not feigning her condition or malingering.  *See* Defense Exhibit 2A at 4, 7 (noting that Dr. Brown passed both a test designed for malingering and embedded measures of malingering); Defense Exhibit 9 at 12 (concluding Dr. Brown was not feigning or exaggerating her symptoms); Court Exhibit 2 at 6 (concluding Dr. Brown was not engaging in positive impression management); 1/28/2015 Tr. at 21:16-22:9 (Dr. Mechanick testifying that he did not see evidence that Dr. Brown's functional impairments were a willful attempt to avoid prosecution); 1/29/2015 Tr. at 81:25-82:20 (Dr. Mechanick responding to Dr. Summerton's

suggestion of "fall from grace" and noting that Dr. Brown's cognitive issues relate to a broad spectrum of information not specifically related to this case); 1/30/2015 Tr. at 25:22-25, 49:3-10 (Dr. Malamut testimony regarding malingering); 1/29/2015 Tr. at 47:19-48:2 (Dr. Anthony confirming that she did not conclude that Dr. Brown was malingering).

202.    Dr. Malamut administered the test of memory and malingering ("TOMM"), which assesses an individual's effort on testing.  Dr. Brown passed both trials, including a perfect score on the second trial.  Defense Exhibit 2A at 9-10; *see* 1/30/2015 Tr. at 23:21-25:22.

203.    The TOMM relies on a different memory system than the memory system that is impaired in Dr. Brown.  *See* 1/30/2015 Tr. at 60:1-17.

204.    Dr. Brown also passed measures of malingering that are embedded in other tests. *See, e.g.*, 1/30/2015 Tr. at 47:16-49:10; Defense Exhibit 2A at 4, 7.

205.    Dr. Voskanian, Dr. Summerton, and Dr. Anthony did not adequately consider Dr. Malamut's testing results.

206.    Although each mentioned Dr. Malamut's testing in their respective reports, the failure to incorporate those results into their analyses and opinions is a significant flaw in their conclusions.

207.    Patients with dementia have varying cognitive abilities from day-to-day, and also within a day.  *See* 1/30/2015 Tr. at 20:11-21:3; 1/29/2015 Tr. at 82:21-83:23; *see also* 1/29/2015 Tr. at 40:19-41:2 (Dr. Anthony testifying about Dr. Brown's ability to recall some memories but not others).

208.    Dr. Brown's impairments preclude her from participating in trial, even with the benefit of shortened trial days or breaks during trial.  *See* 1/29/2015 Tr. at 83:24-84:25.

209.     The types of impairments that Dr. Brown is experiencing would not preclude her from driving to a familiar location, from personal grooming, or from simple or routine shopping. *See* 1/30/2015 Tr. at 43:13-44:2; *see also id.* at 65:24-66:11 (noting Dr. Brown drove herself to Dr. Malamut's office, which is located in vicinity of Dr. Brown's home).

210.     Deficiencies associated with mild neurocognitive disorder often are not overtly observable.  1/30/2015 Tr. at 50:9-24.

211.     Individuals with higher levels of education are better able to compensate for their deficits; they are coherent, they appear well, and they are dressed well.  1/30/2015 Tr. at 50:25-51:13.

212.     Reliance on collateral information and neuropsychological testing are important to identify the cognitive deficits of those individuals.  *See* 1/30/2015 Tr. at 50:25-51:13; 1/29/2015 Tr. at 66:5-68:18 (Dr. Mechanick explaining significance of neuropsychological test results to understanding Dr. Brown's impairments); *id.* at 68:19-70:2 (Dr. Mechanick explaining importance of utilizing collateral information to assess Dr. Brown's competency); *id.* at 93:18-94:5 (Dr. Mechanick explaining value of information beyond in-person examination).

213.     Neuropsychological tests can reveal that overt observations are not correct.  *See* 1/30/2015 Tr. at 50:25-51:13.

## II.    PROPOSED CONCLUSIONS OF LAW

**Legal Standards**

1.      "The conviction of a legally incompetent person violates due process." *United States v. Jones*, 336 F.3d 245, 256 (3d Cir. 2003) (quoting *Pate v. Robinson*, 383 U.S. 375, 378 (1966)).

