IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 12-0367 |
| DOROTHY JUNE BROWN | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                 **APRIL  8 , 2015**

  Defendant Dorothy June Brown seeks an order from the Court declaring that she is not

competent to stand retrial of this matter pursuant to 18 U.S.C. § 4241(d).  After reviewing the

reports submitted by the psychologists and psychiatrists who evaluated Defendant, and after a

hearing in open court, we conclude that Defendant is competent to stand retrial in this matter.

**I.**  **BACKGROUND**

  **A.**  **Indictment and First Trial[1]**

  In January 2013, Defendant was charged with multiple counts of wire fraud, conspiracy

to obstruct justice, obstruction of justice, and witness tampering.[2]  The charges are related to

Defendant's alleged scheme to defraud two charter schools out of an amount over six million

dollars.  Defendant was charged with four co-Defendants.  Two of those defendants—Joan

Woods Chalker and Anthony Smoot—entered negotiated guilty pleas prior to the trial.  The two

---

  [1] A more detailed factual background of the Government's allegations against Defendant
can be found in the Court's July 31, 2014 Memorandum denying Defendant's post-trial motion
for an acquittal.  (ECF No. 328.)

  [2] The Indictment charged Defendant with 52 counts of wire fraud, in violation of 18
U.S.C. § 1343 (Counts 1-52); one count of conspiring to obstruct justice, in violation of 18
U.S.C. § 371 (Count 53); ten counts of obstruction of justice, in violation of 18 U.S.C. § 1519
(Counts 54-59, 63, 65) and § 1512(c)(2) (Counts 61-62); and one count of witness tampering, in
violation of 18 U.S.C. § 1512(b)(3) (Count 67).

other co-Defendants—Michael A. Slade, Jr. and Courteney L. Knight—joined Defendant at the first trial, which began in November 2013 and lasted approximately 26 days. Defendant did not testify at the trial. On December 19, 2013, the jury returned a partial verdict finding Defendants Slade and Knight not guilty of the counts charged against them. (Min. Entry, ECF No. 265; *see also* ECF Nos. 267-270.) The jury resumed deliberations with respect to the charges against Defendant. (Min. Entry, ECF No. 290.) On January 9, 2014, after communicating to the Court that it was unable to reach a verdict on many of the remaining counts, the jury returned a partial verdict with respect to Defendant. (Min. Entry, ECF No. 293.) The jury found Defendant not guilty on Counts 38-41 (wire fraud), 59 (obstruction of justice), and 67 (witness tampering). (*Id.*; Verdict, ECF No. 294.) The jury was deadlocked on the remaining Counts: Counts 1-37, 46-58, 61-63, and 65. (Verdict.) The Government notified the Court of its intention to retry Defendant. Retrial was scheduled to commence on September 8, 2014.[3]

### B. Competency Hearing

Approximately one month prior to the start of the retrial, defense counsel contacted the Court with concerns about Defendant's competency. On September 2, 2014, Defendant filed a Motion requesting a competency hearing. (ECF No. 334 (filed under seal).) Attached as exhibits to the motion were two reports from Defendant's doctors: (1) Stephen Mechanick, M.D., a forensic psychiatrist; and (2) Barbara Malamut, Ph.D., a neuropsychologist. The Government did not oppose Defendant's request for a hearing on competency, but requested that the Court appoint an expert to evaluate Defendant.

By Order dated September 5, 2014, Defendant's motion requesting a hearing on competency was granted, and Defendant was ordered to submit to the psychiatric and mental

---

[3] Retrial was delayed because of the scheduling conflicts of defense counsel. The Government did not oppose the delay.

competency evaluation by Dr. Pogos Voskanian. (ECF No. 342.) Defendant was also ordered to submit to a psychological evaluation and testing by Jeffrey Summerton, Ph.D. (ECF No. 344.)

On September 22, 2014, after review of the various expert reports, the Government filed a Motion for Custodial Examination Pursuant to 18 U.S.C. § 4247(b). (ECF No. 347.) This Motion was unopposed. By Order dated September 24, 2014, Defendant was committed to the custody of the Attorney General for a competency examination. Defendant self-reported to the Federal Medical Center—Carswell (FMC Carswell), located in Fort Worth, Texas. During the 29-day custodial examination at FMC Carswell, Defendant was evaluated by Christine Anthony, Ph.D., and Daniel Kim, Ph.D., and was observed by the Carswell staff. Dr. Anthony and Dr. Kim rendered a report dated November 20, 2014.

A Competency Hearing was held from January 28, 2015 through January 30, 2015. (Jan. 28, 2015 Hr'g Tr. 3, ECF No. 376.) At the hearing, the report of each expert—defense doctors, Dr. Malamut and Dr. Mechanick; and Court-appointed doctors, Dr. Voskanian, Dr. Summerton, and Dr. Anthony from FMC Carswell—was offered into evidence. Each of these doctors testified at the hearing. Dr. Anthony participated by way of videoconference. (Jan. 29, 2015 Hr'g Tr. 4-5, ECF No. 377.) Prior to the hearing, the parties had agreed that each expert report would be admitted into evidence at the hearing and constitute the direct testimony of these witnesses. (Jan 28 Hr'g Tr. 3-4.) It was also stipulated that Defendant could submit an affidavit from her attorney, Greg Miller, in lieu of offering his testimony, and that the Government would have the opportunity to cross-examine Mr. Miller with regard to the contents of the affidavit. (*Id*. at 4.) Mr. Miller stated that they would decide after the testimony of the experts whether they would proceed with offering the affidavit into evidence. (*Id*.) The affidavit was never offered into evidence or shown to the Court.

## II.    LEGAL STANDARD

The criminal trial of a defendant who lacks mental competency violates the defendant's due process right to a fair trial. *See Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *United States v. Renfroe*, 825 F.2d 763, 765-66 (3d Cir. 1987) (citing *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). The basic standard for competency, as set forth by the Supreme Court in *Dusky v. United States*, requires that a defendant must have a rational and factual understanding of the proceedings, and a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" to stand trial. 362 U.S. 402, 402 (1960) (per curiam); *see also Taylor v. Horn*, 504 F.3d 416, 430 (3d Cir. 2007) (citing *Dusky*, 362 U.S. at 402). Requiring a criminal defendant to "be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993).

