IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 12-0367 |
| DOROTHY JUNE BROWN | : | |

## MEMORANDUM

**SURRICK, J.**                                                    **NOVEMBER <u>23</u> , 2015**

Defendant Dorothy June Brown and the Government jointly seek an order from the Court

declaring that Defendant is not competent to stand trial.  After reviewing the reports submitted

by the psychologists and psychiatrists who evaluated Defendant, as well as affidavits from

Defendant's counsel, we are compelled to agree with Defendant and the Government that

Defendant Dorothy June Brown is not competent to stand trial.

## I.      BACKGROUND

### A.      Indictment and First Trial[1]

In January 2013, Defendant was charged with multiple counts of wire fraud, conspiracy

to obstruct justice, obstruction of justice, and witness tampering.[2]  The charges are related to

Defendant's alleged scheme to defraud two charter schools out of more than six million dollars.

Defendant was charged with four co-Defendants.  Two of those defendants—Joan Woods

---

[1] A more detailed factual background of the Government's allegations against Defendant
can be found in the Memorandum dated July 31, 2014 denying Defendant's motion for Judgment
of acquittal.  (ECF No. 328.)

[2] The Indictment charged Defendant with 52 counts of wire fraud, in violation of 18
U.S.C. § 1343 (Counts 1-52); one count of conspiring to obstruct justice, in violation of 18
U.S.C. § 371 (Count 53); ten counts of obstruction of justice, in violation of 18 U.S.C. § 1519
(Counts 54-59, 63, 65) and § 1512(c)(2) (Counts 61-62); and one count of witness tampering, in
violation of 18 U.S.C. § 1512(b)(3) (Count 67).  (ECF No. 47.)

Chalker and Anthony Smoot—entered negotiated guilty pleas prior to the trial. The two other co-Defendants—Michael A. Slade, Jr. and Courteney L. Knight—joined Defendant at the first trial, which began in November 2013 and lasted approximately 26 days. Defendant did not testify at the trial. On December 19, 2013, the jury returned a partial verdict finding Defendants Slade and Knight not guilty of the counts charged against them. (Min. Entry, ECF No. 265; *see also* ECF Nos. 267-270.) The jury resumed deliberations with respect to the charges against Defendant. (Min. Entry, ECF No. 290.) On January 9, 2014, after communicating to the Court that it was unable to reach a verdict on many of the remaining counts, the jury returned a partial verdict with respect to Defendant. (Min. Entry, ECF No. 293.) The jury found Defendant not guilty on Counts 38-41 (wire fraud), 59 (obstruction of justice), and 67 (witness tampering). (*Id.*; Verdict, ECF No. 294.) The jury was deadlocked on the remaining Counts: Counts 1-37, 46-58, 61-63, and 65. (Verdict.) The Government notified the Court of its intention to retry Defendant. Trial was scheduled to begin on September 8, 2014.[3]

### B.    Competency Hearing

Approximately one month prior to the start of the trial, defense counsel contacted the Court with concerns about Defendant's competency. On September 2, 2014, Defendant filed a Motion requesting a competency hearing. (ECF No. 334 (filed under seal).) Attached as exhibits to the motion were two reports from Defendant's doctors: (1) Stephen Mechanick, M.D., a forensic psychiatrist; and (2) Barbara Malamut, Ph.D., a neuropsychologist. The Government did not oppose Defendant's request for a competency hearing, but requested that the Court appoint an expert to evaluate Defendant.

---

[3] Trial was delayed because of the scheduling conflicts of defense counsel. The Government did not oppose the delay.

By Order dated September 5, 2014, Defendant's motion requesting a hearing on competency was granted, and Defendant was ordered to submit to the psychiatric and mental competency evaluation by Pogos Voskanian, M.D. (ECF No. 342.) Defendant was also ordered to submit to a psychological evaluation and testing by Jeffrey Summerton, Ph.D. (ECF No. 344.)

On September 22, 2014, after review of the various expert reports, the Government filed a Motion for Custodial Examination Pursuant to 18 U.S.C. § 4247(b). (ECF No. 347.) This Motion was unopposed. By Order dated September 24, 2014, Defendant was committed to the custody of the Attorney General for a competency examination. Defendant self-reported to the Federal Medical Center—Carswell (FMC Carswell), located in Fort Worth, Texas. During the 29-day custodial examination at FMC Carswell, Defendant was evaluated by Christine Anthony, Ph.D., and Daniel Kim, Ph.D., and was observed by the Carswell staff. Drs. Anthony and Kim rendered a report dated November 20, 2014.

A Competency Hearing was held from January 28, 2015 through January 30, 2015. (Jan. 28, 2015 Hr'g Tr. 3, ECF No. 376.) At the hearing, the reports of the experts, defense doctors, Dr. Malamut and Dr. Mechanick, Court-appointed doctors, Dr. Voskanian, Dr. Summerton, and Dr. Anthony from FMC Carswell, were offered into evidence. Each of these doctors testified at the hearing. Dr. Anthony participated by way of videoconference. (Jan. 29, 2015 Hr'g Tr. 4-5, ECF No. 377.) Prior to the hearing, the parties agreed that the report of each expert would be admitted into evidence at the hearing and would constitute the direct testimony of the expert. (Jan 28 Hr'g Tr. 3-4.) It was also understood that Defendant could submit an affidavit from her attorney, Greg Miller, in lieu of offering his testimony, and that the Government would have the opportunity to cross-examine Miller with regard to the contents of the affidavit. (*Id*. at 4.)

Miller advised that it would be decided after the testimony of the experts whether they would proceed with offering this affidavit. (*Id.*) No affidavit was offered.