2.      "Fundamental to an adversarial system of justice is the precept that 'a person whose mental condition is such that the person lacks capacity to understand the nature and the object of the proceedings, to consult with counsel, and to assist in preparing a defense may not be subjected to trial." *United States v. Leggett*, 162 F.3d 237, 241 (3d Cir. 1998) (quoting *Drope v. Missouri*, 420 U.S. 162, 171 (1975)) (alteration marks omitted).

3.      "Allowing a judicial proceeding to continue when there is genuine doubt as to the competence of the accused plainly implicates the substantial rights of the accused and seriously affects the fairness, integrity and public reputation of the judicial proceedings." *United States v. Dreyer*, 705 F.3d 951, 960 (9th Cir. 2013).

4.      A court must continuously assess a defendant's competency to stand trial, from indictment through sentencing. *See Drope v. Missouri*, 420 U.S. 162, 181-82 (1975); *United States v. Renfroe*, 825 F.2d 763, 766 (3d Cir. 1987) ("at any time after the commencement of prosecution . . . and prior to sentencing").

5.      Thus, Dr. Brown's competency and ability (or inability) to participate in the first trial is immaterial. Even a defendant who has been convicted at trial cannot be sentenced for that conviction if he or she is no longer competent at the time of sentencing. *See, e.g.*, *Dreyer*, 705 F.3d at 961; *United States v. Rothman*, No. 08-20895, 2010 U.S. Dist. LEXIS 127639, at *24-25,

*111 (S.D. Fla. Aug. 18, 2010) (noting prior competency determination does not control subsequent determination).

6.      A defendant is not competent to stand trial if either (1) the defendant lacks the ability to consult with her lawyer with a reasonable degree of rational understanding, or (2) the defendant is unable to understand the proceedings rationally as well as factually. *See Drope*, 420 U.S. at 171; *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *Leggett*, 162 F.3d at 242.

7.      Dr. Brown's lack of competency to stand trial is based on the first prong, i.e., she lacks the ability to consult with her lawyer with a reasonable degree of rational understanding.

8.      The defendant's ability to consult with her lawyer requires her to have a reasonable degree of rational understanding of the government's allegations and the facts of her case. *See, e.g.*, *United States v. Timmins*, 82 F. App'x 553, 554-55 (9th Cir. 2003) (holding that district court erred by failing to consider whether defendant lacked ability to rationally comprehend the government's evidence against him); *Rothman*, 2010 U.S. Dist. LEXIS 127639, at *111 (concluding defendant was not competent for sentencing due to, in part, his inability to present facts to attorney regarding his conduct); *United States v. Kasim*, No. 07-56, 2008 U.S. Dist. LEXIS 89137, at *45-46, *52-53 (N.D. Ind. Nov. 3, 2008) (concluding that defendant's inability due to dementia to understand the charges and tendency to provide inaccurate information contributed to incompetency); *see also* 1/29/2015 Tr. at 52:23-53:5 (Dr. Anthony admitting a defendant must understand the facts of her case to be competent to stand trial); *id.* at 90:20-24, 92:8-93:11 (Dr. Mechanick testifying regarding need to understand facts and charges).

9.  The defendant's ability to assist counsel must be evaluated in light of the type of participation required. *Dreyer*, 705 F.3d at 961. The fact that a defendant is cooperative and articulate does not preclude a finding of incompetency. *See id.* at 962.

10. The Court considers several factors in determining a defendant's competency to stand trial, including whether medical professionals have evaluated the defendant's competence to stand trial, counsel's representations, and the defendant's behavior and demeanor. *See Drope*, 420 U.S. at 177 n.13; *Jones*, 336 F.3d at 256; *Renfroe*, 825 F.2d at 767.