Congress codified this competency standard in 18 U.S.C. § 4241(d), which provides that:

> If, after the [competency] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

The Government has the burden to prove that Defendant is competent to stand trial. *United States v. Velasquez*, 885 F.2d 1076, 1089 (3d Cir. 1989). Pursuant to § 4241, psychiatric or psychological examinations of the defendant may be conducted, psychiatric or psychological reports prepared, and a hearing held, in accordance with subsections (b), (c), and (d), respectively. 18 U.S.C. § 4241(b)-(c). In determining whether a defendant is competent to stand trial, "court[s] must examine the unique circumstances of the case and decide whether the defendant '(1) has the capacity to assist in her or his own defense and (2) comprehends the

nature and possible consequences of a trial.'" *United States v. Jones*, 336 F.3d 245, 256 (3d Cir. 2003) (citations omitted). A number of factors may be considered, including "'evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial.'" *Id.* (quoting *United States v. Leggett*, 162 F.3d 237, 242 (3d Cir. 1998)). Another factor that courts deem relevant is "an attorney's representation about his client's competency." *Id.* There is "no predetermined formula" for competency determinations; each case will depend on the facts presented. *Leggett*, 162 F.3d at 242. Even one factor alone may be sufficient in certain circumstances. *Jones*, 336 F.3d at 256. The district court judge who presided over the hearing and over the trial "will often prove best able to make more fine-tuned mental capacity decisions." *United States v. Rauser*, 378 F. App'x 229, 231 (3d Cir. 2010).

## III. DISCUSSION

### A. Conclusions of Mental Health Professionals

#### 1. *Dr. Stephen Mechanick*

At the request of defense counsel, Stephen Mechanick, M.D., a forensic psychiatrist, evaluated Defendant on August 29, 2014, and prepared a report dated August 30, 2014. (Mechanik Rept. 1, Def. Ex. 9.) Dr. Mechanick's evaluation lasted about four hours and fifteen minutes. (*Id.*) Prior to the examination, Dr. Mechanick spoke with two of Defendant's attorneys about their experiences interacting with Defendant and the nature of their concerns. (*Id.*; Jan 28 Hr'g Tr. 12.) As part of the evaluation, Dr. Mechanick reviewed correspondence from counsel, the neuropsychological report of Dr. Malamut, and other medical records of Defendant. (Mechanick Rept. 1)

Dr. Mechanick noted that Defendant drove herself to the interview, "was stylishly dressed and well groomed," and was pleasant and cooperative during the evaluation. (*Id.* at 10.)

In addition, Defendant "showed reasonable social judgment in her interactions with [Dr. Mechanick], and she did not display any unusual behavior." (*Id.*)

During her evaluation, Defendant had difficulty remembering facts about her personal, professional, and educational history. (*Id.* at 3-4; Jan. 28 Hr'g Tr. 14-15, 38, 47.) She did not remember the names of doctors, the year she and her husband were married, the year her daughter was born, the names of places she worked, or the years she attended school. (Mechanick Rept. 3-4.)

Dr. Mechanick did not believe that Defendant fully understood the consequences of going to trial. He did not believe that she understood the extent of time she could face in prison or the amount of financial penalties she faced. When Dr. Mechanick mentioned to Defendant that she could face forfeiture of over six million dollars, she responded: "I don't know. I don't understand because I can't believe it." (*Id.* at 9.) Dr. Mechanick reported that Defendant did not remember the details of a conversation she had with her counsel the day before about the possible outcome of a plea bargain versus the possible penalties she faces if she proceeds to trial. (*Id.* at 10.)

In his report, Dr. Mechanick commented about Defendant's understanding of courtroom procedure. (Mechanick Rept. 5-6.) Defendant had a general understanding about the process, the role of the jury, and the respective roles of the judge, of defense attorneys, and of the Assistant United States Attorneys ("AUSAs"). (*Id.*) She specifically commented that she believed the AUSAs in this case "far exceeded their role" in that they "set[] up proffers" in an attempt to persuade people to say what the Government wants them to say to prove its case. (*Id.* at 6.) Defendant provided the names of some prosecution witnesses. (*Id.*) She generally understood the process and consequence of a plea bargain. (*Id.*)

With regard to her case, Defendant was able to remember that she started three charter schools, although she forgot the name of the first school. (*Id.* at 7.) She recalled that she was the CEO of those schools, although just on paper. Defendant told Dr. Mechanick that her problems related to a company called K12. (*Id.*; Jan 28 Hr'g Tr. 15-16.) She recalled that the name of the first attorney she hired, but who had to withdraw her appearance as a result of a conflict. (Mechanick Rept. 8.) Defendant understood that with respect to the wire fraud charges, the Government alleges that she did not have the authority to receive or make payments, rendering any money that she received, as described in those counts, illegal.

When asked by Dr. Mechanick about the Government's allegations, Defendant responded that it alleged that she did not have a signed contract with K12, "which was a lie." (*Id.* at 8; Jan 28 Hr'g Tr. 15-16.) Defendant recalled her first trial and that all of the witnesses had lied. (Mechanick Rept. 8.) When asked for examples, she named two witnesses, Courteney Knight and Doris Evans-White. Co-Defendant Courteney Knight did not testify at the trial. (*Id.*) Defendant also stated that Anthony Smoot was a co-Defendant at the first trial when in fact Smoot had entered a guilty plea and testified against Defendant during the trial. (Jan 28 Hr'g Tr. 16.) Dr. Mechanick opined that Defendant's confusion about who served as witnesses and co-defendants during her first trial is significant, because it reveals her inability to keep this information organized in such a way as to meaningfully assist counsel to rebut witness testimony and weigh risks associated with proceeding with trial or entering into a plea. (Jan 28 Hr'g Tr. 17.)

Dr. Mechanick administered the Mini-Mental State Exam ("MMSE") to Defendant. Defendant scored 17/30, which was in the range of moderate impairment. (Mechanick Rept. 11; Specific impairments noted were "Defendant's inability to name the year, month, and day of the

month; her inability to subtract sevens in a sequence, and short-term recall of only one of three objects after two minutes." (*Id.* at 11.)

Based on his examination of Defendant and his review of Defendant's medical records, including Dr. Malamut's report, Dr. Mechanick opined that Defendant has mild to moderate cognitive impairment that likely represents an early stage of a dementing illness such as Alzheimer's disease. (*Id.* at 11.) Dr. Mechanick did not believe that stress or anxiety played a part in her cognitive impairment (*id.*), but did not explain why he arrived at this conclusion. In addition, Dr. Mechanick concluded that Defendant's cognitive troubles substantially impair her ability to assist her attorneys in the preparation and conduct of her defense, and that Defendant "currently lacks adequate ability to testify in an intelligent, coherent, and relevant manner." (*Id.* at 13.) He opined that Defendant lacks a detailed understanding of the charges that she faces, and the penalties that she faces if convicted. This conclusion was based, in part, on Defendant's difficulties understanding the facts of her case, and problems recalling conversations she had with her attorneys. While Dr. Mechanick recognized that Defendant has an aversion to the criminal charges against her and at times "willfully avoids" dealing with them, he did not believe that she was malingering or feigning cognitive deficits. (*Id.* at 12.)