### C.    Post-Competency Hearing

On April 8, 2015, a Memorandum and Order were filed. Based upon the evidence and testimony we found that Defendant was competent to stand trial, pursuant to 18 U.S.C. § 4241(d). (ECF Nos. 380-81.) After a conference with Counsel, trial was rescheduled for July 7, 2015. (Apr. 14, 2015 Order, ECF No. 386.) On June 15, 2015, two weeks before jury selection was to begin, Defendant filed a Submission of Supplemental Information Regarding Competency to Stand Trial. (Def.'s Suppl. Submission, ECF No. 389.) Attached as exhibits to the submission were medical records produced from an examination of Defendant at the Cleveland Clinic's Lou Ruvo Center for Brain Health Neurological Institute, which included notes from the examining physician Jagan Pillai, M.D., a Supplemental Report from Dr. Mechanick based upon Cleveland Clinic's findings, and a draft affidavit that Defendant's counsel provided to the Government on January 23, 2015, regarding the interactions with Defendant that led to competency concerns. On June 18, 2015, Defendant's counsel filed affidavits with the Court asserting that Defendant does not have the current capacity to meaningfully participate in her own defense. (Miller Aff., ECF No. 391; Haggerty Aff. ECF No. 392.)

On June 22, 2015, an Order was entered continuing the trial. (ECF No. 394.) Defendant was subsequently ordered to submit to an additional competency evaluation by Dr. Voskanian. (June 24, 2015 Order, ECF No. 395.) Dr. Voskanian filed a report with the Court on July 1, 2015, based upon his findings. (Voskanian Rept., ECF No. 398 (filed under seal).) On July 8, 2015, Dr. Mechanick again met with Defendant and her husband. On July 10, 2015, he issued a report based upon the interviews he conducted and Dr. Voskanian's reported findings.

(Mechanick Rept., ECF No. 398 (filed under seal).)  On August 12, 2015, pursuant to the

Government's request for a current competency evaluation conducted by an expert of their

choosing, Susan Rushing, M.D., J.D., submitted a report to the Court.  (Rushing Rept., ECF No.

401 (filed under seal).)  On August 20, 2015, the Government and the Defense submitted a joint

proposed order to the Court which declared that the Defendant was not competent to stand trial.

(On file with the Court.)  Also submitted was the Government's Unopposed Motion to Dismiss

the Superseding Indictment against Dorothy June Brown without Prejudice.  (Gov't's Unopposed

Mot. (on file with the Court).)

## II.    LEGAL STANDARD

The criminal trial of a defendant who lacks mental competency violates the defendant's

due process right to a fair trial.  *See Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *United*

*States v. Renfroe*, 825 F.2d 763, 765-66 (3d Cir. 1987) (citing *Drope v. Missouri*, 420 U.S. 162,

172 (1975)).  The basic standard for competency, as set forth by the Supreme Court in *Dusky v.*

*United States*, requires that a defendant have a rational and factual understanding of the

proceedings, and a "sufficient present ability to consult with [her] lawyer with a reasonable

degree of rational understanding" to stand trial.  362 U.S. 402, 402 (1960) (per curiam); *see also*

*Taylor v. Horn*, 504 F.3d 416, 430 (3d Cir. 2007) (citing *Dusky*, 362 U.S. at 402).  Requiring a

criminal defendant to "be competent has a modest aim:  It seeks to ensure that [she] has the

capacity to understand the proceedings and to assist counsel."  *Godinez v. Moran*, 509 U.S. 389,

402 (1993).

Congress codified this competency standard in 18 U.S.C. § 4241(d), which provides that:

> If, after the [competency] hearing, the court finds by a
> preponderance of the evidence that the defendant is presently
> suffering from a mental disease or defect rendering him mentally
> incompetent to the extent that he is unable to understand the nature

and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

The Government has the burden of proving that Defendant is competent to stand trial. *United States v. Velasquez*, 885 F.2d 1076, 1089 (3d Cir. 1989). Pursuant to § 4241, psychiatric or psychological examinations of the defendant may be conducted, psychiatric or psychological reports may be prepared, and a hearing is held. 18 U.S.C. § 4241(b)-(c). In determining whether a defendant is competent to stand trial, "court[s] must examine the unique circumstances of the case and decide whether the defendant '(1) has the capacity to assist in her or his own defense and (2) comprehends the nature and possible consequences of a trial.'" *United States v. Jones*, 336 F.3d 245, 256 (3d Cir. 2003) (citations omitted). A number of factors may be considered, including "'evidence of a defendant's irrational behavior, [her] demeanor at trial, and any prior medical opinion on competence to stand trial.'" *Id.* (quoting *United States v. Leggett*, 162 F.3d 237, 242 (3d Cir. 1998)). Another factor that courts deem relevant is "an attorney's representation about his client's competency." *Id.* There is "no predetermined formula" for competency determinations; each case will depend on the facts presented. *Leggett*, 162 F.3d at 242. Even one factor alone may be sufficient in certain circumstances. *Jones*, 336 F.3d at 256.

## III.   DISCUSSION

### A.   Conclusions of Medical and Mental Health Professionals

#### 1.   The Cleveland Clinic

Without the knowledge of defense counsel, and approximately five months after Defendant was observed at FMC Carswell, Defendant's husband arranged for his wife to be examined for cognitive impairment by doctors at the Cleveland Clinic's Lou Ruvo Center for Brain Health Neurological Institute (the "Cleveland Clinic"). (Def.'s Suppl. Submission 1-2.)

Dr. Jagan A. Pillai coordinated and oversaw Defendant's care while she underwent testing at the Cleveland Clinic.  (*See id.* 2.)  The Cleveland Clinic conducted neuropsychological performance testing; whole blood, plasma, and cerebrospinal fluid genotype and biomarker testing; and brain magnetic resonance imaging ("MRI").  (*See* Cleveland Clinic Rept., Def.'s Suppl. Submission, Ex.'s 1-5.)