11. Additional factors include:

- the defendant's ability to rationally consider the wisdom of taking a course other than standing trial on the merits (*e.g.*, plea bargaining);

- the defendant's ability to meaningfully assist in confronting witnesses and evidence;

- the defendant's ability to competently consider the benefits and liabilities of exercising her constitutional right to take the stand, and if she does take the stand, the ability to testify in an intelligent, coherent, and relevant manner;

- the state of the defendant's memory;

- the extent to which relevant evidence could be reconstructed from communications made by the defendant to his counsel or from independent sources;

- the defendant's ability to review and evaluate documents and other written evidence bearing on the case;

- the defendant's appreciation of the government's evidence;

- the defendant's ability to remain sufficiently alert and responsive so as to follow and recognize any discrepancies in the testimony of witnesses;

- the defendant's ability to discuss the testimony with her attorneys and to postulate questions to the witnesses through counsel; and

- the defendant's apathy and amotivation.

*See United States v. Silva*, No. 11-96, 2013 U.S. Dist. LEXIS 180084, at *29-30 (D. Utah July 31, 2013); *United States v. Derisma*, No. 09-64, 2011 U.S. Dist. LEXIS 99302, at *7-8 (M.D. Fla. June 27, 2011); *Rothman*, 2010 U.S. Dist. LEXIS 127639, at *106.

12.     Reciting charges, listing witnesses, and using legal terminology are not sufficient to demonstrate a rational understanding.  *See McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001) (en banc).

13.     Calm demeanor in court – as opposed to outbursts – does not mean the defendant is competent.  *See Dreyer*, 705 F.3d at 964-65.  Passivity may mask incompetence to participate in the proceedings.  *Id.* at 964.

**Burden of Proof**

14.     The government bears the burden of demonstrating, by a preponderance of the evidence, that the defendant is competent to stand trial.  *United States v. Velasquez*, 885 F.2d 1076, 1089 (3d Cir. 1989); *see United States v. Louis*, Nos. 13-4064, 13-4065, 2015 U.S. App. LEXIS 266, at *10 (3d Cir. Jan. 8, 2015).

15.     The government has not met its burden in this case.

**Discussion of Evidence – Dr. Brown is Not Competent to Stand Trial**

16.     Based on the record presented during the competency hearing, the Court makes the following conclusions of law.

17.     The government has not established that Dr. Brown is presently able to consult with and assist her counsel with a reasonable degree of rational understanding.

18.     The government introduced one exhibit and proffered one witness during a three-day hearing on Dr. Brown's competency to stand trial.

19.     Dr. Brown does not possess a reasonable degree of rational understanding of the government's allegations in the superseding indictment, as demonstrated by her persistent inability to reasonably describe the events that led to the current charges to several evaluators. *See* Proposed Findings of Fact ¶¶ 21-23, 57-58, 73-74, 114-119, *supra*. Dr. Brown's descriptions of the allegations to the evaluators demonstrate a fundamental lack of a basic understanding of her own case, which has been proceeding for several years at this point.

20.     As such, Dr. Brown lacks the ability to meaningfully assist in confronting witnesses and evidence; to competently consider the benefits and liabilities of exercising her constitutional right to take the stand, and if she does take the stand, to testify in an intelligent, coherent, and relevant manner; to review and evaluate documents and other written evidence bearing on the case; to appreciate the government's evidence; to recognize any discrepancies in the testimony of witnesses; and to discuss the testimony with her attorneys and to postulate questions to the witnesses through counsel.

21.     The Court credits the diagnosis and testimony of Dr. Malamut that Dr. Brown presently suffers from mild neurocognitive disorder, which, as Dr. Malamut described, is a serious condition, which reflects brain dysfunction or brain damage. *See* Defense Exhibit 2A; 1/30/2015 Tr. at 12:12-19, 12:24-13:21.

22.     The Court credits the diagnosis and testimony of Dr. Malamut that Dr. Brown's presentation, medical history, and performance on neurocognitive testing suggest that Dr. Brown suffers from mild organic cerebral dysfunction with greatest involvement of the temporal-parietal regions of the brain, and that this is consistent with the early stages of a primary progressive dementia such as Alzheimer's disease. *See* Defense Exhibit 2A; 1/30/2015 Tr. at 14:18-15:4.