### 2. Dr. Pogos Voskanian

At the Court's request, Dr. Voskanian, a forensic psychiatrist, conducted a psychiatric and mental competency evaluation and prepared a report dated September 15, 2014. (Voskanian Rept., Court Ex. 1.) Dr. Voskanian has performed thousands of competency evaluations for the state and federal courts. His evaluation of Defendant took place on September 8, 2014, and lasted approximately five hours and 45 minutes. (*Id.*) Prior to his examination, Dr. Voskanian reviewed the Indictment, several of Defendant's medical records, an e-mail from Defendant's

attorney explaining the posture and background of Defendant's criminal case, and the reports of Drs. Mechanick, Summerton, and Malamut. (*Id.* at 1-2.)

Dr. Voskanian opined that "at the time of the examination, [Defendant] was able to understand the proceedings against her and was able to assist in her defense with a reasonable degree of rational understanding, and was therefore competent to stand trial." (Voskanian Rept. 3.) Dr. Voskanian recognized that Defendant showed some memory issues, and opined that as a result of this "likely age-related forgetfulness," Defendant would not be able to represent herself *pro se*. (*Id.*) Alternatively, Defendant's memory difficulties could relate to her disassociating from stressful situations in her life, such as her criminal case, which could have been caused by, in part, trauma she experienced at a younger age. (*Id.* at 19.) Dr. Voskanian believes that Defendant's memory difficulties do not substantially impair her competency to stand trial. (*Id.* at 19.)

Dr. Voskanian reported that Defendant was "logical, coherent, and goal-oriented" at the examination. (*Id.* at 11.) Defendant provided Dr. Voskanian with a long and detailed description of her personal and family history. (Voskanian Rept. 4-7.) She did, however, forget certain details, such as where one of her siblings resides, the names of schools she attended, and other dates. (*Id.* at 4-7, 11.) She brought a "cheat sheet" with her to the evaluation, which contained historical information about where she lived, her academic background, and her work history. (Voskanian Rept. 4; Jan. 30, 2015 Hr'g Tr. 3, ECF No. 378; Court Ex. 3.) Defendant did not refer to the cheat sheet during the examination. (Voskanian Rept. 4.) Defendant stated that she has no problem driving, no problem with personal hygiene, and no problem with daily activities. (Voskanian Rept. 5, 8.) On the MMSE administered by Dr. Voskanian, Defendant scored 28/30, which does not suggest cognitive decline. (Voskanian Rept. 19.)

When asked about her case, Defendant relayed complaints about individuals from K12, and her belief that the charges against her stem from complaints made by K12. (Voskanian Rept. 4.)[4] Defendant commented that her memory problems began abruptly, and that they come about when someone talks about K12 or her trial. (*Id.* at 8.) She confesses that the trial has been "traumatic" for her, and that she does not want to deal with it. (*Id.*) Defendant stated that the anxiety associated with her criminal cases causes her to "block out" during court hearings. (*Id.* at 9.) Defendant described the charges of wire fraud, obstruction of justice, and witness tampering. (*Id.* at 13.) She understood the roles of the judge, the jury, and the prosecution, and was able to differentiate between pleas of guilty, not guilty, and guilty by way of insanity. (*Id.*) She understood her legal rights, such as her right not to testify, right to an attorney, and right to a jury trial. (*Id.* at 14.) Dr. Voskanian believed that Defendant understood hypothetical defenses, possible verdicts, and the consequences of conviction.

Dr. Voskanian opined that Defendant demonstrated an ability to assist her counsel in a rational manner. (Voskanian Rept. 15.) Defendant recognized that, although she forgot specific details, she relied on her attorneys to recite them. (*Id.*) She was able to explain what took place during her first trial, including the names of her co-defendants, and the identities of those who pled guilty and who were acquitted. (*Id.*) Dr. Voskanian opined that Defendant is able to testify relevantly and be cross-examined if necessary, and that although she has difficulty recalling specific details, she has a "good understanding of the issues involved in her case." (*Id.* at 15.)

---

[4] K12 was a company that contracted with Defendant's management company, Cynwyd, to perform all business aspects and day-to-day management of the Agora Cyber Charter School, one of the charter schools founded by Defendant. Although the Government's allegations center around Defendant's conduct in fraudulently creating the contract between Agora and Cynwyd, there was also a contract between K12 and Cynwyd that was referenced repeatedly in the Indictment and at trial.

When asked why she did not testify at her first trial, she stated "because nobody asked me to." (*Id.* at 15.)

### 3. Dr. Jeffrey Summerton

At the Court's request, Dr. Jeffrey Summerton, a forensic psychologist, performed a psychological evaluation on Defendant, and prepared a report dated September 3, 2014. (Summerton Rept., Court Ex. 2.) Dr. Summerton is often appointed by courts to render competency opinions. (Jan 28 Hr'g Tr. 136-37.) Dr. Summerton's evaluation of Defendant took place on September 13, 2014, and lasted approximately three hours and 30 minutes. (Summerton Rept. 1; Jan. 28 Hr'g Tr. 180.) Dr. Summerton and Defendant communicated about her criminal case. Dr. Summerton believed that Defendant understood the Government's allegations against her. (Jan. 28 Hr'g Tr. 144.) However, when asked about her case, Defendant provided "a vague and somewhat disjoined account of her offense conduct." (*Id.* at 143.)

As part of his evaluation, Dr. Summerton administered a number of psychometric tests to Defendant, which included the MMSE, the Beck Depression Inventory, Second Edition (BDI-II), the Beck Anxiety Inventory (BAI), the Personality Assessment Screener (PAS), and the Paulhaus Deception Scales. (Summerton Rept. 4-6.) Defendant scored 23 out of 30 on the MMSE administered by Dr. Summerton, a score which placed Defendant in the mild cognitive impairment range.[5] The results of the BDI-II indicated that Defendant was experiencing moderate levels of clinical depression, and the results of the BAI indicated that Defendant was experiencing a moderate range of anxiety. (Summerton Rept. 5.) Based on the results of the

---

[5] In his report, Dr. Summerton stated that Defendant scored 24 out of 30. However, at the hearing, Dr. Summerton stated that he erred in scoring one of the questions, which resulted in a score of 23 instead of 24. (Jan. 28 Hr'g Tr. 177-78.) A score of 23 also places Defendant in the mild cognitive impairment range. (*Id.* at 178.)