Based upon neurocognitive screening tests demonstrating that Defendant had difficulties in "delayed recall, working memory executive function, [and] visuospatial function," Dr. Pillai determined that Defendant may be suffering from "[d]ementia of the [Alzheimer's Disease] AD type."[4]  (*Id.*, Ex. 3 at 2.)  Neuropsychological testing revealed that Defendant was performing within the Borderline to Extremely Low range of functioning in learning, recall, and recognition memory tasks, as well as in areas of executive functioning and language skills.  (*Id.*, Ex. 5.)  Further tests were ordered to confirm and/or rule out causes of Defendant's cognitive performance deficits.  (*Id.*, Ex. 3 at 6.)

Genomic DNA testing revealed that Defendant "possesses and ApoE genotype that indicates with high specificity that Alzheimer's disease is the cause of or a contributor to the observed dementia."  (*Id.*, Ex. 2 at 1.)  In addition, cerebrospinal testing indicated that Defendant's amyloid-beta peptide (1-42), total tau, and phospho-tau protein levels were "consistent with a diagnosis of Alzheimer's (AD) disease as a cause of []her neurological

---

[4]  Defendant received a raw score of 11 on the Montreal Cognitive Assessment ("MoCA"), which "raise[d] concern[s] for [a] neurodegenerative process."  (Def.'s Suppl. Submission, Ex. 3 at 5.)

symptoms." (*Id.*, Ex. 2 at 3.)  Furthermore, it was noted that Defendant's vitamin B1 and D levels were abnormally low.[5]

As to neuroimaging, Defendant's hippocampal volume was in the low average range (15th percentile) for someone of similar age, and she exhibited "minimal white matter disease," which, the Cleveland Clinic concluded, is "reflective of chronic microvascular ischemia." (*Id.*, Ex. 3 at 15.)  Although the testing physician stated that Defendant's MRI results did not support a conclusion of neurodegeneration, findings were limited by the fact that pre-morbid imaging was not utilized as a comparison tool.  (*See id.*, Ex. 3 at 13-14.)

On May 26, 2015, upon review of the testing data gathered at the Clinic, Dr. Pillai noted the following:

> I reviewed her CSf [cerebrospinal fluid] tests results which were consistent with Alzheimer's disease, APoe 3/4[,] Low Vit B1 and D noted[.]
>
> Neuropsychological evaluation revealed prominent impairment in episodic memory and confrontation naming.  Executive functioning was also fairly consistently impaired.  In contrast, basic attention, information processing speed, and visuospatial skills were generally within normal limits.  The patient's memory performance was characterized by poor learning and delayed recall of new information, and she did not show benefits from recognition paradigms.  On brief mood screening measures, she indicated mild symptoms of depression and anxiety.  Neuropsychological evaluation revealed prominent impairment in episodic memory and confrontation naming.  Executive functioning was also fairly consistently impaired.  In contrast, basic attention, information, processing speed, and visuospatial skills were generally within normal limits.

---

[5] The Clinic reports do not elaborate on the significance of this finding.  We note that peer-reviewed studies indicate that both vitamins B and D have been found to play a significant role in Alzheimer's type dementia and/or cognitive functioning.  *See, e.g.,* Littlejohns et al., *Vitamin D and the Risk of Dementia and Alzheimer Disease,* 83.10 NEUROLOGY 920, 920 (2014) ("Our results confirm that vitamin D deficiency is associated with a substantially increased risk of all-cause dementia and Alzheimer disease."); Smith et al., *Homocysteine-Lowering by B Vitamins Slows the Rate of Accelerated Brain Atrophy in Mild Cognitive Impairment: A Randomized Controlled Trial,* 5.9 PLoS ONE (2010) ("The accelerated rate of brain atrophy in elderly with mild cognitive impairment can be slowed by treatment with homocysteine-lowering B vitamins.").

(*Id.*, Ex. 4 at 3.) Dr. Pillai diagnosed Defendant as suffering from Alzheimer's disease. (*Id.*, Ex. 4 at 4.) Defendant was prescribed five milligrams of donepezil (Aricept) daily for the condition. (*Id.*, Ex. 4 at 5.)

### 2. *Dr. Pogos Voskanian*

At the Court's request, Pogos Voskanian, M.D., a forensic psychiatrist, conducted a second psychiatric and mental competency evaluation, the results of which are provided in a report dated July 1, 2015. (Voskanian Rept.) His evaluation of Defendant took place on June 26, 2015, and lasted approximately four hours. (*Id.* at 1.) Prior to his examination, Dr. Voskanian reviewed his previous report, dated September 15, 2014, records from FMC Carswell, and the exhibits attached to Defendant's Submission of Supplemental Information Regarding Competency to Stand Trial. (*Id.*)

Dr. Voskanian opined:

> [A]t the time of the examination, [Defendant] was able to understand the proceedings against her and was able to competently argue that she is incompetent to stand trial, that she was able to understand the proceedings against her, was able [to] assist her attorney[s] in her defense with a reasonable degree of rational understanding and, therefore she is competent to stand trial.