23.     Dr. Brown's condition will progressively deteriorate, and likely has been deteriorating since her diagnosis approximately six months ago.  *See* 1/29/2015 Tr. at 85:9-19; 1/30/2015 Tr. at 14:18-15:4 ("This is related to an insidious, slowly worsening disorder, where parts of the brain become more disabled and a greater part of the brain continues to become involved.").

24.     The Court also credit's Dr. Malamut's findings that show Dr. Brown exhibits impairments in multiple cognitive domains.  *See generally* Defense Exhibit 2A; *see also* Government Exhibit 1 at 10-11 (noting decline in multiple cognitive domains).

25.     Courts have recognized that dementia can inhibit a defendant's competence.  *See, e.g.*, *United States v. Ferro*, 321 F.3d 756, 759 (8th Cir. 2003); *Rothman*, 2010 U.S. Dist. LEXIS 127639, at *101-02; *Kasim*, 2008 U.S. Dist. LEXIS 89137, at *52-53; *United States v. Azure*, 488 F. Supp. 2d 885, 885 (D.N.D. 2007); *cf. Dreyer*, 705 F.3d at 965 (concluding that there was substantial evidence of incompetency due to dementia that district court should have *sua sponte* held a competency hearing).

26.     Aware that a diagnosis alone may not be sufficient to determine that a defendant is not competent to stand trial, *see Leggett*, 162 F.3d at 244, the Court credits the opinion and testimony of Dr. Mechanick that Dr. Brown's present mental disease or defect, i.e. mild neurocognitive disorder, renders Dr. Brown incompetent to stand trial, *see* Defense Exhibit 9 at 11-13.

27.     The Court concludes that Dr. Brown lacks a reasonable degree of rational understanding of the allegations and charges against her and the government's evidence against her, and is unable to reasonably and rationally assist her counsel in preparing a defense, because, *inter alia*, Dr. Brown lacks the ability to:  meaningfully assist in confronting witnesses and

evidence; competently consider the benefits and liabilities of exercising her constitutional right to take the stand, and if she does take the stand, to testify in an intelligent, coherent, and relevant manner; review and evaluate documents and other written evidence bearing on the case; appreciate the government's evidence; recognize any discrepancies in the testimony of witnesses; and discuss the testimony with her attorneys and to postulate questions to the witnesses through counsel.

28.     The fact that Dr. Brown has sat through one trial on these charges does not undermine these conclusions because the second trial may differ from the first, and it is the defendant's *present* capacity that is relevant.  *See* 1/28/2015 Tr. at 24:13-25:23, 40:7-41:5; *see* Proposed Conclusions of Law ¶¶ 4-5, 8, *supra*.

29.     Nevertheless, Dr. Brown's deficiencies and memory failures – particularly regarding her own case – are even more profound considering that she has already sat through one trial on the same issues, and the deficiencies and memory failures underscore her inability to reasonably and rationally assist her counsel in the second trial.

30.     Although three other witnesses testified regarding Dr. Brown's competency to stand trial (Dr. Voskanian, Dr. Anthony, and Dr. Summerton), the Court does not credit the opinions of these witnesses for the reasons discussed below.

31.     The Court does not credit the testimony of Dr. Voskanian for several reasons. First, Dr. Voskanian did not have authorization or proper training to administer the SMMSE to Dr. Brown or to score Dr. Brown's responses, which undermines the validity and reliability of his assessment, and undermines his credibility as a witness.

32.     Second, Dr. Voskanian incorrectly scored Dr. Brown's responses to the SMMSE and erred in determining that Dr. Brown's scores did not suggest that she suffered from a

cognitive impairment. Dr. Voskanian's flawed assessment undermines the reliability of the conclusion he reached, despite his testimony disregarding his administration of the SMMSE.