Paulhaus deception scales, Dr. Summerton concluded that Defendant was engaging in positive impression management. (*Id.* at 6.) However, Dr. Summerton stated elsewhere in his report that Defendant's difficulties with memory may relate to malingering, indicating that "memory is one of the easiest mental properties to malinger, and when the stakes are high, as they are for her, this question will remain." (*Id.* at 10.) Dr. Summerton testified that Defendant's memory was significantly impaired as to basic things from her childhood, such as her educational background. Dr. Summerton thought it was odd that Defendant could have this much trouble with basic facts and still be able to function independently otherwise. (Jan. 28 Hr'g Tr. 151.)

Dr. Summerton also administered the MacArthur Competence Assessment Tool—Criminal Adjudication (MacCat-CA) to Defendant. The MacCat-CA is a 22-item structured interview for the assessment of adjudicative competence. (Summerton Rept. 7.) Defendant scored in the mild impairment range on this test. (*Id.*; Jan. 28 Hr'g Tr. 141-43.) In his report, Dr. Summerton opined that Defendant had a basic understanding of court procedure, and recognized the penalties she would face if convicted. (Summerton Rept. 7.) Dr. Summerton also speculated that Defendant "may suffer from Dissociative Ammesia," which was described as "[a]n inability to recall important autobiographical information, usually of a traumatic or stressful nature, that is inconsistent with ordinary forgetting." (Summerton Rept. 10.) In essence, Dr. Summerton attributed Defendant's memory loss and impairment to the stress and anxiety caused by her criminal case. (Jan 28 Hr'g Tr. 153.) Dr. Summerton elaborated on the impact of Defendant's stress:

> Essentially this is a person with narcissistic character features who appeared and wanted to be seen as highly successful, wealthy, and prominent in the community. She made several mentions of being friends with nationally known figures and of power and influence. Her schools were reportedly 'extremely successful . . . we had the highest rankings in the state.' And now at the age of 77 she is facing dozens of felonies, ten years in prison, and millions of dollars in restitution in

addition to the public humiliation and negative regard. The current fall from grace for such a person so tied to status and appearances can be devastating, especially in light of the, often fragile, self-esteem that narcissism can mask. In Dr. Brown's case, her anxiety and distress about all of this appears to be so overwhelming that it is beyond the felt experiences of anxiety. When that kind of process occurs, more serious mental health conditions can occur and memory can be impaired beyond the control of the individual.

(Summerton Rept. 9.) Dr. Summerton concluded in his report that Defendant's amnesia affected her ability to consult with and assist her attorneys, resulting in impaired competence. (*Id*. at 10.)

At the Competency Hearing, however, Dr. Summerton indicated that his opinion had changed since the time he drafted his report. He testified that after he read the report from FMC Carswell, he believed that Defendant had the present ability to consult with her attorneys. (Jan 28 Hr'g Tr. 181-82) Dr. Summerton found significant that the findings in the Carswell Report were based on observations made over an extended period of time. (*Id*.) Dr. Summerton also found significant that Defendant's attorney had represented her for years, that she had expressed a great deal of trust in her attorneys, and that review of documents and transcripts from the first trial could help refresh her recollection. (Jan 28 Hr'g Tr. 185-86.) Dr. Summerton testified that Defendant may be forgetful as a result of anxiety, stress, or Dissociative Amnesia, but that this would not affect her competency to stand trial. (Jan. 28 Hr'g Tr. 159-60.)

    4.    *FMC Carswell – Dr. Christine Anthony and Dr. Daniel Kim*

Defendant arrived at FMC Carswell on October 15, 2014, and stayed approximately 29 days. (Carswell Rept., Gov't Ex. 1.) During her stay at Carswell, Defendant was evaluated by Christine Anthony, Ph.D., and Daniel Kim, Ph.D. (*Id*.) Dr. Anthony clinically interviewed Defendant on four occasions, and Dr. Kim evaluated her on another day. (Def Ex. 18; Jan. 29 Hr'g Tr. 22-25.) Dr. Anthony also administered the Personality Assessment Inventory (PAI) to Defendant, and monitored a sample of Defendant's telephone calls. (Carswell Rept. 1.) In

addition, members of the FMC Carswell medical and correctional staff observed Defendant's behavior during the course of the 29 days. (*Id*.) This staff included mental health nurses with experience treating mentally ill and Alzheimer's patients. (Jan 29 Hr'g Tr. 21-22.)

Dr. Anthony has been a forensic psychologist at the FMC Carswell for almost five years. (*Id*. at 5.) During that time, she has performed hundreds of competency evaluations. (*Id*.) Dr. Anthony reviewed the Indictment, various medical records, and the reports, including associated raw data, by Dr. Mechanick, Dr. Voskanian, Dr. Summerton, and Dr. Malamut. (*Id*. at 1-2.) Dr. Anthony testified that she did not reach out to defense counsel during the evaluation period. (Jan. 29 Hr'g Tr. 37-38.) She stated that she didn't feel like she needed to because she referred to collateral information contained in the other expert reports. (*Id*.)

When Defendant arrived to FMC Carswell, she reported that she did not know the date, including the current year. (Carswell Rept. 5.) She also stated that she thought she was in Washington, not Texas. (*Id*.) Over the course of Defendant's stay, the FMC Carswell nurses noted that she did not appear confused or disoriented. (*Id.*) She was also observed participating in games and "had no problems with the most difficult ones." (*Id*. at 6.) She was able to navigate herself around the institution, and assisted other inmates in getting around. (*Id*. at 10.)

Defendant reported having difficulty remembering historical information, as well as current information, such as the names of staff members, but she took notes and referred to her notebook appropriately. (*Id*.) Dr. Anthony opined that Defendant was able to effectively recall more and specific information when she was given open-ended questions or was permitted to speak at length, as opposed to when she was asked direct questions. (*Id*. at 6.) Dr. Anthony stated that Defendant's thought process appeared organized, and that her responses were relevant and appropriate. (*Id*. at 7.) She also stated that Defendant appeared to have unimpaired insight

and judgment, and that she did not display any significant memory impairments that affected her daily functioning. (*Id*.) The results of the PAI showed that Defendant did not have clinically significant levels of depression, anxiety, or mental illness. (*Id*. at 8.) However, Dr. Anthony noted that Defendant may be experiencing stress and anxiety, as shown by the test results and her profile, but that she has the social support in place to cope with that stress. (*Id*.) Dr. Anthony stated that the telephone conversations Defendant had with her husband suggest that Defendant is still involved in running one of her schools. (*Id*. at 10.)[6]

Dr. Anthony interviewed Defendant regarding competency-related abilities, and reported that "[Defendant] displayed good factual knowledge of the courtroom procedures and clearly understood the roles of judges, prosecutors, and defense attorneys." In addition, Defendant "displayed an understanding of available pleas and consequences of such pleas," and "accurately described the trial process." (*Id*.) She understood plea bargaining, and "expressed an appreciation for the adversarial nature of the legal system." (*Id*. at 9.) Dr. Anthony opined that Defendant was able to apply the concepts about courtroom procedure to her case and described her legal situation. (*Id*.) She understood that she was accused of forcing people to create documents and to change meeting minutes to reflect the creation and approval of a contract.[7]

---

[6] Indeed, Defendant is listed as the current President of Main Line Academy on the private school's website.