(*Id.* at 3.) Dr. Voskanian concluded that Defendant was experiencing some memory problems, and reasoned that as a result of this "likely age-related forgetfulness," Defendant would not be able to represent herself *pro se*. (*Id.*) Alternatively, he opined, Defendant's memory difficulties could stem from trauma she experienced at a younger age, which causes her to "dissociate[]" from stressful situations, such as her criminal case. (*Id.* at 33.) Dr. Voskanian believes that Defendant's memory difficulties do not substantially impair her competency to stand trial. (*Id.*)

With regard to an appreciation of the charges against her, Defendant stated that she was being accused of "'stealing money,'" but did not know much beyond that. (*Id.* at 22.) However,

when she was reminded that she was able to explain the meaning of wire fraud charges earlier in the interview, Defendant asserted that Dr. Voskanian was "writing too much." (*Id.*) As to the meaning of conspiracy, Defendant explained that it is to "associate with somebody else when you are doing wrong." (*Id.* at 23.) When asked about the roles of various courtroom personnel, Defendant responded that her case is being retried because "3 jurors [] acquitted her." (*Id.* at 24.) In addition, Defendant stated that the U.S. Attorney was responsible for "bring[ing] up charges" against her (*id.* at 23), and that the role of a defense attorney is "to find evidence on her behalf" (*id.* at 24). Defendant asserted that she did not know the difference between a judge and a jury, but Dr. Voskanian stated that her response seemed "sarcastic." (*Id.* at 25.) Defendant understood the concept of plea bargaining as making "a deal" to "get it behind" her. (*Id.*) Although Defendant stated that she did not know many of the legal concepts that she was asked to describe, Dr. Voskanian concluded that "she was able to understand the proceedings against her." (*Id.* at 3.)

As to her ability to assist in her defense, Defendant stated "that she does not recall any details" of the events surrounding the case against her and that her attorneys cannot help her with such details. (*Id.* at 26.) Dr. Voskanian reported that Defendant emphasized certain details related to her defense when speaking about her previous trial. (*Id.*) However, few specific details are provided in the report. Part of the issue, Defendant explained, is "figur[ing] out what is an important detail and what is not important." (*Id.* at 27.) Defendant stated that she has "stacks of paperwork in her house," but doesn't know how to help her attorneys with this "crap." (*Id.* at 26.)

Dr. Voskanian reported that Defendant "chose when to cooperate with the interview, noting that Defendant would not answer some of his questions by stating that she "'knew'" the

answers "during [the] first interview[,] but doesn't know [them] now."  (*Id.* at 35.)  Defendant expressed the opinion that she was not competent to stand trial because, if asked, "she wouldn't know if [she] committed a crime."  (*Id.* at 28.)  He concluded that, although Defendant "may have a Mild Neurocognitive Disorder, her presentation . . . did not remotely suggest incompetence to stand trial."  (*Id.* at 35.)

Dr. Voskanian "would not embark on an interpretation" of Defendant's test results from the Cleveland Clinic.  (*Id.*)  However, he did note that Cleveland Clinic MRI findings did mention that she was diagnosed with Alzheimer's disease.  (*Id.* at 34.)  Dr. Voskanian postulated that Defendant may be exaggerating her symptoms, as "memory is one of the easiest mental properties to malinger."[6]  (*Id.* (internal quotations omitted).)

### 3. *Dr. Stephen Mechanick*

At defense counsel's request, Dr. Stephen Mechanick, a forensic psychiatrist, reviewed the Cleveland Clinic medical records.  Upon reviewing Defendant's performance on the MoCA, Dr. Pillai's observations, Dr. Bonner-Jackson's neuropsychological evaluation and diagnostic test results, Dr. Mechanick reaffirmed his finding that Defendant has Alzheimer's dementia.  (Def.'s Suppl. Submission 1-2, Ex. 6 at 4.)  He concluded that based on the progressive nature of the disease, "it is likely that [Defendant's] capacity to stand trial has become more compromised since [he] last evaluated her."  (*Id.*)

On July 10, 2015, Dr. Mechanick issued another report based, in part, upon a second meeting with Defendant that lasted approximately one and a half hours.  (Mechanick Rept., on

_____

[6] It is unclear whether Dr. Voskanian administered a second Mini-Mental State Examination ("MMSE") during his June 26, 2015 meeting with Defendant.  Although he does provide new responses to some of the tasks associated with the measure, a new raw score for the measure is not provided.

file with the Court.) The report is based upon a review of counsel's affidavits, Dr. Voskanian's July 1, 2015 report, an interview with Defendant's husband, and all previous reports. (*Id.*)

Dr. Mechanick noted that during the meeting with Defendant, her thought processes were "moderately disorganized," and her speech was often circumstantial and tangential. (*Id.* at 13.) In addition, he noted that she has memory problems that "impair her ability to remember what she and others have said." (*Id.*) Dr. Mechanick once again asserted that Defendant is not competent to stand trial and that her problems in thinking stem from her diagnosis of Alzheimer's disease. (*Id.* at 14.) He stated that her condition will continue to "progressively worsen over the upcoming months . . . ." (*Id.*) In support of these claims, he noted that Defendant did not know the current date, she could not remember the town in which they met, nor could she list U.S. presidents in reverse chronological order (*id.* at 8), and that this "was worse than her performance at Dr. Voskanian's prior examination" (*id.* at 11).

As to understanding the nature and consequences of her impending trial, Dr. Mechanick stated that Defendant was "unable to provide a reasonably detailed account of what led to her charges, or what happened at her first trial." (*Id.* at 13.) Defendant asserted that the Government "'make[s] up things to get rid of you'" (*id.* at 2), and that she could not reasonably assess the possibility of conviction because she thought she was "'100% likely to be found innocent'" (*id.* at 13). In addition, she repeatedly contended that the charges against her stem from the Government's assertion that she did not have "permission" to operate the school programs in which she was involved. (*See id.* 2-3.) Dr. Mechanick pointed out that Defendant could not provide Dr. Voskanian with an explanation as to how or why the charges of obstructing justice or witness tampering applied to her, and that this provides further evidence that Defendant does not have an appreciation of the charges with which she is faced. (*Id.* at 12.)