33. Third, Dr. Voskanian failed to adhere to the Guidelines adopted by the AAPL for forensic evaluations of competency to stand trial – which he acknowledged is a reliable authority – in conducting his evaluation, and failed to adequately inform himself of the complications Dr. Brown's counsel faced in preparing Dr. Brown's defense for a second trial. *See, e.g.*, 1/29/2015 Tr. at 87:24-88:9; *see also* Defense Exhibit 23 (Dr. Voskanian qualifications listing affiliation with AAPL); Defense Exhibit 30 at S32 ("A defendant's attorney will often have information that is not otherwise available, such as what has happened during previous attorney-client contacts and the reasons that the attorney believes the defendant may be incompetent to stand trial. Information about the quality of the attorney-client relationship may be especially valuable . . . ."); *id.* at S38 ("Court-appointed psychiatrists may want to speak with both the prosecution and defense attorneys."); *id.* at S39 ("A brief interview with the defense attorney may provide valuable information about the attorney's specific concerns about the defendant's competence and examples of the defendant's limitations related to trial proceedings."); *id.* at S46 ("In many evaluations of adjudicative competence, the psychiatrist should contact the defendant's attorney to assess the defendant's ability to assist counsel. Potentially useful information provided by defense counsel may include the defendant's behavior with the attorney, the defendant's ability to follow instructions provided by the attorney, . . . and other effects of psychiatric symptoms on the defendant's interaction with counsel. . . . The psychiatrist should also assess the defendant's capacity to make legal decisions in collaboration with defense counsel and to participate in other activities that counsel may require.").

34. These failures undermine the reliability and validity of Dr. Voskanian's methodology, which the Court concludes was neither sufficiently comprehensive nor adequate to assess Dr. Brown's competency to stand trial.

35. Fourth, Dr. Voskanian attempted to reject Dr. Malamut's diagnosis of mild neurocognitive disorder, but quoted in his report and relied on the diagnostic criteria for a different disorder. *Compare* Court Exhibit 1 at 20-21, *with* Defense Exhibit 3 (DSM-5 criteria for mild neurocognitive disorder), *and* Defense Exhibit 4 (DSM-5 criteria for major neurocognitive disorder). This additional flaw in Dr. Voskanian's analysis and report further undermines the validity and reliability of his conclusions.

36. Fifth, Dr. Voskanian's reliance in his testimony – in light of the foregoing errors – solely on his personal interactions with Dr. Brown and without consultation of available collateral information renders his evaluation inadequate and incomplete. *See, e.g.*, Defense Exhibit 30 at S33 ("Collateral information may help guide the psychiatrist's inquiries and place in perspective any responses that suggest deception."). Dr. Brown demonstrated unfamiliarity with and lack of knowledge of the government's allegations and evidence against her, as well as the facts of her own case. Dr. Voskanian's reliance on superficial descriptions of the wire fraud allegations and the legal elements of the obstruction and witness tampering charges was, therefore, wholly inadequate. In the absence of a sufficiently comprehensive and adequate evaluation, any conclusions Dr. Voskanian reached are not reliable.

37. Sixth, Dr. Voskanian failed to properly and adequately consider Dr. Malamut's neuropsychological testing results. *See* 1/29/2015 Tr. at 66:5-68:18, 88:1-16.

38. Seventh, Dr. Voskanian failed to recognize and credit Dr. Brown's coping or compensatory strategies. *See* 1/29/2015 Tr. at 74:22-75:15.

39.     Eighth, Dr. Voskanian is not familiar with the complications of early stages of dementia, as evidenced by his testimony that patients with dementia do not vary in their cognitive abilities from day-to-day. *Compare* 1/28/2015 Tr. at 132:25-133:24, *with* 1/29/2015 Tr. at 82:21-83:23, 1/30/2015 Tr. at 20:14-22, *and* Defense Exhibit 2A at 3 (noting that Dr. Brown's presentation and alertness varied).

40.     For this reason, Dr. Voskanian is not qualified to competently assess the impact of Dr. Brown's condition on her competency to stand trial.

41.     Finally, Dr. Voskanian's examination did not yield sufficient information from Dr. Brown to determine whether she understood the charges or the government's allegations against her. *See* 1/29/2015 Tr. at 92:8-93:11 (Dr. Mechanick testimony regarding Dr. Brown's comprehension of charges: "We are, in my opinion, so far from that in terms of the other experts' exploration of her understanding of the facts that in my opinion, again, it's not close to being able to establish competency.").