[7] On cross-examination of Dr. Anthony, Defense counsel highlighted the fact that Defendant's description of how the case began was inaccurate since the Government's allegations do not involve a contract with a supply company or a contract with K12, even though Defendant reported this to Dr. Anthony. (Jan 29 Hr'g Tr. 33-34.) Dr. Anthony recognizes that a dispute with a supplier is not part of the Indictment, however, was satisfied that "Defendant knew that she was accused of forcing people to create false documents and to falsify meeting minutes." (*Id*. at 34.) She also stated that when Defendant discussed the supplier contract and K12, that it was part of a "backdrop" leading into how the investigation began and ensued. (*Id*.) Dr. Anthony reviewed the Indictment many times and was satisfied that Defendant's description reflected a rational understanding of her case.

Defendant also described how she was charged with contacting someone prior to trial who was going to testify. (*Id*.)[8] Defendant discussed the witnesses from her first trial, and how they had received proffers to "lie about her on the stand to receive immunity." (*Id*.) She also described the effect that the media has had on her, and the stress she has been experiencing as a result of the trial. (*Id*.) She expressed that she can "focus before trial starts, but then something blanks me out." (*Id*.) Finally, she described being comfortable with her attorneys, and that she records the contents of their meetings in a binder, which she finds helpful. (*Id*. at 10.) Defendant told Dr. Anthony that she trusts her attorneys and her husband, and that she believes that they "probably have all the information required to try the case." (*Id*.)

Based on her evaluation of Defendant, her review of the collateral information, her observations, and the observations of her staff, Dr. Anthony concluded that Defendant did not meet the criteria for a mental illness that would render her unable to understand the nature and consequences of the proceedings against her or to assist properly in her defense. (Carswell Rept. 11.) Dr. Anthony believes that Defendant is "able to describe her case and communicate appropriately about her intentions regarding her case." (*Id*. at 11.) If Defendant becomes distracted or anxious at trial, Dr. Anthony suggests that Defendant can assist her attorneys by reviewing and providing input on the transcripts from the first trial, and keeping a notebook to record information from meetings with her attorneys. (*Id*.)

---

[8] Defense counsel pointed out that Defendant was acquitted of the witness tampering count, and therefore, Defendant's discussion of that charge reveals that she did not have a rational understanding of her legal case. (Jan 29 Hr'g Tr. 31-32.) Simply because Defendant was describing evidence used to support a charge for which she was acquitted does not reveal a misunderstanding about her case. Moreover, even though Defendant has been acquitted of the count itself, evidence supporting the witness tampering charge is nevertheless admissible to support the conspiracy count. *See United States v. Wright*, 936 F. Supp. 2d 538, 554 (E.D. Pa. 2013).

5. *Dr. Barbara Malamut*

Defendant retained Dr. Malamut to conduct a neuropsychological evaluation. (Malamut Rept. 1, Def. Ex. 2A.) Dr. Malamut evaluated Defendant over the course of three days: August 6, 11, and 13, 2014. (Malamut Rept. 1.) Over the course of the evaluation, which lasted in total approximately four and one-half hours, Dr. Malamut administered over 20 neuropsychological tests to Defendant. (Jan. 30 Hr'g Tr. 20; Malamut Rept. 9-10.) Dr. Malamut is a clinical neuropsychologist who has experience with elderly patients and evaluating dementia. However, Dr. Malamut has no training and experience in evaluating for competency to stand trial. (Jan. 30 Hr'g Tr. 53-54.) She has never offered an opinion in a criminal proceeding about a defendant's competency. (*Id.*)

Defendant reported that she was having difficulty remembering names and other details. (Malamut Rept. at 1.) Dr. Malamut interviewed Defendant's husband prior to the evaluations, who indicated that, in the past year, Defendant has had problems with remembering things and recalling words. She has also gotten lost while driving at least six times in the past year. (*Id.* at 1-2.) Defendant's husband also reported that at times, Defendant fails to remember important discussions with him or her attorneys, or fails to remember a witness' testimony at her last trial, even if it is just a few hours later. (*Id.* at 2.)

On the MMSE-II administered by Dr. Malamut, Defendant scored 20 out of 30, which placed Defendant in the mild cognitive impairment range. (Malamut Rept. 4; Def. Ex. 24.)[9]

---

[9] Defendant highlights that Dr. Malamut used the most recent version of the MMSE, the MMSE-II, while Dr. Voskanian used an older version of the test. A question on the older version of the test asks the taker to spell the word "world" backwards. Dr. Voskanian noted that Defendant had difficulties with this task, but ultimately answered it correctly. The newer version of the MMSE replaces this question with a serial sevens task, requiring the taker to count backwards from 100 in multiples of 7. Defendant scored 1 point out of 5 on this task during Dr. Malamut's testing. The two tasks are not equivalent. The serial sevens task is a more difficult

17

Defendant's score on the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) reflected that she was functioning in the low average range. (*Id*.) One of the tests involved Defendant drawing a clock showing that the time was 11:10. (Jan. 30 Hr'g Tr. 41-42.) Dr. Malamut opined that Defendant's performance on this test revealed her cognitive impairment. (*Id*.) Defendant was also administered the TOMM, which evaluates memory malingering. Defendant passed this test, and also passed other malingering measures embedded in other of tests administered by Dr. Malamut. (Jan. 30 Hr'g Tr. 47-49.)