In addition to concluding that Defendant is unable to understand the proceedings against her, Dr. Mechanick opined that Defendant "is incapable of planning legal strategy, providing meaningful and accurate testimony, and/or assisting in cross-examination of witnesses." (*Id.* at 13.) His report suggests that Defendant believes that if she were to take a plea bargain, she would be able to "go on her merry way." (*Id.*) Defendant also made reference to new documents that will prove her innocence, but was unable to identify specifically which new documents she had found. (*Id.* at 6.) Dr. Mechanick reported that Defendant's own views of her memory and other cognitive impairments affect her ability to weigh the benefits and risks of taking the stand in her own defense. (*Id.* at 13.)

In addition to his interview with Defendant, Dr. Mechanick sought collateral information from Defendant's husband. (*See Id.* 9-10.) Defendant's husband reported that Defendant's memory has "gotten worse in the past year." (*Id.* at 9.) He stated that his wife had difficulty remembering things from her meetings with her lawyers, "and she argues with him when he tells her things about those meetings." (*Id.*) He asserted that Defendant "finds things that she thinks are important and that she believes were not seen before; however, he recognizes these as papers that her lawyer already saw . . . ." (*Id.*)

In his review of Dr. Voskanian's report, Dr. Mechanick pointed out statements that he believes support his findings of Defendant's incompetency to stand trial. He noted that during the interview with Dr. Voskanian, Defendant did not "provide him with a reasonable and accurate account of the facts that led to her arrest, how many charges she faces, or the nature of those charges." (*Id.* at 12.) He also pointed out that Defendant made statements to Dr. Voskanian indicating that she believed she was seeing him for treatment rather than for a competency evaluation. (*Id.* at 11.)

With regard to Cleveland Clinic findings, Dr. Mechanick indicated that Defendant's MoCA score of 11 indicates that she is functioning within the lower range of someone with Alzheimer's dementia and well below the range of cognitive impairment. (*Id.* at 10.) He indicated that, although MRI reports do not demonstrate neurodegeneration, "MRI studies are used to rule out other causes of dementia, but are not useful for diagnosing Alzheimer's disease." (*Id.* at 11.) Dr. Mechanick again concluded that Defendant's current psychiatric condition renders her incompetent to stand trial. (*Id.* at 14.)

### 4.     *Dr. Susan E. Rushing*

On August 12, 2015, at the request of the Government, Susan E. Rushing, a forensic psychiatrist and licensed attorney, issued a report as to her findings regarding Defendant's competency to stand trial. (Rushing Rept.) Her conclusions are based upon a July 27, 2015 interview with Defendant, newly administered tests, a review of all past reports and relevant medical records, and collateral interviews with Greg Miller (Defendant's counsel), Defendant's husband, and treatment providers at the Cleveland Clinic. (*Id.* at 1-2.)

Defendant was reportedly late to the examination, stating that she had become lost while driving to Dr. Rushing's office from her home in Haverford, Pennsylvania. (*Id.* at 5.) Dr. Rushing indicated that Defendant appeared "anxious" at first, but "calmed within a few minutes." (*Id.*) She was reportedly "cooperative" during the interview, but "[m]any of her responses were only marginally related to the questions asked." (*Id.*) Defendant's insight was said to be "poor" and her judgment "limited." (*Id.*)

Dr. Rushing's report relies heavily upon her findings from the McGarry Scales, a screening instrument used by forensic assessors to determine competency for trial. (*See id.* at 6-14.) The tool allows a testing psychiatrist to assign levels of impairment, ranging from "not

impaired" to "severe impairment," in a total of thirteen domains associated with competency to stand trial. In summary, Dr. Rushing's McGarry findings are as follows:

**Ability to appraise the legal defenses available.** Dr. Rushing concluded that Defendant was not impaired on this element, as Defendant expressed that she would pursue a legal defense of "'innocence'" by "'bringing in the documents and use papers to disprove'" adverse witnesses. (*Id.* at 7.)

**Level of manageable behavior.** Dr. Rushing determined that Defendant was mildly impaired on this element, as Defendant "tended to be long-winded and tangential" when answering questions. Additionally, she noted that at times Defendant gave wrong information to such things as dates and locations without awareness of her errors. (*Id.*)

**Quality of relating to attorney.** Defendant was identified as not impaired on this element, as she identified "'Mr. Miller'" as her attorney and expressed that she "'trust[ed] him to do the best he can do.'" (*Id.)*

**Ability to plan legal strategy.** Dr. Rushing concluded that Defendant was severely impaired on this element. (*Id.* at 9.) Here, Dr. Rushing noted that Defendant demonstrated "substantial deficits recalling names and dates." (*Id.* at 8.) In addition, Defendant could neither adequately differentiate between the four charter schools with which she was involved, nor explain her role at the schools. (*Id.*) When asked about mounting a successful defense, Defendant went on tangents describing the long hours she worked and the awards with which she had been honored. (*Id.*) Dr. Rushing noted that Defendant believed that she had found new exculpatory documents, but Defendant's attorney notified her that the documents had already been discovered and admitted in the preceding trial. (*Id.*)

**Ability to appraise the role of participants in the court room.**  Defendant was deemed not impaired on this element, as she was able to identify the roles of the judge, jury, and both prosecuting and defense attorneys with clarity and specificity.  (*Id.* at 9.)