42.     The Court does not credit the testimony and opinion of Dr. Anthony. Dr. Anthony admitted that she did not have an adequate understanding of the government's allegations in this case and that it is necessary for Dr. Brown to understand the facts of the case against her. *See* 1/29/2015 Tr. at 35:2-36:8; *id.* at 27:22-28:10 (explaining she did not read indictment count-by-count or school-by-school); *id.* at 31:1-16 (confirming she did not know facts underlying the charge for witness tampering that that it was "possible [she] was inaccurate"); *id.* at 33:25-35:1 (acknowledging Dr. Brown's description of wire fraud counts 1-14 did not match allegations in indictment); *id.* at 91:24-93:11. Therefore, Dr. Anthony could not opine on whether Dr. Brown had a reasonable degree of rational understanding of (1) the

government's allegations, (2) the weight of government's evidence against her, and (3) the facts of her case.

43.     Further, Dr. Anthony's evaluation of Dr. Brown suffered from flaws similar to those of Dr. Voskanian's examination.  First, Dr. Anthony failed to avail herself of available collateral information – from Dr. Brown's counsel and Dr. Brown's husband, *see* 1/29/2015 Tr. at 10:22-11:2, 28:11-14, 37:19-38:17 – to assess the veracity of Dr. Brown's self-reported statements, *see id.* at 93:18-94:5 (Dr. Mechanick explaining that sources of information other than in-person examination can be more valuable).  This failure was highlighted by Dr. Anthony's acceptance of Dr. Brown's description of the government's allegations and her determination that Dr. Brown's daily functions were not impaired in anyway.  *See, e.g.*, *United States v. Sandefur*, No. 06-10184, 2007 U.S. Dist. LEXIS 78827, at *5-7 (D. Kan. Oct. 23, 2007) (rejecting opinion of psychologist who was not adequately aware of the charges to assess whether the defendant understood the charges, and who erroneously accepted defendant's statements at face value).  For instance, Dr. Brown's husband advised Dr. Malamut of Dr. Brown's impaired daily functioning; Dr. Anthony failed to make similar inquiries of Mr. Brown despite opportunities to do so.

44.     Second, Dr. Anthony failed to properly consider Dr. Malamut's neuropsychological testing results and, in fact, did not conduct any testing of Dr. Brown's cognitive abilities despite having received a report diagnosing Dr. Brown with neurocognitive impairment.  *See* 1/29/2015 Tr. at 66:5-68:18, 88:1-16.  Dr. Anthony's failure to duly consider Dr. Brown's demonstrated cognitive impairments, and her decision to substitute inadequate observations of social interactions for proper analysis and examination, undermines the value of

Dr. Anthony's opinions. *See* 1/29/2015 Tr. at 80:7-22, 89:1-90:5; *see also* 1/30/2015 Tr. at 50:9-51:13.

45.     Third, Dr. Anthony lacks the educational background and relevant experience in dealing with the diagnosis, implications, and manifestations of dementia-related diseases, particularly when compared against Dr. Malamut's experience. *See Rothman*, 2010 U.S. Dist. LEXIS 127639, at *102. Dr. Anthony's experience with fewer than ten patients with early signs of dementia pales in comparison to the number of patients Dr. Malamut has evaluated in this area for more than thirty years. *See id.* at 102-03.

46.     For these reasons, Dr. Anthony is not qualified to competently assess the impact of Dr. Brown's condition on her competency to stand trial.

47.     Fourth, Dr. Anthony did not conduct any neuropsychological testing or tests of Dr. Brown's cognitive abilities, and provided no objective evidence or findings to support her conclusion. Rather, she relied on subjective observations of behavior and social interactions, which would not inform her analysis of the implications of Dr. Brown's cognitive disorder. *See* 1/30/2015 Tr. at 50:25-51:13 (Dr. Malamut testifying that neuropsychological tests can reveal that overt observations are not correct); *cf. Rothman*, 2010 U.S. Dist. LEXIS 127639, at *106-07 (rejecting federal facility opinion that was not based on sufficient training in neuropsychology and failed to account for the specific manifestations of the defendant's disorder).