Defendant's neuropsychological test results suggested dysfunction in the temporal and parietal lobes of the brain, which are responsible for the formation of new memories, attention, naming skills, and expressive language skills. (Jan. 30 Hr'g Tr. 13-14.) Dr. Malamut diagnosed Defendant with Mild Cognitive Disorder, Unspecified Etiology, under the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V). (Malamut Rept. 8.) Defendant was not diagnosed with Alzheimer's Disease. According to Dr. Malamut, a doctor can only definitively diagnose Alzheimer's Disease after death and upon review of an autopsy report. (Jan. 30 Hr'g Tr. 15.) Dr. Malamut opined that stress may have played a part in some of Defendant's cognitive deficits. (Malamut Rept. 8 ("Dr. Brown is under a great deal of stress at this time . . . and while it is possible that depression can account for some of her confusion and memory loss, it is unlikely that all of her deficits and weaknesses . . . can be attributed to

task for elderly populations, according to a January 1991 article in the American Journal of Psychology. (*See* Jan 30 Hr'g Tr. 69; *see also* Def. Ex. 27.) Defense counsel makes great efforts to undermine Dr. Voskanian's credibility because he used a version of the MMSE that contained the world task and not the serial sevens task. Assuming Dr. Voskanian substituted the serial sevens task for the world task, and assuming that Defendant provided an incorrect answer on this substituted task, the result would not have made a substantially significant difference in scoring. More importantly, Dr. Voskanian opined that even if Defendant had scored in the mild cognitive impairment range on the MMSE, this would not have affected his opinion that Defendant was competent to stand trial. (Jan. 28 Hr'g Tr. 129-30.) Dr. Voskanian's testimony was reliable, persuasive, and helpful to the Court.

depression or increased stress.").  Dr. Malamut also pointed out that, although Defendant

demonstrated several areas of cognitive impairment, "she continues to independently carry out

her Instrumental Activities of Daily Living, such as driving, managing her medications,

shopping, etc."  (*Id*.)  Because of this, Defendant does not meet the criteria for a diagnosis of full

dementia, or Major Cognitive Disorder, as it is called in the DSM-V.  (*Id*.)  Dr. Malamut offered

no opinion as to Defendant's competency to stand retrial in this matter, noting that she was not

qualified to render such an opinion.  (Jan. 30 Hr'g Tr. 53-54.)

### B.    Defendant's Competency to Stand Trial

Based upon the record before us, we are compelled to conclude that the Government has

established, by a preponderance of the evidence, that Defendant does not suffer from a mental

disease or defect that renders her mentally incompetent to stand trial.  18 U.S.C. § 4241(d).  The

evidence and testimony presented at the Competency Hearing demonstrate that Defendant is able

to understand the nature and consequences of her criminal proceeding, and is presently able to

consult with her attorneys with a reasonable degree of rational understanding.  *See Dusky*, 362

U.S. at 402 (setting forth standard to determine competency).  We agree with Dr. Voskanian, Dr.

Summerton, Dr. Anthony, and Dr. Kim that Defendant is competent to stand trial.  Our

conclusion is supported by the reports of the experts, the opinions of the experts offered during

the Competency Hearing, and the reasons given therefore, as well as our own observations of

Defendant during the first trial and during the Competency Hearing.

Defendant was evaluated by five medical professionals who testified at the Hearing.

Four of the five were qualified to offer opinions on Defendant's competency.  Three of those

four—Dr. Voskanian, Dr. Summerton, and Dr. Anthony—concluded that Defendant was

competent to stand trial.  The testimony of these doctors was particularly helpful in reaching our

competency determination.  Dr. Voskanian, Dr. Summerton, and Dr. Anthony each have a substantial amount of experience evaluating the competency of criminal defendants.  Dr. Voskanian has performed thousands of competency evaluations for the federal and state courts, and Dr. Anthony testified that she has performed hundreds of competency evaluations. Similarly, Dr. Summerton is often appointed by courts to render competency opinions.

When presented with competing expert reports, as is the case here, the district court judge, who is in the best position to evaluate credibility of experts, is permitted to assign greater weight to some opinions over others, or altogether reject certain expert opinions.  *See, e.g.*, *United States v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007) (stating that "[a] district court may rely on one of two competing competency opinions given by qualified experts"); *United States v. Mahoney*, 717 F.3d 257, 264-66 (1st Cir. 2013) (holding that the district court did not err by relying on the testimony of one expert and its own observations rather than on the testimony of another expert); *United States v. VanHoesen*, 450 F. App'x 57, 60-61 (2d Cir. 2011) (holding that district court did not err in attributing more weight to the expert reports finding that defendant was competent, even where a forensic psychologist found defendant to be incompetent). We recognize that Dr. Mechanick concludes that Defendant is not presently competent to stand trial, while Dr. Voskanian, Dr. Anthony, and Dr. Summerton conclude that she is competent.[10]  We find the testimony and opinions of Dr. Voskanian, Dr. Anthony, and Dr. Summerton to be more persuasive.

The conclusions of Dr. Anthony and the rest of the FMC medical staff, who had the ability to observe and evaluate Defendant over an extended period of time, are particularly

---

[10] At the hearing, Dr. Malamut testified that she is not qualified to render competency opinions.  No evidence was presented regarding the qualifications needed in order to feel comfortable rendering an opinion on an individual's competency.

significant, as compared to the evaluations of the other experts. *See United States v. Jackson*, No. 03-173-04, 2005 U.S. Dist. LEXIS 23362, at *16 (E.D. Pa. Oct. 7, 2005) ("A court examining conflicting medical testimony regarding mental competency, may take into consideration the length of time each expert has spent with the defendant."); *United States v. Hoyt*, 200 F. Supp. 2d 790, 794 (N.D. Ohio 2002) (relying on expert who had spent more time evaluating defendant when two qualified court-appointed doctors reached opposite conclusions regarding a defendant's competence to stand trial). Dr. Anthony met with Defendant on four different occasions. Dr. Kim interviewed Defendant on another occasion. Both concluded that Defendant did not have a mental illness that would render her unable to understand the nature and consequences of the proceedings against her or assist properly in her defense. The FMC Carswell medical and correctional staff—some of whom included nurses trained in dementia and Alzheimer's Disease—had the opportunity to observe Defendant on a daily basis for weeks and raised no concerns about her cognitive abilities. We consider and rely more heavily on the opinions of these doctors in light of the relative amount of time they spent with Defendant as compared to the other doctors.

We are satisfied that the evidence presented as to each element of the competency standard supports our conclusion that Defendant is competent to stand trial. The evidence and testimony demonstrate that Defendant has a rational understanding about the nature of a criminal proceeding. With the exception of Dr. Malamut, each of the experts opined that Defendant had a good understanding about courtroom procedure. Dr. Mechanick stated that Defendant had a general understanding about the process, the role of the jury, and the respective roles of the judge, of defense attorneys, and of the AUSAs, and that she even suggested, albeit seemingly cynically, that the AUSAs offer proffers to witnesses in exchange for favorable testimony. Dr.

Voskanian and Dr. Anthony similarly concluded that Defendant understood the roles of the judge, the jury, the prosecution, and the judicial process.