**Understanding of court procedures.**  Defendant was identified as moderately impaired on this element.  (*Id.*)  Defendant understood that she had the right to take the witness stand, but when asked about what happened during her previous trial, she became "fixated on the fact that some African American jurors had voted for her and some against her."  (*Id.*)  Dr. Rushing noted that she tied the racial makeup of the jury "to the need for a re-trial."  (*Id.*)

**Appreciation of the charges.**  Dr. Rushing concluded that Defendant was mildly impaired on this element.  (*Id.* at 11.)  When asked what she was charged with, Dr. Rushing asserted that Defendant's answers "were long and tangential."  (*Id.* at 10.)  She further noted that Defendant "incorporated [relevant] information but not in a logical, coherent manner," especially when responding to open-ended questions.  (*Id.*)  She discussed various school employees and how they reacted to events surrounding the investigation.  (*Id.*)  When asked about specific charges, Defendant again talked about the long hours that she worked and about permission she had received from "the board" with regard to her income.  (*Id.* at 11.)

**Appreciation of the range and nature of the penalties.**  Defendant was identified as being severely impaired on this element.  (*Id.*)  Dr. Rushing reported that Defendant did not recall that she could face jail if convicted.  (*Id.*)  Furthermore, she did not have an appreciation of the monetary implications of a guilty verdict.  She stated that the Government "'charge[s] people a lot of money,'" but that Defendant could not pay the money because "'we have to pay a lot of bills.'"  (*Id.*)

**Ability to appraise the likely outcome.**  Dr. Rushing concluded that Defendant was moderately impaired on this element.  (*Id.* at 12.)  Here, Defendant asserted that she would not take a plea deal and that she will be found not guilty in her retrial.  (*Id.*)  However, when asked what would happen if she were to be found guilty, she again went on a tangent about the racial makeup of the jury in her previous trial, stating "'[t]he last time people voted, there were 5 blacks.'"  (*Id.*)

**Capacity to disclose to the attorney available pertinent facts surrounding the offense.**  (*Id.*)  Dr. Rushing found Defendant severely impaired on this element.  Again it was indicated that Defendant had difficulty remembering names, dates, and places.  (*Id.*)  Dr. Rushing stated that Defendant "confused information" about the various schools with which she was involved.  (*Id.*)  In addition, information that Defendant believed to be correct was often incorrect, as she misstated ages of people and the locations of various places without realizing her errors.  (*Id.*)  Dr. Rushing concluded that any information that Defendant did provide to her attorneys would be suspect and "unreliable."  (*Id.*)

**Capacity to challenge prosecution witnesses realistically.**  Defendant was deemed severely impaired on this element because of her difficulties in remembering dates, meeting content, and who attended such meetings.  (*Id.*)

**Capacity to testify relevantly.**  Defendant was identified as being severely impaired on this element.  (*Id.* at 14.)  Dr. Rushing again pointed to Defendant's difficulties in recalling names and dates as evidence that Defendant could not reliably take the witness stand on her own behalf.  (*Id.*)  In addition to memory issues, Dr. Rushing noted that Defendant shared information containing "paranoid content," which would hinder her ability to testify relevantly.  (*Id.*)  She

stated that Defendant "believed that she was being prosecuted due to the fact that she is African American" and that "her prosecution was tied to former Governor Ed Rendell." (*Id.*)

**Manifestation of self-serving or self-defeating motivation.** Dr. Rushing found Defendant moderately impaired on this element. (*Id.*) As to self-serving motivation, Defendant was said to be "embarrassed by her deficits when she was aware of them," but often thinks she is performing more accurately on tasks, such as the MoCA, than her actual performance indicates. (*Id.*) As to self-defeating motivation, Dr. Rushing noted that Defendant is "very anxious" and sleeps poorly at night. (*Id.*)

In addition to utilizing the McGarry Scales, Dr. Rushing administered the MoCA version 7.2 to Defendant, which is reportedly an alternative version from that administered by the Cleveland Clinic (version 7.1). (*Id.* at 6.) Defendant received a score of 13, which placed her in the clinical range for patients diagnosed with dementia. (*Id.*) Dr. Rushing reported that Defendant "displayed deficits in visuospatial and executive function, on measures of attention, naming, language fluency, abstraction and delayed recall." (*Id.*) She was said to be oriented to person and place, but not to date. (*Id.*)

Based upon her evaluation of Defendant and collateral sources of information, Dr. Rushing opined that Defendant is experiencing a level of cognitive impairment that is "not [] consistent with normal-age related memory impairment." (*Id.* at 14-15.) Even though she could not rule out that anxiety, sleep deprivation, and medication side effects are contributing to Defendant's memory issues, Dr. Rushing determined that Alzheimer's type dementia is the primary cause of Defendant's cognitive impairments. (*Id.* at 15.) Dr. Rushing concluded that Defendant's "memory deficits cause her to be unable to maintain a rational and factual understanding of the proceedings against her." (*Id.* at 16.) She offered the opinion to a

reasonable degree of medical certainty that Dr. Brown is unable to consult with her attorneys with a reasonable degree of rational understanding due to Alzheimer's type dementia and that her memory deficits cause her to be unable to maintain a rational and factual understanding of the proceedings against her. (*Id.*)

## B. Attorney Affidavits

On June 8, 2015, Defendant's counsel, Gregory P. Miller and Richard Haggerty, filed affidavits with the Court. Miller and Haggerty both believe that Defendant does not have the ability to rationally evaluate her legal options and meaningfully participate in her defense. (Miller Aff.; Haggerty Aff.)