48.     Fifth, Dr. Anthony failed to recognize and credit Dr. Brown's coping or compensatory strategies. *See* 1/29/2015 Tr. at 74:22-75:15.

49.     Finally, Dr. Anthony's recommendations for facilitating Dr. Brown's representation are impractical. *See, e.g.*, *United States v. Silva*, No. 11-096, 2013 U.S. Dist. LEXIS 180084, at *25-29 (D. Utah July 31, 2013) (rejecting federal facility recommendations

for accommodations that would require court to alter proceedings to allow repetition of evidence and frequent breaks for counsel to explain testimony to the defendant).

50.     Maintaining a notebook of information and reviewing transcripts will not help Dr. Brown retain information necessary to assist her counsel, nor will it restore her memory. *See* 1/29/2015 Tr. at 71:17-72:19, 78:9-21. Open-ended questions will not facilitate Dr. Brown's ability to assist her counsel or enhance her ability to testify. *See id.* at 78:22-79:22. Indeed, open-ended questions yielded Dr. Anthony inaccurate information from Dr. Brown about the government's case. *See id.* at 36:9-15 (admitting that Dr. Brown's responses to open-ended questions about the allegations against her yielded inaccurate answers).

51.     Nor is there any guarantee that these measures will compensate for Dr. Brown's mild neurocognitive disorder. *See United States v. Conley*, No. 08-20075, 2009 U.S. Dist. LEXIS 38626, at *15 (W.D. Tenn. Mar. 9, 2009) (discussing federal facility's suggestions that counsel review testimony with defendant daily and provide written summaries of testimony during and after trial days, with no guarantee of success). It is apparent from Dr. Malamut's thorough examination that Dr. Brown was unable to retain information, was unable to have her recollection refreshed, could not think flexibly, and perseverated on erroneous responses despite persistent feedback that the response was not correct. *See* 1/30/2015 Tr. at 33:10-34:14, 37:4-38:13, 46:9-49:2; *see also* 1/28/2015 Tr. at 26:18-29:6 (suggesting that attempting to refresh Dr. Brown's memory may be a "perilous endeavor"). These results provide evidence that it is unlikely that Dr. Brown's recollection could be reliably restored. *See* 1/29/2015 Tr. at 79:2-14 (Dr. Mechanick stating that if Dr. Brown is asked direct questions, she may try to "fill in the blanks and do so inaccurately and not even realize she is doing it").

52.     The Court does not credit the testimony and opinion of Dr. Summerton.

53.     Dr. Summerton provided no reliable basis for opining that Dr. Brown understood the allegations against her; he did not ask her about the offenses charged and did not ask her about her alleged offense conduct.  Without that information, there is no reliable basis to infer Dr. Brown understood the allegations against her.

54.     Dr. Summerton's modified opinion carries little weight because he relied on FMC Carswell's opportunity to observe Dr. Brown for a longer period of time, which itself was a flawed basis for determining Dr. Brown's competency, as discussed above.  *See also Rothman*, 2010 U.S. Dist. LEXIS 127639, at *110-11 (rejecting government's argument that ten-day observation period at government facility is the best way to observe the day-to-day fluctuations of dementia patients, as compared to periodic observations over time).

55.     Further, Dr. Summerton's modified opinion carries little weight because he did not identify any specific facts that Dr. Brown was able to recall to support his deference to the FMC Carswell report.  *See generally* 1/28/2015 Tr. at 148:13-21, 154:3-161:16.

56.     Dr. Brown's memory issues are not isolated to the events and circumstances of the charges against her.  She demonstrated, across all evaluations, a broad scope of memory failure.

57.     Moreover, Dr. Brown's memory issues are not a recent phenomenon.  Evidence in the record supports that she experienced memory problems during her first trial, but did not disclose those memory issues to her counsel.  *See* Court Exhibit 2 at 8; 1/28/2015 Tr. at 146:11-24.