Defendant also has a solid understanding of the consequences of proceeding to trial and the consequences of entering a guilty plea. She understands that possible penalties include prison time and restitution. She even quipped that seeking restitution would be a futile effort since she has no money to satisfy this penalty. Dr. Anthony testified that Defendant understood the available pleas, the consequences of such pleas, and the concept of plea bargaining. Dr. Anthony stated that Defendant "expressed an appreciation for the adversarial nature of the legal system." Dr. Voskanian stated that Defendant was able to differentiate between pleas of guilty, not guilty, and guilty by way of insanity, and that she understood her legal rights, such as her right not to testify, right to an attorney, and right to a jury trial. Dr. Mechanick did not believe that Defendant understood the extent of time she could face in prison, or the amount of financial penalties she could receive. However, this may well be related to what Dr. Mechanick also perceived as Defendant's aversion to her criminal charges, and her tendency to "willfully avoid" dealing with the case.

We are also persuaded that Defendant has a rational and factual understanding of the Government's allegations against her. Despite the complexity of the 67-count Indictment, Defendant was able to explain—perhaps generally at times—the nature of the charges against her to each of the experts. She often provided a backdrop or historical context to the Government's allegations, explaining that a company called K12, which was retained to provide management services, caused tension. Providing the context, at times, instead of the specific allegations does not mean Defendant did not understand the charges. She explained to Dr. Mechanick that, with respect to the wire fraud charges, the Government alleges that she did not

have the authority to make or receive payments. Defendant explained to Dr. Voskanian the wire fraud, obstruction of justice, and witness tampering charges. Dr. Anthony reported that Defendant understood that she was accused of forcing people to create documents and to change minutes. This is, of course, the crux of the Government's allegations.

We are also satisfied that Defendant has a sufficient present ability to consult with her attorneys with a reasonable degree of rational understanding. Dr. Anthony noted that Defendant placed a great deal of trust in her attorneys, and that she was capable of assisting her attorneys meaningfully. Dr. Voskanian similarly concluded that Defendant was able to assist her attorneys. Dr. Voskanian noted that Defendant had some memory issues, but that these did not affect his opinion that Defendant was competent to stand trial, so long as she had the assistance of an attorney. Defendant contends that she was unable to meaningfully consult with her attorneys. However, the only evidence presented to support this was Dr. Malamut and Dr. Mechanick stating in their reports that Defendant had forgotten details about meetings with her attorneys, even when the meeting had just occurred on the prior day. We did not hear from any of the experts, or from Defendant's attorneys, about how this forgetfulness substantially impaired her ability to consult with them. Forgetting what has been said at meetings with her attorneys can be easily addressed. Dr. Anthony stated that Defendant kept a notebook at FMC Carswell and referred to it appropriately. Dr. Anthony suggested that Defendant's memory problems could be solved by taking notes during meetings, and taking notes while reviewing transcripts from the first trial with her attorneys.

Although the doctors do not dispute that Defendant exhibited some level of memory loss, they disagree on the cause of that loss. Dr. Malamut and Dr. Mechanick—the doctors retained by Defendant—concluded that the memory loss is attributable to a diagnosis of Mild

Neurocognitive Disorder.  In contrast, Dr. Voskanian opined that the memory issues were nothing more than normal "age-related forgetfulness."  Dr. Summerton, Dr. Voskanian, and Dr. Anthony also believed that stress and anxiety played a significant part in Defendant's memory loss.  Even Defendant admits that the stress and anxiety surrounding her criminal case contributes to memory loss.  She reported to Dr. Anthony that she "can focus before the trial starts, but then something blanks [her] out."  (Carswell Rept. 9.)  Dr. Summerton discussed the dissociative phenomena that may be at play, noting that it is likely that the distress caused by her "fall from grace" explains the memory impairments.  We find this testimony to be persuasive, and believe that the stress and anxiety of this trial, and the fact that Defendant is 77 years old, are contributing to Defendant's memory problems.  However, forgetfulness associated with natural aging, or with stress and anxiety does not rise to the level of incompetence to stand trial in this case.

We also suspect that malingering may have contributed to some extent to Defendant's observed memory issues.  Dr. Voskanian opined that malingering could not be ruled out in Defendant's case.  Dr. Summerton noted that "memory is one of the easiest mental properties to malinger, and when the stakes are high, as they are for [Defendant], this question will remain."  There is no question that the stakes are high for Defendant.  She has lived a life marked by great success as an educator, significant wealth, and prominence in the community.  She now faces prison time, fines, and significant restitution.  Although Defendant's score on the Test for Memory Malingering ("TOMM") administered by Dr. Malamut showed that she put forth adequate effort on that test, we are not convinced that this precludes a finding that she has exaggerated her memory loss during parts of her psychiatric and psychological testing.  Upon her much anticipated arrival to FMC Carswell for a custodial evaluation, Defendant indicated that

she did know what state she was in—she reported she was in Washington, not Texas—and claimed to not know the current date, including the year.[11] Defendant also misstated how old she was to some of the doctors. Dr. Voskanian opined that orientation as to self is one of the last things that a person loses when she shows cognitive decline. In Dr. Voskanian's opinion, the fact that Defendant did not know how old she was suggested "severe severe cognitive decline," which is suspicious in light of the fact that Dr. Voskanian—in addition to at least two of the other doctors—did not believe Defendant showed any signs of cognitive impairment. (*See* Jan 28 Hr'g Tr. 111-12.) Based on this, the Court suspects at least some level of memory loss exaggeration.

We also find significant that Defendant exhibited no problems maintaining daily activities. She drove herself to many of her doctors' appointments, reports no issues caring for her intellectually disabled daughter, and even continues to be involved in running a school that she founded. Defense experts downplay Defendant's ability to maintain normal daily activities, contending that impairment in daily functioning is not required for a diagnosis of Mild Neurocognitive Disorder, and that Defendant's lack of difficulties in her normal, everyday life does not equate with competency to stand trial. However, Dr. Anthony explained that, although

---

[11] Defendant provided an incorrect location even though Carswell Texas had been her first choice of BOP locations for the custodial examination, and even though she self-reported and provided her own transportation to and from the Fort Worth, Texas facility. At a September 24, 2014 hearing, the Court addressed the Government's Motion for a Custodial Examination. At that hearing, counsel for Defendant indicated that Defendant had no opposition to the Government's Motion. Counsel specifically requested that the Court make a recommendation to the BOP that Defendant be placed at the Carswell facility in Texas, as opposed to the other option, the Metropolitan Correctional Center ("MCC") in New York, New York. (*See* ECF Nos. 351, 352.) Counsel also requested that Defendant be permitted to self-surrender to the BOP facility, and that she be permitted to provide her own transportation. After the hearing, an Order was entered directing that Defendant voluntarily surrender to the facility designated by the BOP on October 15, 2014, and that she provider her own transportation to and from the facility. (ECF No. 352.)

a diagnosis of Mild Neurocognitive Disorder under the DSM-V does not require an interference with daily activities, the DSM-V goes on to explain that a patient uses different coping skills or other ways to compensate. The DSM-V describes the diagnostic criteria as follows:

> The cognitive deficits do not interfere with capacity for independence in everyday activities (i.e., complex instrumental activities of daily living such as paying bills or managing medications are preserved, but greater effort, compensatory strategies, or accommodation may be required)." (Def. Ex. 3.)