### 1. *Gregory P. Miller, Esq.*

In Mr. Miller's affidavit, he stated that, although Defendant had exhibited some memory impairment during her previous trial, it was not until July 10, 2014, that he and Mr. Haggerty first became concerned that Defendant was not competent to stand trial. (Miller Aff. ¶¶ 5-10.) He reported that on this date he met with Defendant and that "[s]he was confused, showed little recall of what had occurred during the first trial, and made statements about the case that appeared to be incoherent and irrational." (*Id.* at ¶ 10.) It was based upon these concerns that Mr. Miller asked Defendant to meet with the larger team of attorneys that were representing her in the Government's case. (*Id.*) Miller asserted that during the July 24, 2014 meeting with each team member, Defendant was "unable to recall specifics about the charges that remained against her, the charges upon which she was acquitted, and the related penalties." (*Id.* at ¶ 11) According to Miller, each member of his team expressed concerns about Defendant's competency. (*Id.*) As a result, he referred Defendant for a mental and legal capacity evaluation, and requested that this Court conduct a competency hearing. (*See id.* at ¶¶ 12-15.)

After we found Defendant competent to stand retrial (*see* ECF Nos. 380-81), Miller again met with Defendant to plan an overall strategy for the retrial.  (Miller Aff. ¶ 23.)  Miller submitted notes purportedly taken by Defendant (Miller Aff., Ex. A) during this June 11, 2015 meeting, which he states do not accurately reflect the information discussed during the meeting "in any substantive way."  (Miller Aff. ¶ 23.)  The submitted notes consist of two pages of what appears to be mostly names and dates.  (*See* Miller Aff., Ex. A.)  Miller asserted that he utilized the recommendations from FMC Carswell doctors when speaking with Defendant about her case.  (Miller Aff. ¶ 24.)  He stated that despite trying to implement the suggested techniques, Defendant was unable "to recall any specifics about [] documents that were shown to her or individual witnesses' testimony" presented during the last trial.  (*Id.* at ¶ 25.)

On June 17, 2015, Miller again met with Defendant.  (*Id.* at ¶ 26.)  Miller reported that Defendant remembered that they recently met to discuss her case, but could not remember specific details from meeting conversations.  (*Id.*)  In addition, he stated that when asked to recall a meeting discussed in trial testimony, Defendant "provided a rambling, incoherent, and nonresponsive answer that ended with her inability to recall the original question."  (*Id.* at ¶ 28.)  Finally, when asked about helpful and harmful witnesses during her previous trial, Miller asserted that Defendant could identify several witnesses, but could not recall specifics about their testimony and gave "long rambling discussion[s]" about the effect of such testimony.  (*Id.* at ¶ 29.)

### 2.    Richard M. Haggerty, Esq.

In Mr. Haggerty's affidavit, he stated that during the July 10, 2014 meeting, Defendant's "cognition had appeared to decline precipitously from the end of the first trial."  (Haggerty Aff. ¶ 7.)  He asserted that goals for the meeting were not accomplished and that Defendant's

comments "were incoherent and completely unrelated to either the facts of the case or the upcoming retrial." (*Id.*)  As to the July 24, 2014 meeting, Haggerty stated that Defendant "was unable to focus on the [presented] issues" and "could not remember evidence and testimony from the first trial." (*Id.* at ¶ 8.)

Haggerty reported that after the Court's April 18, 2015 competency finding, Defendant's condition worsened. (*Id.* at ¶ 8.)  He offered a May 19, 2015 phone conversation to substantiate this assertion, stating that Defendant "sounded very confused" during the phone call, and at times made "no sense." (*Id.* at ¶ 9.)   Haggerty described Defendant's responses to open ended questions during June 11 and 17, 2015 meetings as "incoherent" (*id.* at ¶ 11) and "unintelligible" (*id.* at ¶ 13).  He asserted that when asked to remember specific testimony from her previous trial, Defendant "responded with a rambling, unrelated story about another person who was not a witness at the first trial." (*Id.* at ¶ 13.)

### C.    Defendant's Competency to Stand Trial

Initially we must determine whether Defendant is presently suffering from a mental disease or defect. *See* 18 U.S.C. § 4241(d).  Every expert who has evaluated Defendant has concluded that she is experiencing some level of cognitive impairment. (*See, e.g.*, Cleveland Clinic Rept., Ex. 4 at 2 ("Neuropsychological evaluation revealed prominent impairment in episodic memory and confrontation naming.  Executive functioning was also fairly consistently impaired."); Voskanian Rep. 3 (concluding that Defendant "has some degree of likely age-related forgetfulness and, therefore, would not be able to represent her case pro-se."); Mechanick Rept. 13 ("It is my opinion that [Defendant] lacks sufficient ability . . . to recall facts and details related to the current charges."); Rushing Rept. 16 (concluding that Defendant has "memory deficits [that] cause her to be unable to maintain a rational and factual understanding of the

proceedings against her.").)  Clearly Defendant appears to be experiencing problems with her thinking and her memory.  The question therefore becomes how serious is this cognitive impairment, is it the result of the normal aging process, is it the result of Alzheimer's disease, or is Defendant malingering.

Defendant is facing serious criminal charges.  This of course provides a motivation for Defendant to exaggerate the severity of her symptoms.  The testing that was done on Defendant reveals that estimates of her pre-morbid intellectual functioning are extremely low for someone who has achieved such high academic and professional success.  (*See* Cleveland Clinic Rept., Ex. 4 ("Based on her educational and occupational attainment, the [Defendant's] baseline functioning is expected to be in the high average to superior range (e.g., about 115-125), although her performance on an estimate of premorbid function from this evaluation (i.e., single word reading) was significantly lower."); *see also* Malamut Rept. 9, Jan. 30 Hr'g, Def. Ex. 2A (finding that Defendant achieved a standard score of 97 (42nd percentile) on the Test of Premorbid Functioning).)  However, during the course of Defendant's extensive testing, malingering measures and embedded measures sensitive to malingering did not support the conclusion that Defendant is feigning her memory impairment.  Defendant demonstrated adequate effort on the Test of Memory Malingering ("TOMM") and on other malingering measures embedded in neuropsychological tests administered by Dr. Malamut.  (Jan. 30 Hr'g Tr. 47-49.)  In addition, Defendant's Personality Assessment Inventory ("PAI") results indicate that "she did not engage in significant positive or negative impression management."  (Carswell Rept. 8, Jan. 30 Hr'g, Gov't Ex. 1.)[7]  Therefore, notwithstanding a motive to feign memory

---

[7] The PAI negative impression management scale ("NIM") has been identified as an empirically supported malingering screening measure.  *See* Marcus T. Boccaccini, Daniel C. Murrie, & Scott A. Duncan, *Screening for Malingering in a Criminal-Forensic Sample with the*

impairments, we conclude that Defendant's results on standardized measures and qualitative interview data are an accurate depiction of her current cognitive functioning.