58.     The Court credits the testimony of Dr. Malamut and Dr. Mechanick that the assessment of an individual of Dr. Brown's education and presentation cannot solely rely on observations of and interactions with Dr. Brown.  Dr. Brown's neurocognitive impairment is a

serious disorder, is complicated to assess, and requires a well-trained clinician performing a thorough examination to identify and determine the extent of Dr. Brown's cognitive impairments. *See, e.g.*, 1/29/2015 Tr. at 74:4-21 (Dr. Mechanick testifying about complexity of Dr. Brown's assessment); *id.* at 93:18-95:21 (Dr. Mechanick explaining deficiencies in methodologies of Dr. Voskanian and Dr. Anthony relative to a thorough examination endorsed by AAPL Guidelines).

59.     The Court concludes that Dr. Malamut and Dr. Mechanick performed such an evaluation, and that Dr. Anthony, Dr. Voskanian, and Dr. Summerton did not. *See, e.g.*, 1/30/2015 Tr. at 16:22-17:15 (noting importance of seeking collateral information, particularly for dementia patients because the information obtained is often unreliable). Accordingly, the Court accepts the reports and opinions of Dr. Malamut and Dr. Mechanick, and rejects the opinions of Dr. Anthony, Dr. Voskanian, and Dr. Summerton.

60.     In light of the variation of cognitive abilities in people with dementia generally, and Dr. Brown in particular, the Court concludes that it could not structure the trial in a way to accommodate Dr. Brown's impairment. Dr. Brown's "good" days are unpredictable and may not last throughout the trial day.

61.     For all of the foregoing reasons, the Court concludes that Dr. Brown presently suffers from a mental disease or defect, i.e., mild neurocognitive impairment, which renders her unable to assist properly in her defense. *See* 18 U.S.C. § 4241(a).

62.     The government has not proven by a preponderance of the evidence that Dr. Brown is competent to stand trial.

63.     Based on the evidence presented during the competency hearing regarding Dr. Brown's disorder and its progressive nature, and considering that Dr. Brown has already been

committed to FMC Carswell for approximately thirty (30) days, the Court concludes that Dr. Brown will not attain capacity to permit the proceedings to go forward in the foreseeable future. *See* 18 U.S.C. § 4241(d); *see also United States v. Filippi*, 211 F.3d 649, 652 (1st Cir. 2000) (recognizing that § 4241(d) "is much more flexible and case-oriented in determining the length of incarceration"); *Kasim*, 2008 U.S. Dist. LEXIS 89137, at *52 (finding defendant's dementia symptoms rendered him incompetent to stand trial and that it is unlikely he would regain the ability to stand trial). Accordingly, under these circumstances, the requirements of § 4241(d) are satisfied and no additional period of commitment is required.

64.     Moreover, there has never been any suggestion throughout the several years of proceedings in this case that Dr. Brown poses substantial risk of bodily injury to another person or serious damage to property of another. *See* 18 U.S.C. § 4246(c). Accordingly, under these circumstances, the requirements of § 4246(a) are satisfied and no additional period of commitment is required.


                                        Respectfully submitted,

Dated:  February 20, 2015               /s/ Gregory P. Miller
                                        Gregory P. Miller (PA Id. No. 24891)
                                        William M. McSwain (PA Id. No. 86499)
                                        DRINKER BIDDLE & REATH LLP
                                        One Logan Square, Ste. 2000
                                        Philadelphia, PA  19103-6996
                                        (215) 988-2700
                                        (215) 988-2757 Fax
                                        Gregory.Miller@dbr.com
                                        William.McSwain@dbr.com

                                        *Attorneys for Defendant Dorothy June Brown*

## CERTIFICATE OF SERVICE

I, Todd N. Hutchison, hereby certify that on this day I caused a true and correct copy of

the foregoing Proposed Findings of Fact and Conclusions of Law Regarding Competency to

Stand Trial to be filed electronically, and to be thereby served upon counsel listed below:

Joan E. Burnes, Esq.
Frank R. Costello, Esq.
United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476

*Counsel for United States of America*

Dated: February 20, 2015                    /s/ Todd N. Hutchison
                                            Todd N. Hutchison