The explanatory notes that describe the diagnostic features of the disorder state that "[a]t the mild [neurocognitive disorder] level, the individual is likely to describe these tasks as being more difficult or as requiring extra time or effort or compensatory strategies." (*Id*.) Dr. Anthony testified that after observing Defendant over the course of the four-week period, both she and her medical staff—which includes mental health nurses with experience treating mentally ill patients and Alzheimer's patients—concluded that Defendant exhibited no difficulty with daily activities and did not use coping skills or compensatory strategies. The medical staff observing Defendant had been alerted to the issues raised by the doctors and defense attorneys, and the staff was advised to take note of any sort of confusion or disorientation. The nurses saw none. Indeed, even Defendant herself admits that she has no difficulty with daily activities.

In any event, even if Defendant did suffer from some level cognitive impairment such as Mild Neurocognitive Disorder, this does not mean that she is not competent to stand trial. The Third Circuit has observed that "it does not follow that because a person is mentally ill [that person] is not competent to stand trial." *Leggett*, 162 F.3d at 244 (alterations in original) (internal quotation marks omitted); *see also United States v. Nichols*, 56 F.3d 403, 412 (2d Cir. 1995) ("It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial."); *id*. at 412-13 (finding that evidence of paranoid delusions and onset of psychosis did not undermine district court's finding of competency). "If the mental

26

illness does not deprive the defendant of the ability . . . to understand the proceedings . . . rationally as well as factually, then the illness is irrelevant for the purposes of determining competency." *Leggett*, 162 F.3d at 244 (internal quotation marks and citations omitted). Defendant invites us to conclude that because Dr. Malamut diagnosed her with Mild Neurocognitive Disorder, this equates to a finding of incompetency. We decline the invitation. As explained above, the evidence and testimony overwhelmingly supports our conclusion that Defendant is able to understand the nature and consequences of her criminal proceeding, and that she is presently able to consult with her attorneys with a reasonable degree of rational understanding. *See Dusky*, 362 U.S. at 402.

Defense counsel attempts to undermine the credibility of the Court-appointed doctors by highlighting the fact that they did not reach out to her attorneys to gain a collateral perspective of the attorneys' concerns. Counsel cites the American Academy of Psychiatry and the Law ("AAPL") Guidelines for competency evaluations, in support of her argument. The AAPL Guidelines state that "[a] defendant's attorney will often have information that is not otherwise available." (Def. Ex. 30.) The Guidelines also state that "[c]ourt appointed psychiatrists may want to speak with both the prosecution and defense attorneys." (*Id*.) The guidelines may make recommendations, but the experts' choice to not reach out to defense counsel does not weaken their opinions. Each of the Court-appointment doctors had the benefit of Dr. Malamut's and Dr. Mechanick's reports, which included statements that there were concerns about Defendant's ability to remember details from meetings she had with her attorneys. Dr. Anthony testified that she often does reach out to defense counsel when making competency evaluations, but felt as though she did not need to in this case because she had the information she needed from the reports of Dr. Mechanick and Dr. Malamut.

In any event, we find defense counsel's argument to be disingenuous in light of the fact that they had an opportunity to present the court with their concerns about Defendant's cognitive abilities, but opted not to do so. Counsel had the opportunity to present direct evidence about Defendant's interactions with them and whether those interactions raised concerns about her ability to properly assist them in her defense. Counsel's choice to not submit an affidavit, or offer any testimony by themselves or Defendant's husband, is significant because "defense counsel will often have the best-informed view of the defendant's ability to participate in [her] defense." *Medina v. California*, 505 U.S. 437, 450 (1992).

Moreover, we also find significant that Defendant's attorneys neither recognized nor informed the Court of any concerns with Defendant's memory until well after the first trial concluded and only one month prior to the scheduled start of the retrial. *See United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986), *cert denied*, 479 U.S. 1036 (1987) (noting that "since incompetency involves an inability to assist in the preparation of a defense or rationally to comprehend the nature of the proceedings, failure by trial counsel to indicate the presence of such difficulties provides substantial evidence of the defendant's competence"). Defendant admitted that she had difficulties with remembering things during the first trial. The issues with her memory—whether caused by stress and anxiety or whether caused by a mild neurocognitive impairment—manifested itself during the first trial, and yet went completely undetected by counsel. If defense counsel had no concerns about Defendant's ability to consult with them and participate meaningfully in her defense in preparation for and during the first trial, this supports a finding that she was competent then, and is competent now.

There has already been a complete trial in this matter. The trial lasted for 26 days. There were 59 witnesses who testified, and hundreds of exhibits admitted into evidence. The retrial in

this case will be much shorter, and less complex.  There will be fewer counts for the Government to prove, and against only one Defendant, not three.  If anything, the amount of evidence will be reduced, not expanded.  Defendant had a team of not less than five very competent attorneys assisting her through the last trial, and no doubt will have similar support for the retrial.  Defendant will have the ability to review transcripts and exhibits, and consult with her attorneys about what occurred at the last trial in preparation for the retrial.

Finally, the Court's own observations of Defendant—during the 26-day trial and during the three-day Competency Hearing, and during various hearings and other court appearances that have occurred over course of this case—correspond to the findings of Dr. Voskanian, Dr. Anthony, and Dr. Summerton as to Defendant's competency to stand trial.  *See Vamos*, 797 F.2d at 1150 (noting that "deference is owed to the district court's determinations based on observation of the defendant during the proceedings").  During both the trial and the Competency Hearing, Defendant appeared attentive and engaged.  She appeared to follow each witness' testimony and the arguments made by her counsel and the Government, and often took notes in a notebook.  She consistently conferred with her counsel.  We have observed Defendant in the courtroom over the course of almost two years.  In that time, we have seen nothing about her behavior that would suggest that she failed to understand the charges against her or was unable to assist her counsel in her defense.

## IV.     CONCLUSION

For these reasons, we conclude that Defendant is competent to stand retrial in this matter, pursuant to 18 U.S.C. § 4241(d).

An appropriate Order follows.

BY THE COURT:

_____

**R. BARCLAY SURRICK, J.**