Doctors, including the Government's expert, Dr. Rushing, have concluded that Defendant's performance across many of the assessed domains indicates that she suffers from dementia. The Cleveland Clinic doctors concluded that Defendant's ApoE genotype and amyloid-beta peptide (1-42), total tau, and phospho-tau protein levels provide a firm basis upon which to conclude that Alzheimer's disease is the likely cause of her dementia. The Government does not dispute this diagnosis.

The inquiry does not end with a finding that Defendant is suffering from a mental disease or defect. We must determine whether Defendant has a rational understanding of the proceedings against her and whether she can reasonably assist in her own defense. It seems clear that Defendant understands the general nature of the charges against her, the roles of the participants in the criminal justice system, the purpose and nature of a plea and the difference between a plea and a trial. Defendant also has a basic understanding of her constitutional rights. However, the record indicates that Defendant does not have the current ability to direct her attorneys as to her wishes, consider her attorney's advice, and rationally evaluate possible courses of action. The determination of Defendant's competency to stand trial must be supported by "a credible evidentiary basis" and must have a "rational relationship to the supporting data." *United States v. Louis*, 596 F. App'x 167, 171 (3d Cir. 2015) (citation omitted). Neuropsychological testing completed at the Cleveland Clinic revealed that Defendant was performing within the Borderline to Extremely Low range of functioning in learning, recall,

---

*Personality Assessment Inventory*, 18.4 PSYCHOLOGICAL ASSESSMENT 415, 420 (2006) ("Although NIM and [Malingering] MAL both demonstrated large effect sizes (AUC values of .88 and .81, respectively) for identifying malingerers, the effect size for NIM was clearly larger.").

and recognition memory tasks, as well as in areas of executive functioning and language skills. (Cleveland Clinic Rept., Ex. 5.)  Dr. Mechanick found that Defendant "is incapable of planning legal strategy, providing meaningful and accurate testimony, and/or assisting in cross-examination of witnesses."  (Mechanick Rept. 13.)  Dr. Rushing concluded that Defendant was severely impaired in her ability to plan a legal strategy, noting that Defendant's train of thought "was difficult to follow" and that she demonstrated "substantial deficits recalling names and dates."  (Rushing Rept, 8-9.)  Even Dr. Voskanian concluded that Defendant would not be able to represent herself.  In addition, Defendant's counsel, Gregory Miller, advised that Defendant made statements about her case "that appeared to be incoherent and irrational."  (Miller Aff. ¶ 10.)  And attorney Richard Haggerty described Defendant's responses to open ended questions as "unintelligible."  (Haggerty Aff. ¶ 13.)

The clinical interviews, the quantitative and qualitative testing data, and the attorney affidavits lead us to conclude that Defendant is suffering from dementia and does not presently have the adequate memory or executive functioning skills to assist her counsel in a meaningful way.

It is the Government's burden to establish that Defendant is competent to stand trial. *See Louis*, 596 F. App'x at 171 ("The Government has the burden of proving a defendant's competency by a preponderance of the evidence . . . ." (citation omitted).).  The Government's expert, Dr. Rushing, advises that Defendant does not have the present ability to consult with her attorneys with a reasonable degree of rational understanding.  The Government concedes that Defendant is not competent to stand trial.  The Government has concluded "that it is in the interests of justice to dismiss the indictment against defendant Brown due to her mental condition."  (Gov't Unopposed Mot. ¶ 4.)  The Government also advises that "it does not

believe that defendant Brown will be competent to stand trial at any point in the near future, if ever." (*Id.*) Based upon the medical records, the opinions of the experts, and the affidavits of counsel, we are compelled to agree with the Government. Defendant Dorothy June Brown is not competent to stand trial. *See, e.g., United States v. Goodson*, 204 F.3d 508, 512 (4th Cir. 2000) ("[T]he court must grant the government's Rule 48(a) motion [to dismiss the indictment] unless the court concludes that to grant it would be clearly contrary to manifest public interest, determined by whether the prosecutor's motion to dismiss was made in bad faith."); *United States v. Mastronardo*, No. 12-388-16, 2015 WL 3796012, at *1 (E.D. Pa. June 18, 2015) ("[A] court may deny a government motion to dismiss an indictment only when . . . the prosecutor appears motivated by bribery, animus towards the victim, or a desire to attend a social event rather than a trial." (citation omitted)); *see also In re Richards*, 213 F.3d 773, 786 (3d Cir. 2000) (noting that a district court's refusal to dismiss an indictment "is appropriate only in the rarest of cases"). Moreover, it is apparent that committing Defendant to the custody of the Attorney General for competency restoration would serve no practical or legal purpose.

## IV.  CONCLUSION

For these reasons, we conclude that Defendant is not competent to stand trial. The Unopposed Motion to Dismiss the Superseding Indictment Against Defendant Dorothy June Brown Without Prejudice will be granted.

An appropriate Order follows.

BY THE COURT:

_____

**R. BARCLAY SURRICK, J.**